UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LA UNIÓN DEL PUEBLO ENTERO; TEXAS
SENATE HISPANIC CAUCUS; TEXAS
HOUSE OF REPRESENTATIVES MEXICAN
AMERICAN LEGISLATIVE CAUCUS;
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT; CALIFORNIA
LATINO LEGISLATIVE CAUCUS;
COALITION FOR HUMANE IMMIGRANT
RIGHTS; DOLORES HUERTA
FOUNDATION; MI FAMILIA VOTA
EDUCATION FUND; SOMOS UN PUEBLO
UNIDO; GEORGIA ASSOCIATION OF
LATINO ELECTED OFFICIALS; LABOR
COUNCIL FOR LATIN AMERICAN
ADVANCEMENT; PROMISE ARIZONA; EL
PUEBLO, INC.; MARYLAND LEGISLATIVE
LATINO CAUCUS; ASIAN AMERICANS
ADVANCING JUSTICE-CHICAGO; ASIA
SERVICES IN ACTION, INC.; MINKWON
CENTER FOR COMMUNITY ACTION, INC.;
CHELSEA COLLABORATIVE; CHICANOS
POR LA CAUSA; LATINO COMMUNITY
FUND OF WASHINGTON; ARIZONA
LATINO LEGISLATIVE CAUCUS; GENE
WU; and JUANITA VALDEZ-COX;

                        *Plaintiffs*,
     v.

WILBUR L. ROSS, sued in his official capacity
as U.S. Secretary of Commerce;

RON JARMIN, sued in his official capacity as
Performing the Non-Exclusive Functions and
Duties of the Director, U.S. Census Bureau;

U.S. DEPARTMENT OF COMMERCE; and

U.S. CENSUS BUREAU;

                        *Defendants*.

Civil Action No.   8:18-cv-1570

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1

**COMPLAINT**

**INTRODUCTION**

1.      On March 26, 2018, U.S. Department of Commerce Secretary Wilbur Ross directed the Census Bureau to add a citizenship question to the 2020 decennial Census questionnaire and to collect federal and state administrative records for verification of Census respondent information on citizenship.  The addition of a citizenship question to the decennial Census survey sent to every household in the country will result in an undercount of Latinos, Asian Americans, immigrants, and other hard-to-count populations and will compromise the overall accuracy of the Census.

2.      Plaintiffs seek declaratory and injunctive relief in order to preserve the integrity of the decennial Census and prevent Defendants from violating the equal protection guarantee and Apportionment and Enumeration Clauses of the U.S. Constitution as well as the federal Administrative Procedure Act ("APA").

**PARTIES**

*Plaintiffs*

3.      Plaintiff La Union del Pueblo Entero ("LUPE") is a nonprofit membership organization founded by labor rights activists César Chávez and Dolores Huerta.  LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement.  To promote civic engagement in the communities it serves, LUPE conducts know-your-rights discussions and membership meetings, participates in issue-focused advocacy, connects its members to social services, conducts Census outreach, and conducts voter registration, education, and non-partisan get-out-the-vote campaigns.  LUPE

relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, service delivery, and advocacy.

4.      LUPE is headquartered in San Juan, Texas, and its members primarily reside in Hidalgo, Cameron, Willacy, and Starr Counties, Texas.   LUPE has over 8,000 members, including Latinos, U.S. citizens, and non-U.S. citizens.   Some LUPE members are immigrants not authorized to be present in the United States.   LUPE has members that live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Texas and the United States.

5.      LUPE's membership includes individuals that use programs and services whose funding is distributed based on Census data.   For example, LUPE's members receive and rely on funds from Medicaid, Medicare, Supplemental Nutrition Assistance Program ("SNAP"), Supplemental Nutrition for Women, Infants, and Children ("WIC"), and Section 8 Housing voucher programs.   LUPE's membership includes individuals whose children attend Title I schools and schools that receive federal special education grants.   LUPE's membership also includes individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

6.      Prior to the 2010 Census, LUPE provided feedback to national and regional Census officials on the draft Census questionnaire and proposed solutions to operational problems.   LUPE provided recommendations to the Census Bureau about residents in Texas *colonias*—low income, unincorporated communities in rural areas that lack access to basic municipal infrastructure and services—that the Census Bureau could hire to mitigate an undercount in the *colonias*.   LUPE also implemented an outreach plan in which its members distributed community education materials about the Census to residents of Texas's *colonias*,

where many non-U.S. citizens live.  For example, LUPE produced flyers designed to mitigate an undercount caused by the wariness that many undocumented residents feel when they encounter government workers.  As part of its advocacy efforts, LUPE has lobbied the Census Bureau to open a local Census office in Hidalgo County.

7.      In preparation for the 2020 Census, LUPE employees and members serve on Hidalgo County's Census Coalition Committee to mitigate the historic undercount of the Latino, non-U.S. citizen, and rural populations in the Rio Grande Valley.  As a member of that coalition, LUPE works to strengthen the trust between LUPE's members and government workers.

8.      Plaintiff Dolores Huerta Foundation ("DHF"), founded by civil rights leader Dolores Huerta, is a direct action organization and training center for community organizing, leadership development, and policy advocacy.  DHF's mission is to organize and empower communities to pursue social justice through systemic and structural transformation.  To promote civic engagement in the communities it serves, DHF hosts candidate fora and conducts Census outreach, voter registration, voter education, and get-out-the-vote campaigns.  DHF conducts its organizing work through the implementation of a community organizing model that engages residents in California's Central Valley in a process to determine and prioritize their community needs, trains them to speak directly with organizational leaders and public officials, and provides them with a platform to advocate for desired changes.  DHF relies on the accuracy of decennial Census data for purposes of strategic planning, communications, resource allocation, mapping of small rural communities, and advocacy.

9.      DHF is headquartered in Bakersfield, California and serves agricultural communities in California's Central Valley, including the rural communities of Lamont, Arvin, Weedpatch, Greenfield, Bakersfield, California City, Woodlake, Lindsay, Sanger, Parlier, and

the counties of Kern, Tulare, and Fresno.  The local residents DHF serves include Latinos, U.S. citizens, and non-U.S. citizens.  DHF serves some individuals who are immigrants not authorized to be present in the United States.  DHF serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to California and the United States.

10.     DHF serves individuals that use programs and services whose funding is distributed based on Census data.  Some of the individuals that DHF serves receive and rely on funds from Medicaid, Medicare, SNAP, and WIC.  DHF serves individuals with children who participate in the National School Lunch Program and the School Breakfast Program.

11.     In 2010, the U.S. Census Bureau and the California Endowment enlisted the help of DHF to conduct outreach in hard-to-count communities—groups that the Census Bureau identifies as difficult to fully enumerate—within the Central Valley, specifically Latinos, immigrants, residents in rural and agricultural communities, and non-Spanish and non-English speaking indigenous communities.  DHF staff and volunteers canvassed door-to-door to encourage residents to fill out their Census forms.  DHF hosted 15 community presentations, trained 200 volunteers, and knocked on over 3,000 doors.

12.     Because of the addition of the citizenship question to the 2020 decennial Census, DHF will be forced to increase its grassroots organizing of hard-to-count residents and begin its outreach efforts earlier than it did in preparation for the 2010 Census.  DHF plans to increase its grassroots volunteer efforts and trainings to ensure that local community members are engaged in outreach to hard-to-count populations in the Central Valley.

13.     Plaintiff Southwest Voter Registration Education Project ("SVREP") is a nonprofit organization whose mission is to build political power among Latinos and other

minority groups by increasing their participation in the U.S. democratic process.  To achieve that mission, SVREP develops Latino leaders and trains and organizes voters around issues that reflect their values.  To promote civic engagement in the communities it serves, SVREP conducts the following programs: get-out-the-vote; voter registration; voter turnout; and other programs designed to educate voters.  Since it was founded in 1974, SVREP has registered over 2.6 million voters.  SVREP relies on the accuracy of Census data for purposes of strategic planning and communication, resource allocation, service delivery, and advocacy.

14.    SVREP is headquartered in San Antonio, Texas and delivers services to individuals in Arizona, California, Colorado, Nevada, New Mexico, Texas, Utah, Florida, North Carolina, Georgia, Virginia, Washington, Oregon, and Idaho.  SVREP serves Latinos, U.S. citizens, and non-U.S. citizens.  SVREP serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to the population statewide and in United States.

15.    SVREP serves individuals who use programs and services whose funding is based on Census data.  SVREP serves individuals who receive and rely on funds from Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  SVREP serves individuals whose children attend Title I schools and schools that receive federal special education grants. SVREP serves individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

16.    Prior to the 2010 decennial Census, SVREP worked with Latino-serving organizations to raise awareness of the historic undercount of the Latino community and its implications for Latino political power.  SVREP provided Census officials with feedback on the Census questionnaire—particularly on questions of race and ethnicity—and encouraged the

Census Bureau to hire more bilingual workers to better serve the Latino community by addressing the undercount of the Latino population SVREP serves.

17.    In preparation for the 2020 Census, SVREP plans to use its social media platforms to disseminate information to the public about the Census and the addition of the citizenship question.

18.    Plaintiff Mi Familia Vota Education Fund ("MFV") is a national nonprofit organization whose mission is to expand the Latino electorate and increase justice for Latinos through increased civic participation.  To promote civic engagement in the communities it serves, MFV conducts citizenship assistance, voter registration, voter education, Census outreach, get-out-the-vote, and other issue-based campaigns.  MFV relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

19.    MFV is headquartered in Phoenix, Arizona and serves individuals in Arizona, California, Colorado, Florida, Nevada, and Texas.  MFV serves Latinos, U.S. citizens, and non-U.S. citizens.  MFV serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to the states in which MFV is active and the United States.

20.    MFV serves individuals that use programs and services whose funding is based on Census data. Some of the individuals that MFV serves receive and rely on Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  MFV also serves individuals whose children attend Title I schools and schools that receive federal special education grants.  MFV serves individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

21.     During the 2010 Census, MFV conducted door-to-door outreach in Nevada to encourage community members to complete the Census form.  In preparation for the 2020 Census, MFV plans to run door-to-door programs, hold phone banks, and conduct media outreach to educate the public about the citizenship question to promote a complete count of the population.  MFV plans to create educational materials about the Census to raise awareness about the citizenship question.

22.     Plaintiff the Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit membership organization whose mission is to advance the human and civil rights of immigrants and refugees through outreach, education, advocacy, civic engagement, and direct legal services. CHIRLA relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

23.     CHIRLA is headquartered in Los Angeles, California and its members reside throughout California.  CHIRLA has approximately 13,000 members, including Latinos, U.S. citizens, and non-U.S. citizens.  Some CHIRLA members are immigrants not authorized to be present in the U.S.  Many of CHIRLA's members live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to California and the United States.

24.     CHIRLA conducted extensive outreach around the 2010 decennial Census. CHIRLA staff and volunteers canvassed door-to-door, conducted field work, community outreach, community education, and policy efforts to encourage hard-to-count populations to respond to the Census.

25.     In preparation for the 2020 decennial Census, CHIRLA plans to increase its outreach and advocacy efforts.  In light of the addition of the citizenship question, CHIRLA will

be forced to increase the number of staff and volunteers who canvass door-to-door, community outreach, community education, and policy efforts to encourage hard-to-count populations to respond to the 2020 decennial Census.

26.     Plaintiff Georgia Association of Latino Elected Officials ("GALEO") is a nonprofit organization whose mission is to increase Latino civic engagement and Latino leadership in Georgia.   To promote civic engagement in the communities it serves, GALEO conducts leadership programs, citizenship services, voter registration, voter education, Census outreach, know-your-rights, and get-out-the-vote campaigns.   GALEO relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

27.     GALEO is headquartered in Norcross, Georgia and is active across the state. GALEO's membership is predominantly Latino.   GALEO members reside across the state of Georgia, with many in metropolitan Atlanta, Gainesville, Dalton, Savannah, Columbus, Lyons, and in rural areas.   GALEO has members who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Georgia and the United States.

28.     GALEO members regularly drive on public highways and roads in their communities.

29.     In preparation for the 2010 Census, GALEO directed the Georgia Latino Complete Count Committee ("GLCCC"), a committee of over one hundred organizations that worked to ensure a complete count of the Latino population.   GALEO hosted community meetings across the state to promote participation in the 2010 Census.   GALEO also worked with local governments and businesses to promote increased participation in the Census.   GALEO

volunteers canvassed neighborhoods in Latino communities, provided information designed to promote increased participation in the 2010 Census, and stressed that responses to the Census are confidential.  GALEO conducted media outreach through radio, print, and television, and it partnered with Spanish-language media to run public service announcements to increase Latino participation in the Census.

30.     GALEO will lead the GLCCC for the 2020 decennial Census.  In light of the addition of the citizenship question, GALEO plans to increase community meetings, canvass neighborhoods, conduct media outreach, and provide public educational resources to the community about the importance of participation in the Census.

31.     Plaintiff Labor Council for Latin American Advancement ("LCLAA") is a national nonprofit membership organization whose mission is to educate, organize and mobilize Latinos in the labor movement and increase the political influence of Latino workers through civic engagement.  To promote civic engagement in the communities it serves, LCLAA conducts citizenship drives, voter registration, voter education, Census outreach, and get-out-the-vote campaigns.  LCLAA relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

32.     LCLAA is headquartered in Washington, DC and has members and chapters in Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Illinois, Indiana, Kansas, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, Ohio, Pennsylvania, Puerto Rico, Texas, Washington, and Wisconsin.  LCLAA members include Latinos, U.S. citizens, and non-U.S. citizens.  Some LCLAA members are immigrants not authorized to be present in the U.S.  LCLAA has members who live in neighborhoods, cities,

counties and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to the states in which LCLAA is active and the United States.

33.     LCLAA has members who use programs or services with funding distributed based on Census data.  LCLAA's membership includes individuals who receive and rely on funds from Medicaid and Medicare.  LCLAA's membership includes individuals whose children attend Title I schools and participate in the National School Lunch Program and Head Start programs.

34.     For the 2010 decennial Census, LCLAA provided support to its chapters to help Latinos fill out the Census form.  In 2010, LCLAA provided education on the Census at its national convention.  LCLAA urged Latinos to participate in the Census and worked to promote a complete count of the Latino community.  LCLAA's executive director published an opinion article and appeared on television to encourage Latinos to respond to the 2010 Census.

35.     Because of the addition of the citizenship question to the 2020 decennial Census, LCLAA plans to engage in increased public education and outreach efforts.  It will be forced to provide support to its chapters that provide education to the community about the significance of the addition of the citizenship question and the importance of responding to the Census.

36.     Plaintiff Somos Un Pueblo Unido ("Somos") is an immigrant-led nonprofit membership organization whose mission is to promote civic engagement and worker justice by connecting community members to social services, training its members on legislative advocacy and legal rights, and conducting Census outreach, voter registration, get-out-the-vote, and naturalization campaigns.  Somos relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, service delivery, and advocacy.

37.     Somos is headquartered in Santa Fe, New Mexico and its approximately 2,500 members live throughout New Mexico.  Somos members live in at least eight counties in New Mexico, including: Santa Fe, San Juan, Rio Arriba, Chaves, Curry, Roosevelt, Lea, and McKinley.  Somos members include Latinos, U.S. citizens, and non-U.S. citizens.  Some Somos members are immigrants not authorized to be present in the United States.  Somos has members who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to New Mexico and the United States.

38.     Somos has members who use programs and services whose funding is based on Census data.  Somos's membership includes individuals who receive and rely on funds from Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.   Somos's membership includes individuals whose children attend Title I schools and schools that receive federal special education grants.  Somos members include individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

39.     Prior to the 2010 Census, Somos identified potential operational problems for local Census coordinators and offered recommendations on how to reduce the historic undercount of the Latino, immigrant, and rural communities that Somos serves.

40.     In preparation for the 2020 decennial Census, and to promote a full count of the Latino, immigrant, and rural communities that Somos serves, Somos plans to conduct know-your-rights campaigns, weekly radio shows, and outreach through social media, earned media, an email alert system and a text alert system, both of which have approximately 4,000 recipients.

41.     Plaintiff Texas Senate Hispanic Caucus ("SHC") is a nonprofit, nonpartisan organization whose mission is to promote the economic development, health, education, civic

engagement, and civil rights of the Latino communities in Texas.  To achieve its mission, SHC monitors legislation, works to build Latino political power, and elevates the public dialogue on issues that affect the Latino community.  SHC relies on the accuracy of decennial census data for purposes of strategic planning and communication, resource allocation, and advocacy.

42.    SHC is headquartered in Austin, Texas and is comprised of eleven members of the Texas Senate.  SHC includes Latino senators as well as non-Latino senators who represent Latino and majority-minority districts and who support policies important to Latinos in Texas. SHC members have constituents who reside in 46 Texas counties, including: Atascosa, Bastrop, Bee, Bexar, Brewster, Brooks, Caldwell, Cameron, Crockett, Dallas, Dimmit, Duval, Edwards, El Paso, Fort Bend, Frio, Guadalupe, Harris, Hays, Hidalgo, Jim Hogg, Jim Wells, Karnes, Kenedy, Kinney, Kleberg, La Salle, Live Oak, Maverick, McMullen, Medina, Nueces, Pecos, Real, Reeves, San Patricio, Starr, Terrell, Travis, Uvalde, Val Verde, Webb, Willacy, Wilson, Zapata, and Zavala.  Constituents of SHC members include Latinos, U.S. citizens, and non-U.S. citizens.  Some of those constituents are immigrants not authorized to be present in the United States.  Many SHC members and their constituents live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Texas and the United States.

43.    SHC members serve constituents who use programs and services whose funding is based on Census data.  SHC members serve constituents who receive and rely on funds from the Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.   Their constituents include individuals whose children attend Title I schools and schools that receive federal special education grants.  SHC members also serve constituents with children who

participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

44.     Because of the addition of the citizenship question to the 2020 decennial Census, SHC members will be forced to increase Census outreach to their constituents to address the impact of the citizenship question and the importance of achieving an accurate count. SHC has partnered with organizations focused on Latino political access and representation to convene multiple briefings for its members and their staff. SHC members and their staff are involved in building a legislative agenda that provides resources to communities that may receive less funding as a result of a Census undercount. SHC members are working to alleviate their constituents' fears that the Census Bureau will share the citizenship information it gathers with Immigration and Customs Enforcement ("ICE").

45.     Plaintiff Texas House of Representatives Mexican American Legislative Caucus ("MALC") is a nonprofit, nonpartisan organization whose mission is to address issues of particular importance to Latinos across Texas. To achieve its mission, MALC works to build Latino political power, monitors legislation and organizes voting blocs among MALC members on legislation consequential to Latino and immigrant Texans. MALC members sit on all but three committees in the Texas House of Representatives. MALC relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

46.     MALC is headquartered in Austin, Texas and is composed of 41 members of the Texas House of Representatives of any race or ethnicity who represent majority-Latino constituencies. MALC members have constituents who reside in 42 Texas counties, including: Atascosa, Bee, Bexar, Brewster, Brooks, Cameron, Culberson,  Dallas, Dimmit, Duval,El Paso,

Frio, Harris, Hidalgo, Hudspeth, Jeff Davis, Jim Hogg, Jim Wells, Kenedy, Kinney, Kleberg, La Salle, Live Oak, Loving, Maverick, McMullen, Nueces, San Patricio, Starr, Tarrant, Terrell, Travis, Willacy, Uvalde, Val Verde, Webb, Zapata, and Zavala.   MALC primarily conducts its activities in those counties.

47.     MALC members serve constituents that include Latinos, U.S. citizens and non-U.S. citizens.   Some constituents are immigrants not authorized to be present in the United States.   MALC has members and constituents who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Texas and the United States.

48.     MALC members serve constituents who use programs and services whose funding is based on Census data.   MALC members serve constituents who receive and rely on funds from the Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs. Their constituents also include individuals whose children attend Title I schools and schools that receive federal special education grants.   MALC members also serve constituents with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

49.     For the 2010 decennial Census, MALC promoted a complete count of the Latino population of its constituent communities by distributing community outreach materials designed to encourage Latino Texans to accurately complete the Census questionnaire.

50.     In preparation for the 2020 Census, MALC partnered with organizations focused on Latino political access and representation to discuss the risk of a Census undercount as a result of the citizenship question and implemented potential prevention and mitigation strategies. In April 2018, MALC held a Texas Redistricting Forum at the Texas Capitol for legislative staff,

community leaders, and attorneys to discuss the 2020 decennial Census and to educate participants about the consequences of the citizenship question.

51.     Plaintiff California Latino Legislative Caucus ("CLLC") is a nonpartisan organization whose mission is to protect and preserve the rights of Latinos throughout California with a focus on improving the quality of life for California working-class families and integrating immigrant communities into society.  To accomplish its mission, CLLC monitors various legislative issues that affect the Latino community and members often vote as a bloc on consequential legislation for Latino and immigrant Californians.  CLLC relies on the accuracy of decennial Census data to inform its strategic planning, legislative advocacy, and the allocation of state resources.

52.     CLLC is comprised of 25 members of the California State Senate and Assembly and two auxiliary members (constitutional officers), of any race or ethnicity who represent majority-Latino constituencies.  CLLC members represent constituents in 24 counties throughout California, including: Alameda, Colusa, Contra Costa, Fresno, Imperial, Kern, Kings, Lake, Los Angeles, Monterey, Napa, Orange, Riverside, San Benito, San Bernardino, San Diego, San Joaquin, Santa Barbara, Santa Clara, Santa Cruz, Solano, Sonoma, Ventura, and Yolo.  CLLC members and constituents include Latinos, U.S. citizens and non-U.S. citizens.  Some constituents are immigrants not authorized to be present in the U.S.  CLLC has members and constituents who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to California and the United States.

53.     CLLC members serve constituents who use programs and services whose funding is based on Census data.  CLLC members serve constituents who receive and rely on funds from the Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  Their

constituents include individuals whose children attend Title I schools and schools that receive federal special education grants.  CLLC members also serve constituents with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

54.     One of CLLC's highest priorities is to ensure an accurate count of California residents for the 2020 decennial Census.  In response to the addition of a citizenship question to the 2020 Census, CLLC members and their staff are heavily involved in expanding the California budget for Census outreach and advocacy to ensure that there will be adequate funding for activities designed to ensure a complete count.

55.     Plaintiff Promise Arizona ("PAZ") is a nonprofit, faith-based membership organization founded in 2010 in response to the passage of Arizona Senate Bill 1070.  PAZ's mission is to build Latino and immigrant political power to ensure family unity, a path to citizenship, worker protections, and a path to equitable educational opportunities for all immigrants.  To achieve its mission, PAZ promotes civic engagement, provides scholarships to members and other individuals for immigration-related expenses, partners with community colleges to conduct educational and job training programs, conducts youth leadership programs, and provides assistance with applications for immigration relief.  To promote civic engagement, PAZ registers members and individuals to vote, educates members about important voting issues, conducts get-out-the-vote campaigns, and participates in various issue-focused advocacy coalitions.  PAZ relies on the accuracy of decennial Census data for the purposes of strategic planning and communication, resource allocation, and advocacy.

56.     PAZ is headquartered in Phoenix, Arizona.  PAZ has members and serves individuals who primarily reside in Maricopa, Pima, Yuma and Pinal Counties in Arizona.  PAZ

has over 200 members, including Latinos, U.S. citizens, and non-U.S. citizens.  Some PAZ members and some of the individuals PAZ serves are immigrants not authorized to be present in the United States.  PAZ has members and serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Arizona and the United States.

57.     PAZ has membership and serves individuals who use programs and services whose funding is based on Census data.  For example, these individuals receive and rely on funds from Medicaid, Medicare, SNAP, WIC, and Section 8 Housing voucher programs.  PAZ also has members and serves individuals with children that attend Title I schools and who participate in the National School Lunch Program, School Breakfast Program, Head Start and Pell Grant programs.

58.     During the 2010 Census, PAZ's Executive Director, Petra Falcon, conducted media outreach designed to encourage community members to complete the 2010 Census questionnaire.

59.     PAZ is working with national partners to plan a strategy which ensures that Latino and immigrant communities are educated about the importance of the 2020 decennial Census.  PAZ will also host fora on the Census and the citizenship question, conduct media campaigns around the Census and the citizenship question, and organize members and volunteers to canvass door-to-door in the communities PAZ serves to educate community members about the citizenship question and encourage community members to complete the 2020 Census.

60.     Plaintiff Chicanos Por La Causa ("CPLC") is a nonprofit organization founded in 1969.  CPLC's mission is to drive economic and political empowerment in Arizona, and in Nevada and New Mexico through its subsidiary organizations.  To achieve its mission, CPLC

provides a range of direct services to communities in Arizona in the areas of health and human services, housing, education, and economic development, with a focus on individuals and families with low to moderate income levels.  For example, CPLC runs several behavioral health centers throughout Arizona, a domestic violence shelter, an HIV/AIDS program that provides education and supportive services, an emergency aid program, parenting programs, a senior housing and meal program, and a center that provides substance abuse services.  CPLC also runs head start programs, after school programs and extracurricular activities for students, two charter high schools in the Tucson area, and has a subsidiary that provides lending to small businesses, among other programs.

61.     CPLC is headquartered in Phoenix, Arizona and serves individuals who primarily reside in Coconino, Cochise, Maricopa, Pima, and Yuma Counties.  CPLC serves Latinos, U.S. citizens and non-U.S. citizens, some of whom are immigrants not authorized to be present in the U.S.  CPLC serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Arizona and the United States.

62.     CPLC serves individuals that use programs and services whose funding is based on Census data, including programs and services that CPLC provides.  CPLC serves individuals that receive and rely on Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  CPLC also serves individuals whose children attend Title I schools and schools that receive federal special education grants.  CPLC also serves individuals with children who participate in the National School Lunch Program, the School Breakfast Program and Head Start programs.

63.     During the 2010 Census, CPLC ran television spots to encourage communities to complete the Census questionnaire.  CPLC staff assisted households in the Tucson area in filling out Census questionnaires.  CPLC also provided recommendations to the U.S. Census Bureau of individuals throughout Arizona that the Bureau could hire to assist with the 2010 Census.

64.     In preparation for the 2020 Census, CPLC has already started to work on building coalitions to encourage Latinos to complete the Census questionnaire.  CPLC will work with U.S. Census outreach staff to assist in recruiting temporary Census workers.  During the count, CPLC will assist with outreach to the general public in a manner similar to its work in the 2010 census, including television advertisements.  CPLC will also work with community coalitions to educate and engage the community on the importance of participating in the Census and will train key staff to assist individuals in completing Census forms at some facilities.  In addition to these efforts, CPLC also plans to educate other nonprofits as well as community members about the citizenship question.

65.     Plaintiff Arizona Latino Legislative Caucus ("AZLLC") is a nonpartisan organization whose mission is to protect and preserve the rights of Latinos—including Latinos who are immigrants and non-U.S. citizens—throughout Arizona, with a focus on improving the quality of life for Arizona working-class families and integrating immigrant communities into society.  AZLLC members hold strategic leadership positions and promote legislation and policies that directly affect Latinos and immigrants in Arizona.  AZLLC encourages Latinos to engage in the political process through public policy, community events, voter registration, and get-out-the-vote efforts.  AZLLC relies on the accuracy of decennial Census data to inform its strategic planning, legislative advocacy and the allocation of state resources.

66.     AZLLC is comprised of 17 members of the Arizona House and Senate, as well as a communications and outreach liaison.  The members of AZLLC include Latino members as well as members of any race or ethnicity who represent majority-Latino constituencies.  AZLLC members represent constituents in 15 counties throughout Arizona, including: Apache, Cochise, Coconino, Gila, Graham, Greenlee, La Paz, Maricopa, Mohave, Navajo, Pima, Pinal, Santa Cruz, Yavapai, and Yuma.  AZLLC members and constituents include Latinos, U.S. citizens, and non-U.S. citizens.  Some constituents are immigrants not authorized to be present in the U.S.  AZLLC has members and constituents who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Arizona and the United States.

67.     AZLLC members serve constituents who use programs and services whose funding is based on Census data.  AZLLC members serve constituents who receive and rely on funds from the Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  Their constituents include individuals whose children attend Title I schools and schools that receive federal special education grants.  AZLLC members also serve constituents with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

68.     One of AZLLC's highest priorities is to ensure an accurate count of Arizona residents for the 2020 decennial Census.  In response to the addition of a citizenship question to the 2020 Census, AZLLC members and their staff are heavily involved in expanding the Arizona budget for Census outreach and advocacy to ensure that there will be adequate funding for activities designed to ensure a complete count.  AZLLC also holds educational meetings with

nonprofit organizations to provide them with information about the Census to then share with community members across Arizona.

69.     Plaintiff El Pueblo, Inc. ("El Pueblo") is a nonprofit organization whose mission is to build awareness, capacity, and activism in the Latino community in order to achieve political and social change.  To promote civic engagement in the communities it serves, El Pueblo conducts trainings on legislative advocacy and leadership development, voter registration, voter education, Census outreach, know-your-rights, and get-out-the-vote campaigns.  El Pueblo relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

70.     El Pueblo is headquartered in Raleigh, North Carolina, and serves Latinos who live in and around Raleigh and throughout the state.  El Pueblo serves Latinos, U.S. citizens, and non-U.S. citizens.  Some of the individuals El Pueblo serves are immigrants not authorized to be present in the United States.  El Pueblo serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to North Carolina.

71.     El Pueblo serves individuals who use programs and services whose funding is based on Census data.  El Pueblo serves individuals who receive and rely on funds from Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  El Pueblo serves individuals whose children attend Title I schools and schools that receive federal special education grants.  El Pueblo also serves individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

72.     For the 2010 Census, El Pueblo conducted a media campaign to encourage participation in the Census through advertisements in local newspapers, public service

announcements on local Spanish-language news stations, and open letters to the community. El Pueblo also offered support to other local Latino-serving organizations in their efforts to encourage individuals to participate in the 2010 Census.

73.     In preparation for the 2020 Census, El Pueblo plans to engage in media outreach through television and newspapers. It will make the Census part of the focus of its annual La Fiesta del Pueblo, which highlights Latin American culture to foster multicultural understanding and cultural appreciation. El Pueblo is also a part of the North Carolina Counts Coalition, formed to encourage complete participation in the Census.

74.     Plaintiff Maryland Legislative Latino Caucus ("MLLC") is a nonprofit, nonpartisan organization whose mission is to improve the quality of life of Maryland's Latino communities by advocating on their behalf and promoting greater participation in the political affairs of Maryland. MLLC accomplishes its mission by monitoring issues affecting the Latino community, coordinating votes on these issues among themselves and between other caucuses representing communities of color, and engaging with their constituents on a local level to spread awareness of legislative issues that affect Latino communities. MLLC relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy for their constituents who rely on federal funding based on Census data.

75.     MLLC is headquartered in Annapolis, Maryland and is comprised of 25 members of the Maryland State Senate and House of any race or ethnicity who represent majority-Latino constituencies or who are concerned with legislative issues that affect the Latino community. MLLC has members who reside in six Maryland counties and one city: Prince George's, Montgomery, Anne Arundel, Baltimore, Baltimore City, Howard, and Frederick. MLLC primarily conducts its activities in those counties.

76.     MLLC member constituents include individuals who receive and rely on funds from Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  MLLC member constituents also include individuals whose children attend Title I schools and schools that receive federal special education grants.  MLLC member constituents include individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

77.     In response to the addition of a citizenship question Census, MLLC members plan to increase Census outreach in their constituent communities to address the impact of the citizenship question and the importance of achieving an accurate count.  MLLC members and their staff are involved in building a legislative agenda that provides resources to communities that face less funding as a result of a Census undercount.  MLLC members work to break down perceived barriers between their constituents and the government due to fears that citizenship information will be shared with ICE.

78.     Plaintiff Latino Community Fund of Washington ("LCF") is a nonprofit organization whose mission is to invest in the Latino Community to cultivate new leaders, support effective nonprofit organizations, and improve the quality of life for all residents of the State of Washington.  To achieve its mission, LCF: runs the Healthy Latino Families Initiative, through which LCF provides families with free healthcare counseling; connects underrepresented communities with healthcare-related resources, and provides education on environmental justice issues and labor standards; educates and collaborates with other nonprofit organizations to inform the community about important voting issues and to run get-out-the-vote and voter registration campaigns; hosts leadership programs that help participants develop leadership skills to effectively advocate for issues affecting the Latino community in Washington; participates in

issue-based coalitions; provides funds for legal aid, counseling, health, and children and youth programs; and invests funds to improve access to benefits for families.  LCF relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

79.     LCF is headquartered in Seattle, Washington and serves individuals who primarily reside in Yakima, Snohomish, Pierce, and King Counties.  LCF serves Latinos, U.S. citizens, and non-U.S. citizens, some of whom are immigrants not authorized to be present in the U.S.  LCF serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Washington and the United States.

80.     LCF serves individuals who use programs and services whose funding is based on Census data, including, *e.g.*, Medicaid, Medicare, and SNAP.  LCF also serves individuals whose children attend Title I schools.

81.     In preparation for the 2020 Census, LCF is already conducting coalition work around the 2020 Census and the citizenship question, and plans to increase its outreach efforts to the Latino community and run door-to-door programs, hold phone banks, and conduct media outreach to educate the public about the citizenship question to encourage a complete count of the population.

82.     Plaintiff Asian Americans Advancing Justice-Chicago ("Advancing Justice-Chicago") is a pan-Asian, nonprofit organization based in Chicago, Illinois whose mission is to build power through collective advocacy and organizing to achieve racial equity.     Advancing Justice-Chicago works with the Asian American community to develop grassroots leaders, increase civic participation, and mobilize the community to achieve racial equity.  Advancing

Justice-Chicago teaches Asian Americans to share their personal stories, speak up for immigrant rights, and lead the community by practicing solidarity and addressing racial inequity. Advancing Justice-Chicago programs include KINETIC, which engages high school English learners during their ESL classes, and I Speak Power, which assists immigrant and refugee adult English learners. Advancing Justice-Chicago relies on the accuracy of decennial Census data for strategic planning, communications, resource allocation, and advocacy.

83. Advancing Justice-Chicago serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Asian American and non-U.S. citizen populations when compared to Illinois and the United States.

84. Advancing Justice-Chicago conducted extensive outreach and engagement activities for the 2010 Census to help reach hard-to-count populations, including minority language communities, new immigrant communities, and mixed immigration status households. Advancing Justice-Chicago trained 362 staff members at partner organizations and 151 volunteers. Advancing Justice-Chicago conducted Census outreach in Chinese, Korean, Farsi, Khmer, Vietnamese, Hindi, Laotian, Gujarati, Nepali, Urdu, Tagalog, Arabic, and other languages. Advancing Justice-Chicago sent out a multi-lingual postcard that asked Asian Americans to complete and timely mail their decennial Census form to over 6,000 households. Advancing Justice-Chicago developed an English-learner curriculum for use by partner organizations during their 2010 Census outreach activities. Advancing Justice-Chicago drafted newspaper articles and Op-Eds to encourage participation in the 2010 Census, which were often translated for ethnic-language media. Advancing Justice-Chicago drafted and delivered newsletters to its subscribers, as well as to their partner organizations for translation into multiple languages, and reached over 980 households from traditionally undercounted populations.

Advancing Justice-Chicago hosted a "Week of Action" where community partners hosted events to educate community members about the 2010 Census.

85.     Because of the addition of the citizenship question to the 2020 decennial Census, Advancing Justice-Chicago will be forced to increase its outreach efforts and spend additional resources, financially as well as with volunteer and staff time to counteract the negative effects of the addition of the citizenship question.

86.     Plaintiff Asia Services In Action, Inc. ("ASIA") is a nonprofit corporation. Founded in 1995, ASIA's mission is to provide low-income, multilingual, and underserved Asian Americans with culturally and linguistically appropriate access to civic, health, and social services.  To promote civic engagement in the communities it serves, ASIA conducts a statewide civic engagement program which includes voter registration, voter education, and voter turnout. ASIA focuses on reaching underrepresented groups such as young voters, minorities and immigrant voters, and first-time voters.  ASIA relies on the accuracy of decennial Census data for purposes of strategic planning, communications, resource allocation, and advocacy.

87.     ASIA is headquartered in Cleveland, Ohio.  ASIA conducts considerable civic engagement work throughout Ohio, with a particular emphasis in the five economic areas of Ohio with the highest concentrations of Asian Americans, including Dayton, Columbus, Cincinnati, Toledo, and the Cleveland-Akron area.  ASIA serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Asian American and non-U.S. citizen populations when compared to Ohio State.

88.     ASIA serves individuals that use programs and services whose funding is distributed based on Census data.  Some of the individuals that ASIA serves receive and rely on funds from Medicaid, Medicare, SNAP, and WIC.  ASIA serves individuals with children who

participate in the National School Lunch Program, School Breakfast Program, and Head Start programs.

89.     In 2010, ASIA conducted extensive outreach and engagement activities to ensure census participation by hard-to-count communities, including minority language communities, new immigrant communities, and mixed immigration status households.   ASIA distributed subgrants to community organizations serving the Asian American communities in Dayton, Columbus, Toledo, and Cincinnati, and focused on outreach in the Cleveland-Akron area.  ASIA developed a "speakers bureau" where it trained its own staff and volunteers, as well those from other organizations, to conduct 2010 Census outreach at community events.  ASIA spoke about census participation at community centers and events, including at predominantly Korean churches, Burmese ESL classes, and senior housing centers.   ASIA conducted local media outreach such as Op-Eds, developed flyers in Korean and Chinese to promote participation in the 2010 Census.  ASIA also planned and organized community briefings across the state.

90.     Because of the addition of the citizenship question to the decennial Census, ASIA anticipates that it will need to expend additional resources to educate the Asian American community about the privacy protections that cover information collected by the Census.

91.     The MinKwon Center for Community Action, Inc. ("MinKwon") is a nonprofit organization whose mission is to empower the Korean American, Asian American, and immigrant communities to achieve economic and social justice for all.  MinKwon accomplishes this mission through its four program areas: social services, advocacy and community organizing, civic participation, and youth empowerment. MinKwon's program helps the underserved low income, limited English proficient Korean American, Asian American, and

immigrants living in New York City. MinKwon relies on the accuracy of decennial Census data for strategic planning and communication, resource allocation, and advocacy.

92.     MinKwon is headquartered in Flushing, Queens and operates across New York City.  New York City is home to more than 100,000 Korean Americans. There are more than one million Asian Americans in New York City, and nearly 40 percent of the total population is comprised of foreign-born immigrants.  MinKwon serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Asian American and non-U.S. citizen populations when compared to New York and the United States.

93.     MinKwon serves individuals who receive and rely on funds from Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  MinKwon serves individuals whose children attend Title I schools and schools that receive federal special education grants. MinKwon serves individuals with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

94.     To promote civic engagement, MinKwon registered more than 75,000 new voters, conducts extensive nonpartisan voter education efforts, hosts candidate forums, mails voter guides, and canvasses potential voters.  MinKwon is the lead organization and convener of APA VOICE, a coalition of 18 Asian American organizations that work to improve civic participation among Asian Americans.  During the 2017 New York City elections, APA VOICE interacted with more than 90,000 Asian American voters.

95.     MinKwon's civic participation program was heavily involved in promoting participation in the 2010 Census among the Korean and Asian American community.  MinKwon performed a door-knocking campaign in hard-to-count census tracts to encourage residents to mail back the Census and answer questions.  MinKwon's staff and volunteers had the language

capacity to answer questions in Korean, Chinese, and English.  In 2010, MinKwon helped increase response rates from 45 percent to 60 percent in a Census tract with a large Korean population.

96.     In response to the addition of a citizenship question to the 2020 Census, MinKwon will conduct increased efforts for the 2020 Census.  As a result of increased fear among immigrant communities, MinKwon will have to dedicate significant resources to develop materials to educate community members about the citizenship question through workshops, fact sheets, and op-eds in ethnic newspapers.

97.     Plaintiff Chelsea Collaborative is a nonprofit membership organization whose mission is: to address persistent issues of inequity which negatively affect the wellbeing of Chelsea, Massachusetts residents, particularly children, immigrants, and refugees; to improve the social and economic health of the community and its people; and hold institutional decision makers accountable to the community.  Chelsea Collaborative provides leadership development programs, direct services, and leads community organizing efforts on workers' rights, immigrant rights, housing justice, environmental justice, and other issues.  Chelsea Collaborative relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

98.     Chelsea Collaborative is headquartered in Chelsea, Massachusetts and its members reside predominantly in the Chelsea region.  Chelsea Collaborative's membership includes Latinos, U.S. citizens and non-U.S. citizens.  Some Chelsea Collaborative members are immigrants not authorized to be present in the United States.  Many of Chelsea Collaborative members live in a city and in neighborhoods and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Massachusetts and the United States.

99.     The Chelsea Collaborative has members who use programs and services whose funding is based on Census data.  The Chelsea Collaborative has members who receive and rely on funds from Medicaid, Medicare, SNAP, WIC and Section 8 Housing voucher programs.  The Chelsea Collaborative has whose children attend Title I schools and schools that receive federal special education grants.  The Chelsea Collaborative has with children who participate in the National School Lunch Program, School Breakfast Program, Head Start and the Pell Grant programs.

100.    The Chelsea Collaborative conducted outreach for the 2010 decennial Census. The Chelsea Collaborative encouraged community members to apply for decennial Census jobs so that those helping to conduct the Census would be representative of the community and would help establish trust with hard-to-count members of the community.  The Census Bureau hired some of those community members as enumerators.

101.    In response to the addition of the citizenship question to the 2020 decennial Census, the Chelsea Collaborative plans to increase the number of staff and volunteers who will conduct community outreach, community education, and policy efforts to encourage hard-to-count populations to respond to the 2020 decennial Census.

102.    Plaintiff Juanita Valdez-Cox is the executive director and a member of LUPE. She is Latina and resides in Donna, Texas.  Her neighborhood, city, county, and voting district have higher proportions of Latino and non-U.S. citizen populations than the general population in Texas or the United States.  Plaintiff Valdez-Cox regularly drives on highways and roads in her community.

103.    Plaintiff Gene Wu is the State Representative for Texas House District 137.  He is a Chinese-born American and resides in Houston, Texas.  His neighborhood, city, county, and

voting district have higher proportions of Asian American and non-U.S. citizen populations than the general population in Texas or the United States, with more than 86,500 individuals in his home district being foreign born.   Close to 35 percent of Asian Americans in the Greater Houston area are limited English proficient and many individuals in his community are of limited means; nearly 41,000 Asian Americans in Greater Houston live below the poverty line and nearly 110,000 are low-income.  Plaintiff Wu regularly drives on highways and roads in his community.

### *Defendants*

104.   Defendant Wilbur L. Ross is Secretary of the U.S. Department of Commerce. The Secretary of Commerce carries out the functions and duties imposed on him by the Census Act, issues rules and regulations to carry out his responsibilities, and delegates functions and duties as necessary.   13 U.S.C. § 4.   The Secretary of Commerce prepares questionnaires, determines inquiries, and determines the number and form of statistics, surveys, and censuses. 13 U.S.C. § 5.   Congress delegated the duty to conduct the Census to the Secretary of Commerce, who must take a census on April 1 every 10 years "in such form and content as he may determine . . . ."  13 U.S.C. § 141 (a); *see also* 13 U.S.C. § 5.  In that capacity, Defendant Ross issued a memorandum on March 26, 2018, which directed the U.S. Census Bureau to add a question on citizenship to the decennial Census.  Defendant Ross is sued in his official capacity.

105.   Defendant Ron Jarmin is performing the Non-Exclusive Functions and Duties of the Director for the U.S. Census Bureau.  The Director of the U.S. Census Bureau oversees  the 2020 Census operations and is responsible for ensuring the accuracy of the 2020 Census count. Defendant Jarmin directs the Census Bureau and performs Census-related duties assigned by

law, regulation, or the Secretary of Commerce.  13 U.S.C. § 21.  He is sued in his official capacity.

106.    Defendant U.S. Department of Commerce is an agency of the U.S. government which oversees the U.S. Census Bureau and its conduct of the decennial Census and other Census programs.

107.    Defendant U.S. Census Bureau is an agency within the U.S. Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is responsible for conducting all Census programs, including the development and implementation of the 2020 Census.

## JURISDICTION AND VENUE

108.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over Plaintiff's causes of action under the United States Constitution and federal statutes.  This Court has jurisdiction under 5 U.S.C. §§ 702 and 704 over Plaintiffs' claims under the Administrative Procedure Act ("APA").  This Court may grant Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

109.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1), because: 1) Defendants Jarmin (in his official capacity) and United States Census Bureau reside in Prince George's County within this District, 2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and 3) Plaintiff MLLC resides in Annapolis, Maryland within this District and no real property is involved in this action.

## FACTUAL ALLEGATIONS

A.     **Background on the U.S. Census**

110.    The U.S. Constitution requires an "actual Enumeration" of every person living in the United States to take place every ten years.  U.S. CONST. art. I, § 2, cl. 3.

111.    The decennial count of the national population is used to allocate seats in the U.S. House of Representatives to states based on the "whole number" of persons in each state.  U.S. CONST. amend. XIV, § 2.  Decennial Census data is also used for state legislative redistricting.

112.    According to the Census Bureau, federal government agencies use decennial Census data, including population data, to allocate more than $675 billion in federal funds for over 100 different federal programs.[1]

113.    Federal programs use Census Bureau data to distribute funds in various ways, including: 1) selection and/or restriction of recipients of federal funds, 2) award or allocation of funds, and 3) monitoring and assessment of program performance.[2]  Federal programs use Census Bureau data to define the characteristics of governments and organizations eligible to receive federal funding.[3]  Federal programs also use Census Bureau data to determine the amount of funds that will be distributed to eligible recipients and providers.[4]

114.    State governments use Census population data to allocate funds to local jurisdictions for programs which include healthcare, law enforcement, education, and transportation.

115.    The Commerce Secretary reports to the relevant congressional committees the subjects that will be included in the decennial Census no later than three years before the Census date and reports the questions that will appear on the decennial Census no later than two years before the Census date.  13 U.S.C. § 141 (f)(1)-(2).

---

[1] MARISA HOTCHKISS & JESSICA PHELAN, USES OF CENSUS BUREAU DATA IN FEDERAL FUNDS DISTRIBUTION 3 (2017), (*available at* https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf).
[2] *Id*. at 8.
[3] *Id*.
[4] *Id*.

116.    The Commerce Secretary's three-year deadline to report to Congress before the 2020 Census was March 31, 2017 and the two-year deadline was March 31, 2018.

117.    The Commerce Secretary, after submitting either the 2017 and 2018 reports to Congress, may only include new subjects or questions through a new report to Congress that outlines the modification and explains that the Secretary "finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in [the] reports . . . be modified[.]"  13 U.S.C. § 141 (f)(3).

118.    The Census Bureau's March 2018 report to Congress of the 2020 Census questions constitutes final agency action.

1.    **Paperwork Reduction Act, the Information Quality Act, and Office of Management and Budget and Census Bureau Standards**

119.    The Paperwork Reduction Act governs all federal agencies when they conduct a "collection of information" from individuals or other non-federal actors.  44 U.S.C. § 3502(3); *see* 44 U.S.C. §§ 3501(8)-(9), 3504.  The Census is a "survey" under the Paperwork Reduction Act.  *See* 5 C.F.R. § 1320.3(c)(1).

120.    The Director of the Office of Management Budget ("OMB") sets guidelines and policies for all statistical collection methods across the federal government, which includes the decennial Census.  44 U.S.C. § 3504(e)(3).

121.    The Paperwork Reduction Act requires the OMB to "coordinate the activities of the Federal statistical system to ensure the efficiency and effectiveness of the system[] and the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes."  44 U.S.C. § 3504(e)(1).

122.     The Information Quality Act requires that the OMB maximize "the objectivity, utility, and integrity of information (including statistical information)" provided to the public. Consolidated Appropriations Act, Pub. L. No. 106-554, 114 Stat. 2763 (2000).

123.     The OMB principles contained in its published policy directives state that "[a]ny loss of trust in the accuracy, objectivity, or integrity of the Federal statistical system and its products causes uncertainty about the validity of measures the Nation uses to monitor and assess its performance, progress, and needs by undermining the public's confidence in the information released by the Government."[5]

124.     Under the OMB's Policy Directive No. 1, federal statistical agencies must: 1) provide objective, accurate, and timely information; 2) have credibility with data users; 3) have the trust of the individuals whose information is collected, and 4) be independent from political and other undue external influence in the development, production, and dissemination of statistics.[6]

125.     Policy Directive No.1 states that the Census Bureau is a federal statistical agency. The Directive also states that federal statistical agencies must "seek input regularly from the broadest range of private-and public-sector data users" in any plans for information collection or dissemination and must "apply sound statistical methods to ensure statistical products are accurate."[7]

126.     The Census Bureau must also "conduct objective statistical activities," which means that they must "produce data that are impartial, clear, and complete" and make

---

[5] Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units ("Policy Directive No.1"), 79 Fed. Reg. 71610 (Dec. 2, 2014), *available at* https://www.gpo.gov/fdsys/pkg/FR-2014-12-02/pdf/2014-28326.pdf.
[6] *Id*. at 71611-12.
[7] *Id.* at 71615.

information available on an "equitable, policy-neutral, transparent, timely, and punctual basis."[8]

The agency "must seek to avoid even the appearance that agency design, collection, processing,

editing, compilation, storage, analysis, release, and dissemination processes may be

manipulated."[9]

127.    The Information Quality Act requires OMB and federal agencies to issue

guidelines under the Paperwork Reduction Act to ensure and maximize the "quality, objectivity,

utility, and integrity of information" to fulfill the Paperwork Reduction Act's goal of improving

the quality and use of federal data and minimizing cost.[10]

128.    OMB Statistical Policy Directive No. 2: Standards and Guidelines for Statistical

Surveys, requires agencies to design and administer their data collection in a way that

"minimizes respondent burden, while maximizing data quality."[11]  The Policy Directive states

that "a new survey or major revision of an existing survey must develop a written plan that sets

forth a justification. . . ."[12]  The Census Bureau must "ensure that all components of a survey

function as intended when implemented in the full-scale survey."[13]  OMB guidelines recommend

testing "new components of a survey using methods such as cognitive testing, focus groups, and

usability testing, prior to a field test of the survey system and incorporate the results from these

tests into the final design."[14]

---

[8] *Id.*

[9] *Id.*

[10] Consolidated Appropriations Act, Pub. L. No. 106-554, 114 Stat. 2763 (2000); *see* 44 U.S.C. §§ 3504, 3506.

[11] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys*, 11 (2006), *available at* https://goo.gl/83gdr4.

[12] *Id.* at i.

[13] *Id.* at 9.

[14] *Id.*

129.     Pursuant to the Information Quality Act, the Census Bureau's Information and Quality Guidelines state that the Census Bureau must "provide information that is accurate, reliable, and unbiased."[15]

130.     "Since the 1970s, the Census Bureau has conducted content tests to research and improve the design and function of different questions . . ." and to test "the wording of questions to ensure census questionnaires are easily understood and reflect the population accurately."[16]

131.     For example, in 2012, the Census Bureau conducted a public opinion poll test to "inform approaches to communication about administrative records, privacy, and confidentiality."[17]

132.     The Census Bureau conducted the 2012 National Content Test to assess relative self-response rates and internet self-response rates and its telephone questionnaire assistance operations, as well as "evaluate the performance of combined race and origin questions on the Internet."[18]  According to the U.S. Census Bureau, "[i]n the last decade, Census  Bureau researchers observed possible confusion about and misreporting of racial or ethnic identity in the current questions that asks Hispanic origin and race in two separate questions."[19]  Based on the 2012 National Content Test results, the Census Bureau determined that it needed to "further study [] the collection of detailed race and origin groups in a national mail-out test."[20]

133.     In 2015, the Census Bureau conducted the 2015 National Content Test which "was designed to compare different questionnaire design strategies for key [C]ensus content

---

[15] *Information Quality Guidelines Objectivity*,  U.S. CENSUS BUREAU, https://www.census.gov/about/policies/quality/guidelines/objectivity.html (last visited May 30, 2018).
[16] *2020 Census: Content Research*, U.S. CENSUS BUREAU, *available at* https://www.census.gov/programs-surveys/decennial-census/2020-census/research-testing/content-research.html (last visited May 21, 2018).
[17] U.S. CENSUS BUREAU, 2020 CENSUS OPERATIONAL PLAN: A NEW DESIGN FOR THE 21ST CENTURY 34 (2017), *available at* https://goo.gl/xEKfV1 [hereinafter *Operational Plan*].
[18] *Id.* at 35.
[19] U.S. Census Bureau, 2020 Census: Content Research, *available at* https://www.census.gov/programs-surveys/decennial-census/2020-census/research-testing/content-research.html (last visited May 21, 2018).
[20] *Operational Plan*, *supra* note 17, at 36.

areas including race and ethnicity, relationship, and within-household coverage and to provide

research for informing content decisions prior to the 2020 Census ."[21]

134.    The 2015 National Content Test assessed how the wording of instructions and the

terminology affect response accuracy and self-reporting.[22]   The test also "included a reinterview

operation to further assess the accuracy and reliability of the question alternatives for race and

ethnicity."[23]   The purpose of the re-interview was to "assess the accuracy and the reliability of

the various race and Hispanic origin question designs by exploring responses to a number of

probing questions."[24]

135.    The Census Bureau's nearly decade-long study of proposed changes to the race

and ethnicity question cost millions of dollars and included extensive testing on question content,

language, and design.[25]   Following tests and research, the Census Bureau decided not to add the

question to the 2018 End-to-End test, which is considered to be the last opportunity to refine

operations for the 2020 Census.[26]

136.    The Census Bureau's 2013 Statistical Quality Standards require extensive testing

of any data collection or supporting materials in order to identify any problems, including those

related to "question content," "order," "context effects" or when earlier questions affect

---

[21]   KELLY MATTHEWS ET AL., 2015 NATIONAL CONTENT TEST RACE AND ETHNICITY ANALYSIS
REPORT ix (2017), *available at* https://www2.census.gov/programs-surveys/decennial/2020/program-
management/final-analysis-reports/2015nct-race-ethnicity-analysis.pdf.
[22] *Id.* at 29-30.
[23] *Id.* at 2.
[24] *Id.* at 33.
[25] *Our Research: Research to Improve Data on Race and Ethnicity*, U.S. CENSUS BUREAU, *available at*
https://goo.gl/GjGUJx (last visited May 17, 2018).
[26] Memorandum from Albert E. Fontenot, Jr., Associate Director for Decennial Census Programs (Jan. 26, 2018),
https://goo.gl/3TKRti.  In the absence of modified OMB standards on collection of race and ethnicity data, the
Census Bureau "needed to make a decision on the design" of the question and moved forward with the current
question format. *Id.*

responses to later questions, "skip instructions," "formatting,"[27] and to refine the data collection

or other materials based on pretest findings.[28]  These standards apply to all censuses and surveys

conducted by the Census Bureau.[29]

137.    The Statistical Quality Standards also state that "[d]ata collection instruments in

any languages other than English must be pretested in the languages that will be used to collect

data during production."[30]

138.    The Census Bureau's Policy and Sensitivity Review Checklist for Division and

Office Chiefs, which is used to "determine the suitability for publication and release of Census

Bureau information products," asks whether "the information product express[es] views on or

discuss[es]" certain topics "in an inappropriate manner or in a way that is inconsistent with laws,

Commerce Department policies, or Census Bureau policies[.]"[31]  The Checklist topics include:

"[i]ssues relating to privacy, confidentiality, data security, or access to and use of administrative

records . . . ."[32]  The Checklist topics also include "[a]ny issue that is politically sensitive or that

has been the subject of recent news articles, correspondence, hearings, or current or potential

lawsuits."[33]  Examples of sensitive issues include "[c]oncerns about the enumeration of sensitive

populations (racial or ethnic populations, immigrants . . . )."[34]

139.    A Census Bureau official stated in January 2018, "Adding a question or making a

change to the [d]ecennial Census or the ACS involves extensive testing, review, and evaluation.

This process ensures the change is necessary and will produce quality useful information for the

---

[27] U.S. CENSUS BUREAU, STATISTICAL QUALITY STANDARDS 12 (2013), *available at*
https://goo.gl/NLswcq.
[28] *Id.* at 7-8, 10.
[29] *Id.* at ii.
[30] *Id.* at 10.
[31] *Id.* at 109.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 109-10.

nation."[35]   Additionally, "[f]inal proposed questions result from extensive cognitive and field

testing to ensure they result in the proper data with an integrity that meets the Census Bureau's

high standards."[36]

140.   The Census Bureau also stated in an Information Collection Request supporting

statement to OMB about the 2018 End-to-End test that:

> [M]ost survey results cannot be directly applied to a decennial
> census environment.   The size, scope, mandatory nature,
> importance of results (for such things as congressional
> apportionment, state redistricting efforts, and the allocation of
> billions of dollars in federal funds each year), and timing
> constraints (legal deadlines for producing apportionment and
> redistricting data) of the decennial census are unique.   Thus,
> thorough and separate research and integrated testing must be
> conducted to ensure that new methods and operations will work in
> a decennial [C]ensus environment."[37]

## 2.   Citizenship Data in the Current Census

141.   A citizenship question last appeared on the decennial Census questionnaire sent to

every household in 1950.

142.   From 1960 to 2000, the Census Bureau included a citizenship question on the

decennial "long-form" questionnaire distributed to a sample of the total population.

143.   After the 2000 decennial Census, the Census Bureau began the process of

replacing the "long-form" questionnaire with the American Community Survey ("ACS").   The

ACS does not seek responses from every person, but instead is an ongoing survey of portions of

the population.   The Census Bureau conducts the ACS annually with approximately 1 in every

---

[35] U.S. Census Bureau, Jan. 26, 2018 Program Mgmt. Review Tr. at 20, https://goo.gl/kKpYsR.
[36] *Id.*
[37] U.S. CENSUS BUREAU, SUPPORTING STATEMENT FOR 2018 END-TO-END CENSUS TEST--PEAK OPERATIONS 22 (Jan. 23, 2018), *available at*
https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201801-0607-002 (listed as 2018 E2E Census Test Supporting Statement_A_RHOupdates.docx) (last visited May 22, 2018).

38 U.S. households[38] through internet, mail, and telephone surveys as well as in-person interviews.

144.    The ACS includes dozens of questions that seek information on social, economic, housing, and demographic characteristics of the U.S. population, including a question about U.S. citizenship.

145.    According to the Census Bureau, ACS information about citizenship helps policymakers and agencies better understand the immigrant experience in order to establish or evaluate public policy, enforce anti-discrimination laws, regulations, or policies, and/or tailor services to different groups.[39]

**B.     Defendants Add a Citizenship Question to the Decennial Census**

146.    As required by federal law, Defendant Census Bureau submitted the subjects for the 2020 Census, including age, gender, race/ethnicity, relationship, and tenure, to Congress on March 28, 2017—three years before the 2020 Census date.  The Census Bureau's March 2017 report to Congress did not include a subject on citizenship.

147.    John Gore, acting head of the U.S. Department of Justice ("DOJ") Civil Rights Division, drafted a letter requesting that a citizenship question be added to the decennial Census. On November 3, 2017, Mr. Gore sent the draft letter to Arthur Gary, an official of the DOJ Justice Management Division, and asked Mr. Gary to send it the Census Bureau under Mr. Gary's signature.[40]

---

[38] U.S. CENSUS BUREAU, AMERICAN COMMUNITY SURVEY INFORMATION GUIDE 3 (2014), *available at* https://goo.gl/jfcVrt.
[39] *American Community Survey: Why We Ask Questions About Place of Birth, Citizenship, Year of Entry*, U.S. CENSUS BUREAU, https://goo.gl/F7JKFB (last visited May 17, 2018).
[40] Email from Michelle M. Allen to Arthur Gary (Nov. 29, 2017, 05:24 EST) at 28, *available at* https://goo.gl/ZdNd8q.

148.    On December 12, 2017, Mr. Gary sent a letter to Defendant Jarmin that asked the Census Bureau to add a question on citizenship to the 2020 Census form.[41]

149.    In his letter, Mr. Gary stated that, "[t]o fully enforce [the requirements of the Voting Rights Act], the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected" and that "the decennial census questionnaire is the most appropriate vehicle for collecting that data . . . ."[42]

150.    The DOJ's request for citizenship data to be collected from the decennial Census does not point to any change in the law or to new facts that affect the DOJ's ability to enforce the Voting Rights Act of 1965, 52 U.S.C. § 10301.

151.    On December 29, 2017, Mr. Gary stated in an email that the letter he sent to the Census Bureau was "at the request of leadership, working with John [Gore]."[43]

152.    Since 2010, the DOJ has filed a total of four cases to enforce the Section 2 of the Voting Rights Act.

153.    In testimony before Congress, John Gore was unable to identify a single case brought under the Voting Rights Act that failed because the court required citizenship data based on a 100% Census survey.

154.    On March 19, 2018, President Trump's reelection campaign sent an email that said, "The President wants the 2020 United States Census to ask people whether or not they are citizens," and, "The President wants to know if you're on his side."[44]

---

[41] Letter from Arthur Gary, General Counsel, Justice Management Division, Dep't. of Justice, to Ron Jarmin, Performing the Non-Exclusive Functions and Duties of the Director, U.S. Census Bureau (Dec. 12, 2017), *available at* https://goo.gl/J9aY9p.

[42] *Id.* at 1.

[43] Email from Arthur Gary, General Counsel, Justice Management Division, Dep't. of Justice to Sarah Flores, et al., (Dec. 29, 2017, 1:04 PM EST) at 49, *available at* https://goo.gl/V7VRKK.

[44] Tara Bahrampour, *Trump's Reelection Campaign Calls For Adding Citizenship Question to 2020 Census Amid Criticism That He is Politicizing the Count*, WASH. POST (Mar. 20, 2018), *available at* https://goo.gl/5KP2bN.

155.    On March 26, 2018, Defendant Ross directed the Census Bureau to add a citizenship question to the 2020 Census and to use federal and state administrative records to validate Census responses to the citizenship question.  As directed, the Census Bureau then submitted its list of questions to Congress for the 2020 Census on March 27, 2018 and included a citizenship question.[45]

156.    The new citizenship question for the decennial Census will ask of each household member: "Is this person a citizen of the United States?"[46]  Respondents must choose one of the following responses: 1) "Yes, born in the United States[;]" 2) "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas[;]" 3) "Yes, born abroad of U.S. citizen parent or parents[;]" 4) "Yes, U.S. citizen by naturalization - *Print year of naturalization*[;]" and 5) "No, not a U.S. citizen[.]"[47]

157.    In his announcement, Defendant Ross stated that the "Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness."[48]

158.    After Defendants' added the citizenship question to the 2020 Census, President Trump's campaign sent an email to supporters that stated, "The people spoke.  President Trump has officially mandated that the 2020 United States Census ask people living in America whether or not they are citizens," and that "the sanctuary state of California is now SUING the Trump Administration to stop this commonsense order."[49]

---

[45] U.S. CENSUS BUREAU, QUESTIONS PLANNED FOR THE 2020 CENSUS AND AMERICAN COMMUNITY SURVEY, 7 (2018), *available at* https://goo.gl/pLNGB8.
[46] *Id.*
[47] *Id.*
[48] Memorandum from Secretary Wilbur Ross, Department of Commerce, to Karen Dunn Kelly, Under Secretary for Economic Affairs, on Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire 7 (Mar. 26, 2018), *available at* https://goo.gl/5FHVPN [hereinafter *Ross Memorandum*].
[49] Tal Kopan, *Trump Campaign Rallies Supporters on Census Citizenship Question*, CNN, Mar. 28, 2018, available at https://goo.gl/vCwP5m.

159.    The Census Bureau did not test the addition of a citizenship question in any of the tests it ran in preparation for the 2020 Census, including:  the 2013 Census Test, the 2014 Census Test, the 2015 National Content Test, the 2016 Census Test, the 2017 Census Test, and the 2018 End-to-End Census Test.[50]  The Census Bureau does not plan to conduct additional tests on content, design, operations, question placement, or procedures before the 2020 Census.

160.    Defendants did not identify any "new circumstances" that would justify the modification of the 2017 report to Congress to add citizenship to the list of subjects included on the 2020 decennial Census.

161.    Defendant Ross did not offer any justification or explanation for why the citizenship question does not require testing before it is added to the 2020 decennial Census.

162.    Upon information and belief, Defendant Ross did not examine empirical evidence, which indicates that a citizenship question on the 2020 Census will substantially lower response rates.

163.    Upon information and belief, Defendant Ross did not investigate the rationale for the DOJ request or the reasoning for the request.

1.    **Defendants Disregarded the Expertise of Census Bureau Staff and Census Experts and Concerns From the Public**

164.    In 2017, the Census Bureau's Center for Survey Management released a memorandum stating that its researchers "noticed a recent increase in respondents spontaneously expressing concerns about confidentiality in some of our pretesting studies conducted in 2017."[51] Respondents in these projects were "paid a cash incentive" and "recruited through trusted

---

[50] *See* DECENNIAL CENSUS MANAGEMENT DIVISION, 2020 CENSUS OPERATIONAL PLAN: EXECUTIVE SUMMARY 18-20 (2018), *available at* https://goo.gl/mtHaEJ.
[51] Memorandum from the U.S. Census Bureau, Ctr. For Survey Measurement, to Assoc. Directorate for Research and Methodology, 1, 5-7, 15 (Sept. 20, 2017), *available at* https://goo.gl/bprP6i.

community organizations."[52]  They also had a "researcher sitting next to them during [the] survey" and a researcher "explain confidentiality during informed consent."[53]  The Center for Survey Management stated that "respondent concerns might be more pronounced during a production survey than during pretesting."[54]

165.  During pretests for an internet self-response platform, "one Spanish-speaking respondent said she was uncomfortable 'registering' other household members . . . because of the current political climate and news reports about changing immigration policy."[55] One respondent did not report five unrelated household members(some of whom were immigrants) because she does not report their rental income to the IRS and because of what she referred to as the "Muslim ban."[56]  Another "Spanish-speaking respondent filled out information about herself and three family members but intentionally left three or four roomers [*sic*] off the roster because, 'This frightens me, given how the situation is now' and mentioned being worried because of their 'immigration status.'"[57]  A Spanish-speaking respondent who was a "legal resident in the country, commented: 'Particularly with our current political climate, the Latino community will not sign up because they think that Census will pass their information on and people can come looking for them.'"[58]  Several Chinese-speaking focus group respondents stated that the Chinese community's main fear or concern was immigration status and how the data are used. They also

---

[52] Mikelyn Meyers, Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census, Center for Survey Management, Census Bureau 6 (Nov. 2, 2017), *available at* https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf.
[53] *Id.*
[54] *Id.*
[55] Memorandum from the U.S. Census Bureau, Ctr. For Survey Measurement, to Assoc. Directorate for Research and Methodology, 2 (Sept. 20, 2017), *available at* https://goo.gl/bprP6i.
[56] Memorandum from the U.S. Census Bureau, Ctr. For Survey Measurement, to Assoc. Directorate for Research and Methodology, 2 (Sept. 20, 2017), *available at* https://goo.gl/bprP6i. Memorandum from the U.S. Census Bureau, Ctr. For Survey Measurement, to Assoc. Directorate for Research and Methodology, 2 (Sept. 20, 2017), *available at* https://goo.gl/bprP6i.
[57] *Id.* (alteration omitted).
[58] *Id.*

expressed concern about opening the door to a government official and not wanting to be "investigated."[59]  The Center for Survey Management stated that "this level of deliberate falsification of the household roster, and spontaneous mention of concerns regarding negative attitudes toward immigrants, is largely unprecedented in the usability interviews that [the Center for Survey Management] has been conducting since 2014 in preparation for the 2020 Census."[60]

166.    During the Census Barriers, Attitudes, and Motivators Survey, one Spanish-speaking respondent said, "The possibility that the Census could give my information to internal security and immigration could come and arrest me for not having documents terrifies me," and that "someone could say, 'If you're not satisfied, why are you here?' and this could be used against her to expel her from the country."[61]

167.    The Center for Survey Management conducted focus groups with Spanish-speaking Census Bureau field representatives regarding the Spanish translation of a National Health Interview Survey.  A field representative said during the focus group, "This may just be a sign of the times, but in the recent several months before anything begins, I'm being asked times over, does it make a difference if I'm not a citizen?"[62]  In addition, a field representative said that in June 2017 "she was doing a Census Bureau survey interview with questions about citizenship status.  A Spanish-speaking respondent answered that he was not a citizen, and then appeared to lie about his country of origin.  When the [field representative] started asking about his year of entry into the U.S., he 'shut down' and stopped responding to her questions.  He then walked out and left her alone in the apartment, which had never happened to her during an interview

---

[59] *Id.*
[60] *Id.* at 3.
[61] *Id.*
[62] *Id.* at 4.

before."[63]   Another Spanish-speaking field representative said, "There was a cluster of mobile homes, all Hispanic.  I went to one and I left the information on the door.  I could hear them inside.  I did two more interviews, and when I came back, they were moving . . . .  It's because they were afraid of being deported."[64]

168.   During a focus group with field representatives and field supervisors that worked on a recent housing survey operation, "[field supervisors] reiterated that the main issue they saw was privacy concerns of Latino respondents . . . ."[65]  Another field representative said that "respondents have been confusing him with someone from Immigration and Customs Enforcement . . . .  He reported that respondents that identified him as working for the government were hesitant to answer any questions, and it was difficult to gain their trust."[66]

169.   The Center for Survey Management also released findings from a new qualitative study that assessed privacy and confidentiality concerns by respondents based on 2017 and Spring 2018 Census projects.  In one example, a Spanish-speaking respondent "redacted detail origin from 'Mexican' to 'Hispanic[,]'" and said, "No, I want to [deselect] that.  With the whole [administration] having us classified . . . .  We really are fearful . . . .  I don't want to write my status."[67]  In response to message testing from Privacy Act studies, one Spanish-speaking respondent said, "But for someone who doesn't have papers, sometimes the law doesn't matter.  They don't feel protected even by the law . . . .  They do not feel that the government will protect them because of what they have seen in their community."[68]  Center for Survey Management

---

[63] *Id*. at 5.
[64] *Id*.
[65] *Id*. at 6.
[66] *Id*.
[67] Mikelyn Meyers & Patricia Goerman, *Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and data Quality for the 2020 Census*, U.S. CENSUS BUREAU, 23 (Mar. 16-18, 2018), *available at* https://goo.gl/vWsJpL.
[68] *Id*. at 17.

staff stated that "[r]espondents with confidentiality concerns could potentially: not answer survey questions, provide incomplete or inaccurate data on survey questions, [or] refuse to participate in a survey altogether[,]" and that "[t]his could negatively impact data quality and coverage for the 2020 Census and federal surveys in general."[69]

170.   In his March 26, 2018 Memorandum, Defendant Ross said that the Census Bureau analyzed three alternatives:

> "Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial [C]ensus, which goes to every American household; and Option C was not placing a question on the decennial [C]ensus and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data . . . ."[70]

171.   Defendant Ross further stated, "The Census Bureau and many stakeholders expressed concern that Option B . . . would negatively impact the response rate for non-citizens. A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow-up . . . operations."[71]   However, he said, "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially."[72]

172.   On April 25, 2018, Attorney General Jefferson B. Sessions stated in response to public concerns about the addition of a citizenship question to the 2020 Census: "I've learned it's the twelfth question on the form, the last question, I believe.   It shouldn't scare people, they

---

[69] *Id.* at 25.
[70] Ross Memorandum, *supra* note 43, at 2.
[71] *Id.* at 3.
[72] *Id.*

don't have to answer it, really.  So I would think that's a very reasonable thing, and I believe the concerns over it are overblown."[73]

173.    Every adult is required by law to answer the questions on the Census form truthfully.  Any individual who refuses or willfully neglects to respond is subject to prosecution and financial penalties under 13 U.S.C. § 221.

174.    On May 14, 2018, Defendant Ross said of the addition of the citizenship question, "I don't think the sky will fall when we add it to the Census itself in 2020."  He further stated, "We are also putting the citizenship question last so that someone who for whatever reason feels uncomfortable with that question, at least they can deal easily with questions with which they are not uncomfortable."[74]

175.    A Rhode Island resident—an undocumented immigrant—said during an interview about the 2018 End-to-End test and the addition of the citizenship question to the decennial Census, "After you answer that question saying that you are not a citizen, you're going to be looking behind you all the time," and that, "People who live here day by day are thinking, 'Are we going to be here tomorrow?'"[75]

**C.**     **Including a Citizenship Question on the 2020 Census Runs Contrary to the Experience and Long-standing Position of Previous Census Bureau Directors**

176.    According to the Census Bureau, inclusion of a citizenship question in the decennial Census would "inevitably jeopardize the overall accuracy of the population count," and "suspicious and fearful" respondents would refuse to cooperate if they felt that there was any

---

[73] *Attorney General Sessions on Justice Department Budget Request*, C-SPAN (Apr. 25, 2018) *available at* https://goo.gl/oCBty3.

[74] *Commerce Secretary Wilbur Ross at National Press Club*, C-SPAN (May 14, 2018), *available at* https://www.c-span.org/video/?445463-1/commerce-secretary-ross-administration-alternative-remedies-zte-ban.

[75] Hansi Lo Wang and Marisa Peñaloza, *Many Noncitizens Plan to Avoid the 2020 Census, Test Run Indicates*, NPR (May 11, 2018), *available at* https://www.npr.org/2018/05/11/610492880/many-noncitizens-plan-to-avoid-the-2020-census-test-run-indicates.

chance the information provided would be used to their detriment.[76]  The Census Bureau also stated that a question on citizenship is "particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."[77]

177.    During Congressional testimony in 1988 on legislation that would have required the decennial Census to ask respondents' citizenship status, then-Director of the Census Bureau John Keane stated that any changes to the way the Census is conducted so close in time to the Census date would "impose serious timing problems that could affect the conduct of the census," and cautioned against the inclusion of "untested and unproven procedures."[78]  Then-Director Keane predicted that if the decennial Census included a question regarding immigration status "undocumented immigrants may either avoid the census altogether or deliberately misreport themselves as legal residents of [*sic*] the census."[79]

178.    In 2005, former Census Director Kenneth Prewitt testified that a citizenship question on the Census short-form would be "treated with suspicion," and that "accuracy will suffer" if respondents skip questions on the Census form.[80]

179.    On October 16, 2009, eight former Census Bureau directors wrote a joint statement opposing a congressional proposal to add a question on citizenship and immigration status to the decennial Census stating, "We can say unequivocally that adding an untested question at this late point in the decennial process would put the accuracy of the enumeration in

---

[76] *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980).
[77] *Id.*
[78] *Exclude Undocumented Residents from Census Counts for Apportionment: Hearing on H.R. 3639, H.R. 3814, and H.R. 4234 Before the H. Subcomm. on Census & Population of the H.. Comm. on Post Office & Civil Servs.*, 100th Cong. 49-50 (1988) (testimony of John Keane, Director, Census Bureau), *available at* https://goo.gl/DanfPL.
[79] *Id.*
[80] *Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Rep., Hr'g Before the Subcomm. on Federalism and the Census of the Cmte on gov't Reform*, 109th Cong. 72 (Dec. 6, 2005) (Statement of Kenneth Prewitt), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-109hhrg26074/html/CHRG-109hhrg26074.htm (last visited May 28, 2018).

all communities at risk . . . ."[81]  The former directors explained that enumerators might have

difficulties with non-response follow-up if "legalized 'head of household[s]' [] avoid

enumerators because one or more other household members are present unlawfully."[82]

180.    In 2016, four former Census Bureau directors, Dr. Kenneth Prewitt, Dr. Robert

Groves, Dr. Martha Farnsworth Riche, and Vincent P. Barabba said that a citizenship question

posed to every household would "invariably lead to a lower response rate to the Census in

general . . . ."[83]  The directors noted that a citizenship question would "seriously frustrate the

Census Bureau's ability to conduct the only count the Constitution expressly requires:

determining the whole number of persons in each state in order to apportion House seats among

the states."[84]

181.    On January 26, 2018, six former Census Bureau directors wrote a letter to

Defendant Ross that opposed the addition of a citizenship question for the 2020 Census.  The

former directors stated,

> "Adding a citizenship question without a testing opportunity in a
> contemporary, [C]ensus-like environment will invalidate the
> results and lessons learned from the End-to-End test. Key
> assumptions underlying estimates of self-response, staffing needs,
> local office sites, and communication strategies will no longer be
> sound, calling into question cost projections that we know [the
> Bureau has] worked hard to validate and update."[85]

The former directors further stated,

---

[81] Statement of Vincent P. Barabba et al., Former Census Directors to U.S. Congress on Adding A New Question to
the 2010 Census (Oct. 16, 2009), *available at* https://goo.gl/PPMce5.
[82] *Id.*
[83] Brief of Former Directors of the U.S. Census Bureau as Amici Curiae Supporting Appellees at 25, *Evenwel v.
Abbott*, 136 S.Ct. 1120 (2016).
[84] *Id.*
[85] Letter from Vincent P. Barabba et al., Former Directors of the U.S. Census Bureau to Wilbur Ross Secretary of
the Dep't of Commerce (Jan. 26, 2018), *available at* https://goo.gl/L3694b.

"It is highly risky to ask untested questions in the context of the complete 2020 Census design. There is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, quality, and truthfulness of response. The effect of adding a citizenship question to the 2020 Census on data quality and census accuracy, therefore, is completely unknown."[86]

## D. Defendants' Decision to Add a Citizenship Question to the Decennial Census Was Motivated By Racially Discriminatory Intent

### 1. President Trump and Administration Officials Have Expressed an Intent to Target Latinos, Asian Americans and Non-U.S. Citizens

182. On June 16, 2015, President Donald J. Trump announced his candidacy for President of the United States and stated, "When Mexico sends its people, they're not sending their best . . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[87]

183. On July 5, 2015, in an interview on Fox News' "Media Buzz," President Trump stated: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, rapists, etc."[88]

184. In August 2015, at a Republican presidential debate, President Trump said, "[T]he Mexican government is much smarter, much sharper, much more cunning, and they send the bad ones over because they don't want to pay for them, they don't want to take care of them."[89]

---

[86] *Id.*
[87] Newsday.com Staff, *Donald Trump Speech, Debates and Campaign Quotes*, NEWSDAY (Nov. 9, 2016, 2:48 AM), *available at* https://goo.gl/v8AwJa.
[88] Michelle Ye Hee Lee, *Donald Trump's False Comments Connecting Mexican Immigrants and Crime*, WASH. POST (Jul. 8, 2015), *available at* https://goo.gl/CRdok3.
[89] Louis Jacobson, *Donald Trump: 'The Mexican Government . . . They Send the Bad Ones Over'*, POLITIFACT (Aug. 6, 2015, 10:12 PM), *available at* https://goo.gl/GKJpX1.

185.   During an October 2015 radio interview with Breitbart News, Attorney General Sessions stated:

> "In seven years, we'll have the highest percentage of Americans, non-native born, since the founding of the Republic. Some people think we've always had these numbers, and it's not so. It's very unusual, it's a radical change. When the numbers reached about this high in 1924, the president and congress changed the policy, and it slowed down immigration significantly, we then assimilated through the 1965 and created really the solid middle class of America, with assimilated immigrants, and it was good for America."[90]

186.   In Fall 2015, during his presidential campaign, President Trump issued a press release that called "for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."[91]   President Trump also asserted that he was following in Roosevelt's footsteps when he said "what I am doing is no different than what FDR — FDR's solution for German, Italian, Japanese, you know, many years ago," adding, "Take a look at what FDR did many years ago, and he's one of the most highly respected presidents . . . .  They named highways after him.'"[92]

187.   On February 27, 2016, President Trump said of Gonzalo P. Curiel, a U.S. District Judge for the Southern District of California who was presiding over two civil lawsuits related to Trump University, "I think it has to do with, perhaps, with the fact that I'm very, very strong on

---

[90] Jessica Prois, *Jeff Sessions, Who Has An Asian Granddaughter, Praised Era When Asians Were Banned From U.S.*, HUFF. POST (Jan. 11, 2017), *available at* https://www.huffingtonpost.com/entry/jeff-sessions-asian-granddaughter_us_5876a1cee4b092a6cae514d5.
[91] Jeremy Diamond, *Donald Trump: Ban all Muslim Travel to U.S.*, CNN (Dec. 8, 2015), *available at* https://www.cnn.com/2015/12/07/politics/donald-trump-muslim-ban-immigration/index.html.
[92] Duncan Williams and Gideon Yaffe, *Trump's Administration Says the Travel Ban Isn't Like Japanese Internment. It Is.*, WASH. POST (May 16, 2017), available at https://www.washingtonpost.com/posteverything/wp/2017/05/16/trumps-administration-says-the-travel-ban-isnt-like-japanese-internment-it-is/?utm_term=.d5c23f572d02.

the border - very, very strong on the border.  He has been extremely hostile to me.  Now, he is Hispanic, I believe."[93]

188.    On March 9, 2016, President Trump told CNN that he wanted to ban Muslims from entering the United States of America because "we can't allow people coming into this country who have this hatred of the United States" and "of people that are not Muslim."[94]

189.    On May 25, 2016, President Trump tweeted, "The protesters in New Mexico were thugs who were flying the Mexican flag.  The rally inside was big and beautiful, but outside, criminals!"[95]

190.    On May 27, 2016, at a campaign rally in San Diego, President Trump said Judge Curiel was a "hater of Donald Trump" because he "happens to be, we believe, Mexican[.]"[96]

191.    On June 2, 2016, President Trump said Judge Curiel had an "absolute conflict" presiding over the Trump University case.[97]    President Trump referred to Judge Curiel as "a Mexican," and stated, "I'm building a wall.  It's an inherent conflict of interest."[98]

192.    On June 24, 2016, President Trump tweeted, "Many of the thugs that attacked the peaceful Trump supporters in San Jose were illegals.  They burned the American flag and laughed at police."[99]

---

[93] Geneva Sands, *Judge, Once Berated by Trump, Rules in Favor of Border Wall Waivers*, ABC News, (Feb. 28, 2018, 9:54 PM), *available at* https://goo.gl/Gk6HAx.
[94] Anderson Cooper 360 Degrees,  *Exclusive Interview with Donald Trump*, CNN (Mar. 9, 2016), *available at* http://www.cnn.com/TRANSCRIPTS/1603/09/acd.01.html.
[95] Donald Trump, The protesters in New Mexico were thugs who were flying the Mexican flag. The rally inside was big and beautiful, but outside, criminals!, Twitter, May 25, 2016, *available at* https://goo.gl/GLFeTg.
[96] Kristen East, *Trump Attacks 'Mexican' Judge in Trump U Lawsuit*, POLITICO, May 28, 2016, available at https://goo.gl/SfNYEX.
[97] Brent Kendall, *Trump Says Judge's Mexican Heritage Presents 'Absolute Conflict*,' WALL STREET JOURNAL, June 3, 2016, available at https://goo.gl/LCMcBX.
[98] Elliot Hannon, Trump Says Judge's Mexican Ancestry Is "Inherent Conflict of Interest" Because "the Wall," Slate (June 2, 2016), available at https://goo.gl/ChspcJ.
[99] Donald Trump, Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals, Twitter, June 4, 2016, available at https://goo.gl/ZcKCiU.

193.    On October 19, 2016, during a presidential debate, President Trump said in response to a question about immigration that, "[w]e have some bad hombres here, and we're going to get them out."[100]

194.    In November 2016, Attorney General Sessions stated that "almost no one coming from the Dominican Republic to the United States is coming here because they have a provable skill that would benefit us and that would indicate their likely success in our society."[101]

195.    In November 2016, Carl Higbie, a former member of the Trump Administration who was appointed to, but resigned from the Corporation for National and Community Service, said a Muslim registry would "hold constitutional muster" and that "[w]e've done it with Iran back a while ago. We did it during World War II with the Japanese.[]"  Mr. Higbie further stated, "I'm just saying there is precedent for it."[102]

196.    In 2016, when the previous administration planned to house unaccompanied undocumented children in Alabama, then-Senator Sessions stated that the decision was "idiotic policy" that is "encouraging more people to come illegally."  He further stated that, "then we treat them, we house them, we feed them for months, and we release them basically on bail and then they just go where they wanted to go to begin with."[103]

197.    In response to lower Latino enrollment in Alabama public schools following the enactment of Alabama HB 56, then-Senator Sessions stated, "All I would just say to you is that

---

[100] Matt Pearce, Trump on immigration: 'We have some bad hombres here, and we're going to get them out,' L.A. Times (Oct. 19, 2016), available at https://goo.gl/61878B.
[101] Sam Stein & Amanda Terkel, *Donald Trump's Attorney General Nominee Wrote Off Nearly All Immigrants From An Entire Country*, HUFFINGTON POST (updated Nov. 20, 2016), *available at* https://goo.gl/xQ6NrY.
[102] Derek Hawkins, *Japanese American Internment is 'Precedent' For National Muslim Registry, Prominent Trump Backer Says*, WASH. POST (Nov. 17, 2016), *available at* https://www.washingtonpost.com/news/morning-mix/wp/2016/11/17/japanese-internment-is-precedent-for-national-muslim-registry-prominent-trump-backer-says/?utm_term=.ee84e6e5a7e9.
[103] Remezcla Estaff, *A Look At Attorney General Appointee Jeff Sessions' Long History of Hostility Toward Latinos*, REMEZCLA (Jan. 12, 2017, 12:55 PM), *available at* https://goo.gl/mwNuih.

it's a sad thing that we've allowed a situation to occur for decades that large numbers of people are in the country illegal [*sic*] and it's going to have unpleasant, unfortunate consequences."[104]

198.    On November 27, 2016, President Trump tweeted, "[i]n addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally."[105]

199.    On January 23, 2017, news outlets reported on a leaked draft Executive Order entitled, "Executive Order on Protecting American Jobs and Workers by Strengthening the Integrity of Foreign Worker Visa Programs" ("Jan. 23 Draft Executive Order").[106]

200.    The Jan. 23 Draft Executive Order stated that its purpose was to "help fulfill several campaign promises" and to address the "flow of illegal entries and visa overstays."[107]  To that end, it instructed the Director of the U.S. Census Bureau to "include questions to determine U.S. citizenship and immigration status on the long-form questionnaire in the decennial [C]ensus."[108]

201.    The Jan. 23 Draft Executive Order made no mention of voting rights enforcement or the need for citizenship data in order to enforce Section 2 of the federal Voting Rights Act. The Jan. 23 Draft Executive Order also made no mention of placing a question about citizenship on the decennial Census questionnaire that is sent to all households.

202.    In January 2017, Kansas Secretary of State Kris Kobach stated to the media that he spoke with President Trump about adding a citizenship question to the U.S. Census and that the President "absolutely was interested in this."  Kobach explained that the Census should

---

[104] *Id.*
[105] Donald Trump (@realDonaldTrump), TWITTER (Nov. 27, 2016, 3:30 PM), *available at* https://goo.gl/Lhj4hu.
[106] Memorandum from Andrew Bremberg to Donald Trump, President on Executive Order on Protecting American Jobs and Workers by Strengthening the Integrity of Foreign Worker Visa Programs 1 (Jan. 23, 2017), *available at* https://goo.gl/qWHL5T.
[107] *Id.*
[108] *Id.*

inquire into citizenship because California in particular, has had its "congressional seats inflated by counting illegal aliens."[109]

203.    On June 13, 2017, the Acting Director of U.S. Immigrations and Customs Enforcement ("ICE"), Thomas Homan, testified before Congress that "every immigrant in the country without papers . . . should be uncomfortable.  You should look over your shoulder.  And you need to be worried."[110]

204.    On August 25, 2017, President Trump pardoned former Maricopa County, Arizona Sheriff Joe Arpaio, who had been held in criminal contempt by a federal district court for failure to comply with another federal court's order that enjoined his practice of racially profiling Latinos.

205.    On September 5, 2017, Attorney General Sessions said that Deferred Action for Childhood Arrivals "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."[111]

206.    In Fall 2017, President Trump asked a career intelligence officer "Where are you from?" When the Asian American woman answered that she was from New York, President Trump asked her where "your people" are from.[112]

207.    On January 11, 2018, President Trump discussed an immigration proposal with advisors and party leaders and asked why he would want "all these people from shithole

---

[109] Bryan Lowry, *That citizenship question on the 2020 Census? Kobach says he pitched it it to Trump*, THE KANSAS CITY STAR (Mar. 27, 2018, 2:01 PM), *available at* https://goo.gl/iZFVjP.

[110] *Immigration and Customs Enforcement and Border Patrol Fiscal Year 2018 Budget Request: Hearing Before the Subcomm. on Homeland Sec. of H. Comm. on Appropriations*, 115th Cong. (2017) (statement of Thomas D. Homan, Acting Director, Immigration and Customs Enforcement), *available at* https://goo.gl/cRcX6i; *see also* Elise Foley, *ICE Director To All Undocumented Immigrants: 'You Need To Be Worried,'* HUFFINGTON POST (Jun. 13, 2017, 6:51 PM) *available at* https://goo.gl/dMvXrx.

[111] Jefferson B. Sessions, U.S. Attorney General, Remarks on DACA (Sep. 5, 2017), *available at* https://goo.gl/sT7EGQ.

[112] Christopher Woody, *Trump Reportedly Asked Why a 'Pretty Korean Lady' Intelligence Officer Wasn't Negotiating with North Korea for the US*, Buss. Ins. (Jan. 12, 2018), *available at* http://www.businessinsider.com/trump-pretty-korean-lady-negotiating-north-korea-2018-1.

countries," referring to Haiti and various nations in Africa.[113]   President Trump added that the United States should accept more immigrants from countries like Norway.[114]

208.    In January 2018, President Trump asked a career intelligence officer, "Where are you from?"  When the Asian American woman answered that she was from New York, President Trump asked her where are "your people" from.[115]

209.    On May 10, 2018, during an interview with National Public Radio, White House Chief of Staff John Kelly said undocumented immigrants were "not people that would easily assimilate into the United States, into our modern society. They're overwhelmingly rural people. In the countries they come from, fourth-, fifth-, sixth-grade educations are kind of the norm. They don't speak English; obviously that's a big thing. . . .  They don't integrate well; they don't have skills."[116]

210.    On May 16, 2018, during a California Sanctuary State Roundtable and in response to a comment by Fresno County Sheriff, Margaret Mim, about the criminal gang MS-13, President Trump said, "We have people coming into the country, or trying to come in—and we're stopping a lot of them—but we're taking people out of the country.  You wouldn't believe how bad these people are.  These aren't people.  These are animals.  And we're taking them out of the country at a level and at a rate that's never happened before."[117]

211.    On May 21, 2018, the White House published an article on its website regarding MS-13 that used the term "animals" to describe individuals ten times.  The article states,

---

[113] Julie H. Davis, et al., *Trump Alarms Lawmakers With Disparaging Words for Haiti and Africa*, NYT, Jan. 11, 2018, *available at* https://goo.gl/xCTsNN (last visited May 16, 2018).
[114] *Id*.
[115] Vivian Salama, *Trump's History of Breaking Decorum With Remarks on Race, Ethnicity*, NBC News (Jan. 12, 2018), *available at*  https://www.nbcnews.com/news/us-news/trump-s-history-breaking-decorum-remarks-race-ethnicity-n837181.
[116] John Burnett and Richard Gonzales, *John Kelly on Trump, The Russia Investigation and Separating Immigrant Families*, NPR (May 10, 2018), *available at* https://goo.gl/7RDpmH.
[117] *President Trump Hosts California Sanctuary State Roundtable*, C-SPAN (May 16, 2018), *available at* cs.pn/2INPSJ4.

"President Trump's entire Administration is working tirelessly to bring these violent animals to justice."[118]

212.    On May 23, 2018, during a roundtable on immigration, President Trump said, "We have the worst immigration laws of any country, anywhere in the world," and that unaccompanied, undocumented children have "exploited the loopholes in our laws to enter the country as unaccompanied alien minors…. They look so innocent. They're not innocent."[119]

## 2.    President Trump Demands Exacting Loyalty From Cabinet Heads and Department Secretaries

213.    Since taking office in January 2017, President Trump has fired or forced several members of his Administration to resign.  As of April 12, 2018, there have been at least 23 high-profile firings or forced resignations from the Trump Administration.[120]  The rate of turnover for high-level positions is double that of President Ronald Reagan's Administration and three times higher than the Administration of President Barack Obama.[121]

214.    Upon information and belief, President Trump caused the departure of several Administration members for failing to follow strictly President Trump's agenda and for engaging in specific actions that President Trump disagreed with politically.

215.    For example, in November 2017, Acting Secretary of Homeland Security Elaine Duke extended temporary protected status for immigrants from Honduras for six months.  In response to Acting Secretary Duke's decision, White House Chief of Staff, John Kelly, told her

---

[118] White House, *What You Need to Know About the Violent Animals of MS-13*, May 21, 2018, *available at* https://www.whitehouse.gov/articles/need-know-violent-animals-ms-13/.

[119] Seung Min Kim, T*rump Warns Against Admitting Unaccompanied Migrant Children: 'They're Not Innocent'*, Wash. Post (May 23, 2018), *available at* https://goo.gl/QknT7u.

[120] Denize Lu & Karen Yourish, *Hired and Fired: The Unprecedented Turnover of the Trump Administration*, N.Y. TIMES (updated Apr. 26, 2018), *available at* https://goo.gl/T6y5Dx; *see also* Jeremy Berke, *Tom Bossert is Out — Here Are All The Casualties of the Trump Administration so Far*, BUS. INSIDER (Apr. 10, 2018, 12:20 PM), *available at* https://goo.gl/mB952x.

[121] Kathryn Dunn Tenpas, *Why is Trump's Staff Turnover Higher than the 5 Most Recent Presidents?*, BROOKINGS INST. (Jan. 19, 2018), *available at* https://goo.gl/2Qhba7.

that her decision "'prevents our wider strategic goal' on immigration."[122] Former Secretary of State Rex Tillerson also told Acting Secretary Duke that ending temporary protected status for immigrants from Honduras "was just something she had to do."[123] In April 2018, Acting Secretary Duke and Department of Homeland Security international adviser James Nealon, reportedly resigned because of pressure from the Trump Administration to end temporary protected status for immigrants from Honduras and Haiti.[124]

216.    In May 2018, during a meeting on immigration, President Trump criticized Homeland Security Secretary Kirstjen Nielsen because the number of people arrested for illegally crossing the Mexico border topped 50,000 for the second consecutive month.[125] President Trump said to Nielson, "Why don't you have solutions? How is this still happening?" and that "We need to shut [the border] down.  We're closed."[126] President Trump also stated that Nielson is "not tough enough."[127]

217.    In March 2018, James Schwab, an U.S. Immigrations Custom Enforcement spokesperson resigned over what he described as "false" and "misleading" statements about "criminal aliens" escaping capture in Northern California because Oakland's mayor tipped them off, made by Attorney General Sessions and Thomas Homan, ICE acting director.[128] Mr. Schwab explained, "I quit because I didn't want to perpetuate misleading facts . . . .  I asked

---

[122] Jonathan Blitzer, *The Battle Inside the Trump Administration Over T.P.S.*, THE NEW YORKER (May 11, 2018), *available at* https://goo.gl/UapFdC (last visited May 19, 2018).
[123] Lorelei Laird, *Officials Resigned Reportedly After Pressure to Cancel Temporary Protected Status for Immigrants*, ABA Journal (May 14, 2018), available at https://goo.gl/8PSjv5 (last visited May 19, 2018).
[124] *Id.*
[125] Josh Dawsey and Nick Miroff, Trump Unloads on Homeland Security Secretary in Lengthy Immigration Tirade, Wash. Post (May 10, 2018), *available at* https://goo.gl/UuyJFs (last visited May 19, 2018).
[126] *Id.*
[127] *Id.*
[128] Meagen Flynn and Avi Selk, ICE Spokesman Resigns, Citing Fabrications by Agency Chief, Sessions About Arrests, Chicago Tribune (March 13, 2018), *available at* https://goo.gl/ncZEuc (last visited May 19, 2018).

them to change the information.  I told them that the information was wrong, they asked me to deflect, and I didn't agree with that.  Then I took some time and I quit."[129]

**E.**     **The Inclusion of a Citizenship Question Harms Latinos, Asian Americans, and Non-U.S. Citizens and Increases the Chances of a Large and Differential Undercount**

218.    Latinos, Asian Americans and non-U.S. citizens, including individual Plaintiffs, clients and members of Plaintiff organizations and member constituents of Plaintiff legislative caucuses, will be injured by the addition of a citizenship question to the 2020 Census.

219.    The Census Bureau recognizes racial and ethnic minorities, linguistic minorities, lower income persons, homeless persons, undocumented immigrants, young mobile persons, and children as hard-to-count populations.[130]

220.    A University of New Hampshire study found that "about a quarter of all [hard-to-count] counties in the nation are rural majority-minority counties," based on Census data.[131]  "Of the thirty-seven Hispanic [hard-to-count] counties, twenty-nine were located in rural areas, mostly in the Southwest . . . ."[132]  The Census Bureau also identified certain barriers to census enumeration in the *colonias* or hard-to-count areas studied: "irregular housing, little or no knowledge of English and limited formal education, concerns regarding confidentiality, and complex and fluid households."[133]

---

[129] *Id.*
[130] Julie A. Dowling, *Hard to Count Population Working Group Presentatio*n, Census Bureau, 2 (Mar. 27, 2015), *available at* https://www2.census.gov/cac/nac/meetings/2015-03/2015-03-26_dowling.pdf.
[131] William P. O'Hare, *2020 Census Faces Challenges in Rural America*, University of New Hampshire, 3 (2017), *available at* https://scholars.unh.edu/cgi/viewcontent.cgi?article=1329&context=carsey.
[132] *Id.*
[133] Manuel de la Puente, *Census 2000 Testing, Experimentation, and Evaluations Program Topic Report No. 15, TR-15: Census 2000 Ethnographic Studies*, U.S. Census Bureau, 21 (Mar. 2014), *available at* https://www.census.gov/pred/www/rpts/TR15.pdf.

221.    The 1990 Census undercounted Hispanics by approximately 5 percent.[134] The 2010 Census undercounted Hispanics by 1.5 percent.[135] The 2000 Census undercounted Hispanics by 0.7 percent.[136]

222.    The undercount of the Asian American and Pacific Islander ("AAPI") community in the 1990 Census was 2.36 percent.[137] The 2010 Census had a relatively "accurate" count for AAPIs, with a net undercount rate of 0.08 percent for Asian Americans, and 1.34 percent for Non-Hispanic Pacific Islanders.[138] Although statistically insignificant, the 2010 Census, in fact, missed hundreds of thousands of Asian Americans – a problem that was offset, at the national level, by double counting or other mistaken enumerations.[139] The proportion of Asian Americans who should have been counted but were not during the 2010 census was higher than that of non-Hispanic Whites, with 5.3 percent of Asian Americans not counted as compared to 3.8 percent for non-Hispanic Whites.[140]

223.    Latino children are particularly vulnerable to an undercount. The 2010 Census undercounted Latino children by 7.5 percent.[141]

224.    The Census Bureau recognizes that questions about citizenship or immigration status are considered sensitive.[142] Given that these hard-to-count populations already experience

---

[134] Edward W. Fernandez, *Using Analytic Techniques to Evaluate the 1990 Census Coverage of Young Hispanics* (U.S. Census Bureau, Working Paper No. 11, 1995), *available at* https://goo.gl/zZfxtM.
[135] Press Release, U.S. Census Bureau, Census Bureau Releases Estimates of Undercount and Overcount in the 2010 Census (May 22, 2012), *available at* https://goo.gl/rbdUFP.
[136] *Id.*
[137] U.S. Census Bureau, *2010 Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States* 15 (2012), *available at* https://www.census.gov/coverage_measurement/pdfs/g01.pdf [hereinafter "2010 CCM Report"].
[138] 2010 CCM Report at 15.
[139] *Id.*
[140] *Id.* at 17.
[141] Scott Konicki, *The Undercount of Young Children in the Decennial Census*, Census Bureau, 5 (Apr. 12, 2016), *available at* https://goo.gl/BZ8shj.
[142] DATA STEWARDSHIP EXECUTIVE POLICY COMMITTEE, DS-16: POLICY ON RESPONDENT IDENTIFICATION AND SENSITIVE TOPICS IN DEPENDENT INTERVIEWING, U.S. CENSUS BUREAU, (Dec. 9, 2014), *available at* https://www2.census.gov/foia/ds_policies/ds016.pdf.

undercounts relative to the general population and that these populations represent a significant percentage of the overall population in Arizona, California, Georgia, Maryland,  Massachusetts, New Mexico, New York, North Carolina, Ohio, Texas, and Washington, any reluctance by Latinos and Asian Americans to participate in the Census will result in a more severe undercount of Hispanic/Latino, and Asian American populations.

225.    Latinos, Asian Americans, and non-U.S. citizens are less likely to respond to a Census questionnaire that includes a citizenship question.  Defendant Ross noted in his March 26, 2018 Memorandum that when the citizenship question was included in the decennial Census long form, the decline in self-response rates for non-U.S. citizen households was 3.3 percent greater than for citizen households.[143]  Defendant Ross also noted that for the 2013-2016 ACS survey, 11.6 to 12.3 percent of Hispanics did not respond to the citizenship question, compared to 6.0 to 6.3 percent of non-Hispanic whites.[144]

## F.    Defendants' Actions Harm Organizational Plaintiffs, as Well as Their Members, Clients and Constituents

226.    Organizational Plaintiffs, as well as their members, clients and constituents, will be injured by the addition of a citizenship question to the 2020 Census.[145]

227.    Organizational Plaintiffs' members, clients and constituents live in communities that will suffer from a disproportionate undercount of Latinos and non-U.S. citizens. Organizational Plaintiffs' members, clients, and constituents live in communities whose residents are less likely to respond to the citizenship question on the Census out of fear that Census

---

[143]  Memorandum from Secretary Wilbur Ross, Department of Commerce, to Karen Dunn Kelly, Under Secretary for Economic Affairs, on Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire (Mar. 26, 2018), *available at* https://goo.gl/5FHVPN.
[144]  *Id.* at 3.
[145]  The term "Organizational Plaintiffs" refers to all Plaintiffs except for Plaintiffs Juanita Valdez-Cox and Gene Wu.

responses will not be kept confidential and that there may be adverse immigration enforcement against non-U.S. citizen household members.

228.    Organizational Plaintiffs will be injured as organizations by the addition of a citizenship question to the decennial Census.  A citizenship question on the decennial Census will discourage Plaintiffs' members, clients, and constituents from completing the Census form.

229.    Adding a citizenship question to the Census will harm Organizational Plaintiffs, including, but not limited to draining their limited resources and frustrating their organizational missions.  Organizational Plaintiffs expended or will be required imminently to expend additional resources to educate their members, constituents and the clients they serve about how to respond to a citizenship question on the 2020 Census questionnaire.  Organizational Plaintiffs have also expended and will be required imminently to expend additional resources to address community fears and to persuade their members, constituents, and clients to participate in the Census despite the addition of a citizenship question on the questionnaire, including expending resources on additional staff, hotlines, public service announcements, written educational materials and other outreach methods that these organizations would not otherwise conduct.

*Arizona Organizational Plaintiffs*

230.     Many of the communities that AZLLC, CPLC, and PAZ serve have relatively larger Latino and non-U.S. citizen populations when compared to Arizona and the United States.

231.    The addition of the citizenship question will harm individuals that AZLLC, CPLC, and PAZ serve and/or represent because they will all receive a 2020 decennial Census questionnaire.  AZLLC and PAZ will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because AZLLC has constituents and PAZ has members who are Latinos

and/or non-U.S. citizens who will be deterred from responding to the 2020 Census because of the citizenship question.

232.    The inclusion of a citizenship question will result in a disproportionate undercount of residents in Arizona and the majority of counties AZLLC, CPLC, and PAZ serve and/or represent.  Individuals in these counties will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  These individuals will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

233.    An undercount will result in a loss of federal funds for services and programs on which AZLLC constituents, PAZ members, and the individuals that CPLC and PAZ serve rely.

234.    The addition of a citizenship question to the 2020 decennial Census frustrates AZLLC's mission to integrate immigrant communities into society and improve the quality of life of working-class Latino residents in Arizona.  Plaintiff AZLLC will devote significant resources to counteract the negative effects of the addition of the citizenship question and undercount of the Latino and non-U.S. citizen population.  As a result of the citizenship question, AZLLC will have to divert resources away from civic engagement efforts, such get-out-the-vote and voter registration efforts, to address concerns over the citizenship question.  But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent on AZLLC's core activities.

235.    The addition of a citizenship question to the 2020 decennial Census has made it difficult for CPLC to encourage other nonprofits to join coalitions around the Census because they have reservations about the question.  The addition of a citizenship question further frustrates CPLC's mission to drive economic and political empowerment in Arizona.  As a result of the addition of the citizenship question, CPLC has already diverted employee time from its

other programs and coalition work, including its education, healthcare, civic engagement, and voter registration work, to educate other nonprofits as well as community members about the citizenship question.   But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent toward CPLC's core activities.

236.    As a result of the addition of a citizenship question to the 2020 Census, PAZ has already diverted resources by receiving and responding to inquiries from community members concerned about the addition of a citizenship question to the 2020 Census.  PAZ will imminently have to divert its limited resources—including time and money—from its other efforts to educate the communities it serves about what the addition of this question means, and to encourage these communities to complete the Census questionnaire.

### California Organizational Plaintiffs

237.    Many of the communities that CHIRLA serves have relatively larger Latino and non-U.S. citizen populations when compared to California and the United States.

238.    The addition of the citizenship question will harm all CHIRLA members because they will all receive a 2020 decennial Census questionnaire.   CHIRLA will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because CHIRLA has members who are Latinos and/or non-U.S. citizens who will be deterred from responding to the 2020 Census because of the citizenship question.

239.    The addition of the citizenship question will frustrate CHIRLA's primary mission to advance the human and civil rights of immigrants and refugees through civic engagement, outreach, and education.  CHIRLA has diverted resources—including time and money—from its get-out-the-vote efforts to its Census outreach program in order to respond to the addition of the citizenship question and inevitable undercount of the Latino and non-U.S. citizen population.  In

order to test the impact of the citizenship question, and to assess the additional resources that will be needed to counteract the addition of the citizenship question, CHIRLA plans to use its members to conduct focus groups that test response rates and participant willingness to respond to a citizenship question on the 2020 decennial Census. CHIRLA will imminently divert resources away from other advocacy activity to secure more funding and resources for increased outreach to ensure an accurate count of hard-to-count populations in California. But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent toward CHIRLA's core activities.

240. Many of the communities in which CLLC members reside have relatively larger Latino and non-U.S. citizen populations when compared to California and the United States.

241. CLLC will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because CLLC members have Latino and/or non-U.S. citizen constituents that will receive the 2020 Census questionnaire and many of those constituents will be deterred from responding to the 2020 Census because of the citizenship question.

242. The addition of a citizenship question to the 2020 decennial Census frustrates CLLC's mission to integrate immigrant communities into society and improve the quality of life for working-class Latino residents in California. Plaintiff CLLC will devote significant resources to counteract the negative effect of the addition of the citizenship question and undercount of the Latino and non-U.S. citizen population, such as diverting resources from its immigration advocacy efforts, including the defense of California's Senate Bill 54, and educating immigrant communities about the availability of California resources for non-U.S. citizens. But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent toward CLLC's core activities.

243.    Many of the communities that DHF serves have relatively larger Latino and non-U.S. citizen populations when compared to California and the United States.

244.    DHF will be harmed by the inclusion of the citizenship question because DHF relies on Census data to determine which communities in the Central Valley are in most need of DHF's assistance.  Inaccurate Census data would frustrate DHF's mission because DHF may not target those communities that it otherwise would want to target for its services.

245.    In response to concerns raised after the addition of the citizenship question to the 2020 decennial Census by Latino and immigrant communities that DHF serves, DHF will shift to a more intensive direct neighbor-to-neighbor education model instead of using volunteers that may not be local residents.  The addition of the citizenship question will frustrate DHF's primary mission to organize and empower communities to pursue social justice through systemic and structural transformation.  DHF will devote significant resources to counteract the negative effects of the citizenship question and undercount of the Latino and non-U.S. citizen population. DHF will divert its limited resources—including time and money—from other important matters, such as promoting civic engagement through voter registration, voter education, and get-out-the-vote campaigns, in order to educate community members and mitigate any negative effects that the addition of the citizenship question to the Census may have on the completeness or accuracy of the count.  But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent toward DHF's core activities.

246.    The inclusion of a citizenship question will result in a disproportionate undercount of residents in California and the majority of counties CHIRLA, CLLC, and DHF serve.  CHIRLA, CLLC, and DHF members, clients, and constituents will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.

CHIRLA, CLLC, and DHF members, clients, and constituents will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

247.    An undercount in California will result in the loss of federal funds for services and programs on which CHIRLA, CLLC, and DHF members, and individuals within the communities they serve rely.

***Georgia Organizational Plaintiff***

248.    The addition of the citizenship question will harm GALEO members because they will all receive a 2020 decennial Census questionnaire.  GALEO will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because GALEO has members who are Latinos who will be deterred from responding to the 2020 Census because of the citizenship question.

249.    The inclusion of a citizenship question will result in a disproportionate undercount of residents in the majority of counties GALEO serves.  GALEO members will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  GALEO members will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

250.    An undercount in Georgia will result in a loss of federal funding in counties where GALEO members reside, including funding for public roads and highways.

251.    The addition of the citizenship question will frustrate the primary mission of GALEO to achieve political social change through civic engagement.  In service of its mission, GALEO uses Census data to identify where to target its programs and advocacy efforts, and inaccurate Census data will harm GALEO's ability to effectively target its resources.  Plaintiff GALEO will be required to devote significant resources to counteract the negative effects of the

addition of the citizenship question and undercount of the Latino and non-U.S. citizen population. GALEO will start its Census outreach efforts much earlier than it planned and will expend resources to recruit volunteers in order to conduct its Census related work. GALEO also will divert organizational resources to expanding its role as the leader of the GLCCC, given that the addition of the citizenship question will make it more difficult to ensure Latinos fill out and return the Census form. GALEO also plans to begin training staff and volunteers to respond to specific community concerns and to provide assistance with filling out the form. But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent toward GALEO's core activities.

### Illinois Organizational Plaintiff

252.    Many of the communities that Advancing Justice-Chicago serves have relatively larger Asian American and non-U.S. citizen populations when compared to Illinois and the United States. According to ACS data, the total population of Cook County, Illinois is 6.8 percent Asian American. Non-U.S. citizens comprise 10.9 percent of the population in Cook County, and 18.8 percent are Asian American.

253.    The inclusion of a citizenship question in the Census will result in a disproportionate undercount of residents in many of the communities that Advancing Justice-Chicago serves. The communities that Advancing Justice-Chicago serves will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies. The communities that Advancing Justice-Chicago serves will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

254.    The addition of the citizenship question will frustrate the primary mission of Advancing Justice-Chicago to build power through collective advocacy and organizing to

achieve racial equity.   To counteract the negative effects of the addition of the citizenship question to the 2020 decennial Census, Advancing Justice-Chicago will have to spend additional resources, financially as well as with volunteer and staff time to: (1) educate and inform community partners, media, business affinity groups, and the Asian American community in the Chicago area about the presence of the citizenship question; (2) encourage community members to answer the citizenship question; and (3) alleviate fears about immigration repercussions.

***Maryland Organizational Plaintiff***

255.    MLLC's members serve constituents who reside in state legislative districts with higher-than-average Latino population when compared to Maryland and the United States.   As a result, the inclusion of a citizenship question will result in a disproportionate undercount of residents in  many of the districts MLLC's members represent and in which they reside.

256.    The inclusion of a citizenship question in the Census will result in a disproportionate undercount of residents in many of the geographic areas that MLLC members represent.   The local communities that MLLC serves will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.   The geographic areas that MLLC serves will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

257.    MLLC will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because MLLC members have Latino and/or non-U.S. citizen constituents who will receive the 2020 Census questionnaire and many of those constituents will be deterred from responding to the 2020 Census because of the citizenship question.

258.    An undercount in Maryland will result in loss of federal funds for programs on which MLLC constituents rely.

259.    In response to the addition of the citizenship question on the 2020 decennial Census, MLLC will be required to divert resources to further publicize the Census, respond to community concerns about answering the citizenship question, and increase public education to ensure constituents understand the importance of a complete count of the Latino community. The addition of a citizenship question frustrates MLLC's mission to advocate on specific issues that impact Latinos and to promote civic engagement of the Latino community in Maryland.  In service of its mission, MLLC uses Census data to identify where to target its programs and advocacy efforts and to advocate for increased funding for resources to the Latino community, and inaccurate Census data will harm MLLC's ability to effectively fight for resource allocation to the communities local areas they serve and efficiently target their programs and advocacy. MLLC will devote significant resources to counteract the negative effects of the addition of the citizenship question and undercount of the Latino and non-U.S. citizen population, and will divert resources from its legislative agenda to activities to address the distrust and concerns caused by the addition of the citizenship question.  But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent toward MLLC's core activities.

*Massachusetts Organizational Plaintiff*

260.    According to ACS data, the total population of Chelsea, Massachusetts is 65.6 percent Latino.  Non-U.S. citizens comprise 47.1 percent of the population in Chelsea, and 87.7 percent of non-U.S. citizens are Latino.

261.    The inclusion of a citizenship question will result in a disproportionate undercount of residents in the geographic area served by the Chelsea Collaborative.

262. The addition of the citizenship question will harm Chelsea Collaborative members because they will all receive a 2020 decennial Census questionnaire.  The Chelsea Collaborative will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because the Chelsea Collaborative has members who are Latinos and/or non-U.S. citizens who will be deterred from responding to the 2020 Census because of the citizenship question.

263. An undercount in Chelsea will result in loss of federal funds for programs on which Chelsea Collaborative members rely.

264. Chelsea Collaborative members will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  Chelsea Collaborative members will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

265. The addition of the citizenship question will frustrate the primary mission of the Chelsea Collaborative to achieve political and social change through civic engagement.  In service of its mission, the Chelsea Collaborative uses Census data to identify where to target its programs and to support its advocacy efforts for greater resources into the area based on population trends.  The Chelsea Collaborative will be required to devote significant resources to counteract the negative effects of the addition of the citizenship question and undercount of the Latino and non-U.S. citizen population.  The Chelsea Collaborative plans to imminently divert some of its staff and volunteer time from its core activities, such as monitoring wage theft cases, holding ESL classes, or providing other immigration services, to train staff and volunteers to respond to specific community concerns about the Census and to provide assistance with filling out the form.  But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent toward the Chelsea Collaborative's core activities.

*New Mexico Organizational Plaintiff*

266.    Many of the communities that Somos serves have relatively larger Latino and non-U.S. citizen populations when compared to New Mexico and the United States.  As a result, the inclusion of a citizenship question will result in a disproportionate undercount of residents in many of the counties Somos serves.  Somos members will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  Somos members will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

267.    The addition of the citizenship question will harm all Somos members because they will all receive a 2020 decennial Census questionnaire.  Somos will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because Somos has members who are Latinos and/or non-U.S. citizens who will be deterred from responding to the 2020 Census because of the citizenship question.

268.    An undercount in New Mexico will result in loss of federal funds for programs on which Somos members rely.

269.    Following the addition of the citizenship question to the 2020 Census, Somos members have expressed concerns over that question.  The addition of the citizenship question will frustrate the primary mission of Somos to promote civic engagement and worker justice.  In service of its mission, Plaintiff Somos uses Census data to identify where to target its programmatic activities and advocacy efforts, and inaccurate Census data will harm its ability to effectively target its resources.  Somos imminently plans to widen the scope of its year-round organizing campaigns—which currently focus on issues such as wage theft, racial profiling, and immigrant access to drivers' licenses—to include outreach efforts to mitigate the undercount that will result from the addition of the citizenship question.  Somos imminently plans to divert

resources to create public service announcements and educational materials on the inclusion of that question and use its weekly radio show, social media platforms, earned media, e-mail alert system, and text alert system to distribute that information.   Somos also implements naturalization, voter registration, and get-out-the-vote programming through its "Viva el Voto" initiative, which is designed to build the political power of the Latino, rural and immigrant communities in New Mexico.   Because the addition of the citizenship question frustrates the goals of the "Viva el Voto" initiative, Somos imminently plans  to divert resources—including time and money—from its citizenship and naturalization outreach to educate its members and the community it serves on the importance of mitigating the historic undercount of Latino, rural, and immigrant communities.   But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent on Somos's core activities.

### *New York Organizational Plaintiff*

270.    Many of the communities that MinKwon serves have relatively larger Asian American, and non-U.S. citizen populations when compared to New York State and the United States.   As a result, the inclusion of a citizenship question will result in a disproportionate undercount of residents in New York City and the communities MinKwon serves.   The communities MinKwon serves will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.   The communities MinKwon serves will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

271.    An undercount in New York will result in loss of federal funds for programs on which the individuals MinKwon serves rely.

272.    The addition of the citizenship question will frustrate the primary mission of MinKwon to empower the Korean American, wider Asian American, and immigrant communities to achieve economic and social justice.  MinKwon will devote significant resources to counteract the negative effects of the addition of the citizenship question and undercount of the Asian American population, such as diverting resources from its civic engagement work, including hosting candidate forums, mailing voter guides, and canvassing potential voters to remind them of the upcoming election.  But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent on MinKwon's core activities.

***North Carolina Organizational Plaintiff***

273.    The inclusion of a citizenship question will result in a disproportionate undercount of residents in the counties El Pueblo serves.

274.    An undercount in North Carolina will result in loss of federal funds for programs on which the individuals served by El Pueblo rely.

275.    The individuals El Pueblo serves will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  The individuals El Pueblo serves will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

276.    The addition of the citizenship question will frustrate the primary mission of El Pueblo to achieve political and social change through civic engagement.  In service of its mission, El Pueblo uses Census data to identify where to target its programs such as voter registration get-out-the-vote efforts, community advocacy, and know-your-rights efforts, and inaccurate Census data will harm El Pueblo's ability to effectively target its resources.  El Pueblo will be required to devote significant resources to counteract the negative effects of the addition

of the citizenship question and undercount of the Latino and non-U.S. citizen population.  El Pueblo will need to start its outreach efforts much earlier than it planned and will expend resources to recruit volunteers in order to conduct its Census related work.  El Pueblo will imminently divert some of its canvassing capacity from previously planned civic engagement programs to provide information about the 2020 Census and mitigate the damage of the addition of the citizenship question by training volunteers and staff to respond to specific community concerns and to provide assistance with filling out the form.  But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent toward El Pueblo's core activities.

### Ohio Organizational Plaintiff

277.    Several of the communities that ASIA serves have relatively larger Asian American and non-U.S. citizen populations when compared to Ohio.  As a result, the inclusion of a citizenship question will result in a disproportionate undercount of residents in Ohio and the counties ASIA serves.  The communities ASIA serves will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  The communities ASIA serves will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

278.    An undercount in Ohio will result in loss of federal funds for programs on which the individuals ASIA serves rely.

279.    The addition of the citizenship question will frustrate the primary mission of ASIA to empower and advocate for Asian Americans and to promote civic engagement and equal access to civic and social opportunities.  To counteract the negative effects of the addition of the citizenship question to the 2020 Census decennial form, ASIA will have to spend

additional resources, financially as well as with volunteer and staff time to: (1) explain the addition of the citizenship question, (2) explain how to answer the citizenship question, and (3) alleviate fears about immigration repercussions.

***Texas Organizational Plaintiffs***

280.   Many of the communities that LUPE, MALC, and SHC serve have relatively larger Latino and non-U.S. citizen populations when compared to Texas and the United States.

281.   The inclusion of a citizenship question will result in a disproportionate undercount of residents in many of the Texas counties where LUPE, MALC, and SHC members, constituents, and clients reside, when compared to Texas and the United States.

282.   In response to the addition of a citizenship question to the 2020 decennial Census, LUPE has experienced a significant increase in phone calls and questions from its members and other Rio Grande Valley residents who seek information about the implications of the citizenship question.   The addition of a citizenship question frustrates LUPE's mission to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement.   As a result of the addition of the citizenship question, LUPE imminently plans to divert employee time from its English as a Second Language classes toward activities designed to mitigate a Census undercount exacerbated by the addition of a citizenship question, such as the expansion of its know-your-rights campaigns to address community concerns over the citizenship question.   But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent toward LUPE's core activities.

283.   The addition of the citizenship question will harm LUPE members because they will all receive a 2020 decennial Census questionnaire.   LUPE will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because LUPE has members who are Latinos

and/or non-U.S. citizens who will be deterred from responding to the 2020 Census because of the citizenship question.

284.    In response to the addition of the citizenship question on the 2020 Census, MALC will be required to convene briefings to educate members and their staff on the effect of and strategies to address the undercount exacerbated by the addition of the citizenship question. MALC members will also be required to respond to constituent phone calls and concerns over the citizenship question.  The addition of a citizenship question frustrates MALC's mission to promote the civic engagement of the Latino community in Texas.  In service of its mission, MALC uses Census data to identify where to target its programmatic and legislative efforts, and inaccurate Census data will harm MALC's ability to effectively target its resources.  As a result of the addition of the citizenship question, MALC plans imminently to redirect time and expenditures away from its programming and legislative advocacy in its traditional policy focus areas—immigration, business, energy, health, higher education, and public education—toward activities designed to mitigate a Census undercount exacerbated by the addition of a citizenship question, such as hiring a new staff member whose time will partially focus on addressing the addition of the citizenship question.  MALC has already cancelled its plans to sponsor "citizenship workshops" in San Antonio, El Paso, Corpus Christi, and the Rio Grande Valley that would have helped Latino legal permanent residents become U.S. citizens so they could more effectively engage in the political process.  MALC will spend an unprecedented amount of its limited resources, when compared to previous Census cycles, to implement a coordinated Census outreach plan and complete count effort that includes strategies designed to counteract the negative effects of the citizenship question on its constituent communities.  But for the addition

of the citizenship question, these financial and organizational resources would otherwise be spent toward MALC's core activities.

285.     In response to the addition of the citizenship question on the 2020 Census, SHC will be required to convene briefings to educate members and their staff on the effect of and strategies to address the undercount exacerbated by the addition of the citizenship question. SHC members will also be required to respond to constituent phone calls and concerns over the citizenship question.  The addition of a citizenship question frustrates SHC's mission to promote the civic engagement of the Latino community in Texas.  In service of its mission, SHC uses Census data to identify where to target its programmatic and legislative efforts and inaccurate Census data will harm SHC's ability to effectively target its resources.  Plaintiff SHC will devote significant resources to counteract the negative effects of the addition of the citizenship question and undercount of the Latino and non-U.S. citizen population, such as diverting resources away from its voter participation and civic engagement efforts, such as its annual presentation on voting rights and civic engagement at the Texas Democratic Party Convention and its outreach to Latino communities in Texas to educate them about their rights as voters.  But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent toward SHC's core activities.

286.     MALC and SHC will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because MALC and SHC members have Latino and/or non-U.S. citizen constituents that will receive the 2020 Census questionnaire and many of those constituents will be deterred from responding to the 2020 Census because of the citizenship question.

287.     The inclusion of a citizenship question will result in a disproportionate undercount of residents in Texas and the majority of counties that LUPE, MALC, and SHC

serve.  LUPE's, MALC's, and SHC's members, clients, and constituents will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  LUPE, MALC, and SHC members, clients, and constituents will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

288.   An undercount in Texas will result in loss of federal funds for programs on which LUPE, MALC, SHC members, clients, constituents, and individuals within the communities they serve rely.

***Washington Organizational Plaintiff***

289.   According to ACS data, Latinos comprise 47.7 percent of the total population in Yakima County, Washington.  Non-U.S. citizens comprise 13.6 percent percent of the total population in Yakima County, and 96.1 percent of non-U.S. citizens are Latino.

290.   Individuals that LCF serves will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because Latino and/or non-U.S. citizens will be deterred from responding to the 2020 Census because of the citizenship question.

291.   The inclusion of a citizenship question will result in a disproportionate undercount of residents in many of the Washington counties where LCF constituents reside when compared to Washington and the United States.

292.   An undercount will result in loss of federal funds for programs that the individuals that LCF serves rely on.

293.   In response to the addition of a citizenship question to the 2020 decennial Census, LCF has had to organize and participate in coalition work to address the question.  Prior to the announcement that the Census would include a citizenship question, LCF had started preparing and planning for its 2020 Census outreach efforts to educate the communities it serves about the

importance of being counted.  As a result of the addition of the citizenship question, LCF has had to divert employee time away from its efforts to educate the community about the importance of completing the Census questionnaire to work on addressing community concerns about the citizenship question.  But for the addition of the citizenship question, these financial and organizational resources would otherwise be spent toward LCF's core activities.

*National Organizational Plaintiffs*

294.   The total non-U.S. citizen population in just six of states in which SVREP, MFV, and LCLAA conduct activity—California, Texas, Florida, Arizona, Nevada and Washington—comprises over half of the non-U.S. citizen population in the United States.  As a result, the inclusion of a citizenship question will result in a disproportionate undercount of members and residents that SVREP, MFV, and LCLAA serve.

295.   An undercount will result in loss of federal funds for programs on which the members and individuals served by LCLAA, SVREP, and MFV rely.

296.   In response to the addition of the citizenship question on the 2020 Census, LCLAA, SVREP, and MFV will expand their historic Census outreach efforts to address their clients' concerns over the addition of the citizenship question to the 2020 decennial Census questionnaire.  The addition of a citizenship question frustrates LCLAA, SVREP, and MFV's missions to promote the civic engagement of Latinos in the communities they serve.  In service of their mission, LCLAA, SVREP, and MFV use Census data to identify where to target their programmatic activities and advocacy efforts, and inaccurate Census data will harm their ability to effectively target their resources.

297.   SVREP and MFV use Census data to assess where Latino populations are moving in order to help them get the resources they need and as a part of the organizations' work to

ensure Latinos are properly accounted for during state and federal redistricting. LCLAA uses Census data in its research and advocacy, particularly to identify population trends in the Latino population and workforce, and to identify how to best target its limited resources.

298.    LCLAA will divert significant organizational resources to counteract the negative effects of the addition of the citizenship question and undercount of the Latino and non-U.S. citizens populations. LCLAA plans to divert staff and volunteer time to provide trainings and resources to its chapters on the effect of the citizenship question and how to respond to community concerns with filling out the Census form instead of conducting chapter development and recruitment. SVREP will divert resources to address the addition of the citizenship question, such as revising the curriculum for its Latino Academy, a training "boot camp" of community organizers and potential Latino candidates, to include information on the impact of an undercount of Latinos and how to respond to community concerns over the citizenship question. MFV plans to divert some of its canvassing capacity from previously-planned civic engagement programs to provide information about the 2020 Census and mitigate the damage of the addition of the citizenship question by training volunteers and staff to respond to specific community concerns and to provide assistance with filling out the form. But for the addition of the citizenship question, these financial and organizational resources otherwise would be spent toward LCLAA, SVREP, and MFV's core activities.

299.    The addition of the citizenship question will harm LCLAA members because they will all receive a 2020 decennial Census questionnaire. LCLAA will be harmed by the inclusion of a citizenship question in the 2020 decennial Census because LCLAA has members who are Latinos and/or non-U.S. citizens who will be deterred from responding to the 2020 Census because of the citizenship question.

300.    The inclusion of a citizenship question will result in a disproportionate undercount of residents in communities LCLAA, SVREP, and MFV serve.  LCLAA, SVREP, and MFV members and the individuals they serve and will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies.  LCLAA, SVREP, and MFV members and the individuals they serve will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

## G.    Defendants' Actions Harm Plaintiffs Juanita Valdez-Cox and Gene Wu

301.    According to ACS data, the total population of Donna, Texas, where Plaintiff Juanita Valdez-Cox resides, is 16,349 and Latinos constitute 91.74 percent of the total population.

302.    An undercount will additionally harm Plaintiff Valdez-Cox because she and her family regularly drive on highways and roads in Hidalgo County.

303.    According to ACS data, the total population of Houston, Texas, where Plaintiff Wu resides, is 2,240,580 and Asian Americans constitute 6.7 percent of the total population. Nearly 180,000 residents in his home district are foreign born.  In the Greater Houston area, approximately 35 percent of Asian Americans are limited English proficient, nearly 41,000 live below the poverty line, and nearly 110,000 are low-income.

304.    An undercount will additionally harm Plaintiff Wu because he and his family regularly drive on highways and roads in Harris County.

305.    As a result of an undercount, Plaintiffs Valdez-Cox and Wu will be deprived of representation in the U.S. House of Representatives and in state and local elected bodies. Plaintiffs Valdez-Cox and Wu will also suffer a dilution of their voting strength and diminished ability to elect candidates of their choice.

## CAUSES OF ACTION

## COUNT I

### (Violation of the Enumerations Clause of the United States Constitution)

306.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

307.     Article I, Section 2, Clause 3 of the U.S. Constitution requires an "actual enumeration" of people in the United States.  The Constitution mandates that the apportionment of congressional seats be conducted on the basis of total population.  U.S. CONST., Amdt. XIV, § 2 ("Representatives shall be apportioned among the several States, according to their respective numbers, counting the whole number of persons in each State").

308.     Defendants' inclusion of a citizenship question in the 2020 Census questionnaire violates the "actual enumeration" clause of the Constitution because the question will cause a disproportionate undercount of non-U.S. citizens, the U.S. citizen family members of non-U.S. citizens, Asian Americans, and Latinos.

309.     The inclusion of the citizenship question is inconsistent with the constitutional purposes of the Census and it does not bear a reasonable relationship to the accomplishment of an actual enumeration of the population.

310.     The disproportionate undercount will injure Plaintiffs and organizational Plaintiffs' members by depriving them of access to social services whose funding is based on the Census, and will also injure Plaintiffs and organizational Plaintiffs' members by depriving them of representation in the U.S. House of Representatives as well as in state and local redistricting.

## COUNT II

### (Violation of the Equal Protection Clause of the Fifth Amendment

### to the United States Constitution)

311.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

312.    The Due Process Clause of the Fifth Amendment incorporates the equal protection guarantee of the Fourteenth Amendment.

313.    The inclusion of a citizenship question in the decennial Census violates the equal protection guarantee of the Fifth Amendment because it is motivated by racial animus towards Latinos, Asian Americans, and animus towards non-U.S. citizens and foreign-born persons.

314.    Defendants' violation caused and will cause harm to Plaintiffs.

## COUNT III

### (Violation of the Apportionment Clause of the U.S. Constitution)

315.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

316.    U.S. congressional seats are apportioned based on a count of the "whole number of persons." U.S. CONST., amend. XIV, § 2.

317.    Defendants' addition of a citizenship question to the decennial Census will result in an undercount of the whole number of persons and inaccurate Census data for the purposes of congressional district apportionment.

318.    Defendants' violation caused and will cause harm to Plaintiffs.

## COUNT IV

### (Administrative Procedure Act; 5 U.S.C. § 706 (2))

319.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

320.    The APA prohibits final agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," "contrary to constitutional right, power,

privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706.

321.    Defendants' represent or are agencies subject to requirements of the APA.  5 U.S.C. § 706 (b)(1).

322.    Defendants failed to provide any independent analysis or support to justify the DOJ's position that citizenship data is required from the decennial Census in order to enforce the Voting Rights Act.

323.    Defendants failed to complete any studies or tests to research the impact a citizenship question on the decennial Census might have on response rates and accuracy among hard-to-count populations.

324.    Defendants departed from statutory and regulatory requirements under the Paperwork Reduction Act and Information Quality Act, as well as OMB and Census Bureau standards and practices, in order to add a highly sensitive and untested citizenship question to the 2020 decennial Census.

325.    Defendants added the citizenship question to discriminate against Plaintiffs  and Plaintiffs' members because of their race, national origin, or alienage.

326.    Defendants' actions are in violation of their Constitutional obligation to carry out an actual enumeration of the population.

327.    Defendants failed to provide Congress with any report of new circumstances that require a modification to the Census subjects submitted in 2017, as required by statute.

328.    For the foregoing reasons, Defendants' inclusion of a citizenship question in the 2020 decennial Census is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of

statutory jurisdiction and authority; and without observance of procedure required by law. Defendants' actions are therefore in violation of the APA and must be set aside.

329.    Plaintiffs suffered and will suffer permanent and irreparable injury unless the addition of a citizenship question is enjoined.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

(a) Declare that addition of a citizenship question to the 2020 Census questionnaire is unauthorized by, and contrary to, Article I, Section 2, Clause 3 of the U.S. Constitution;

(b) Declare that addition of a citizenship question to the 2020 Census questionnaire is unauthorized by, and contrary to, amend. XIV, § 2 of the U.S. Constitution;

(c) Declare that addition of a citizenship question to the 2020 Census questionnaire violates the Equal Protection guarantee of the Fifth Amendment;

(d) Declare that addition of a citizenship question to the 2020 Census questionnaire violates § 706(2)(A)-(D) of the APA because it is arbitrary and capricious, an abuse of discretion, and not in accordance with law; contrary to constitutional power, right, privilege or immunity; and/or in excess of statutory jurisdiction and authority, and without observance of procedure required by law;

(e) Enjoin Defendants and their agents from including a citizenship question on the 2020 Census questionnaire and from taking any irreversible steps to include a citizenship question on the 2020 Census questionnaire;

(f) Award Plaintiffs reasonable costs, expenses, and attorneys' fees pursuant to 28 U.S.C. § 2412; and

(g) Award such additional relief as the interests of justice may require.

Dated: May 31, 2018                    Respectfully submitted,


By */s/ Robert P. Newman*
Robert P. Newman (MD Dist. Bar No. 20319)
*Attorney & Counselor At Law*
801 Wayne Avenue
Suite 400
Silver Spring, MD 20910
Phone: (301) 892-2713
Facsimile: (301) 883-1533


**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**
Thomas A. Saenz (CA Bar No. 159430 )*
Nina Perales (TX Bar No. 24005046)*
Denise Hulett (CA Bar No. 121553)*
Andrea Senteno (NY Bar No. 5285341)*
Tanya G. Pellegrini (CA Bar No. 285186)*

1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
Facsimile: (202) 293-2849


**ASIAN AMERICANS ADVANCING JUSTICE |
AAJC**
John C. Yang* (IL Bar No. 6210478)
Niyati Shah*° (NJ Bar No. 026622005)
Terry Ao Minnis* (MD Bar No. 0212170024)
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318
*° Admitted in New Jersey and New York only. DC practice limited to federal
courts.*

*Pending pro hac vice Admission*