## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LA UNIÓN DEL PUEBLO ENTERO, *et al.*,

       Plaintiffs,

    v.

WILBUR L. ROSS, in his official capacity as U.S. Secretary of Commerce, *et al.*,

       Defendants.

No. 8:18-cv-01570-GJH

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................................1

ARGUMENT .........................................................................................................................................2

I.     THIS CASE IS NOT JUSTICIABLE ...........................................................................................2

        A.     Plaintiffs Lack Standing to Maintain This Action ...............................................2

                1.     The individual Plaintiffs have not alleged sufficient injury in fact .....................2

                2.     The individual Plaintiffs' alleged injuries are not fairly traceable to the citizenship question. ...............................................................................................2

                3.     The organizational Plaintiffs lack standing .........................................................3

                4.     Plaintiffs' funding-related injuries are outside the zone of interests protected by the Enumeration Clause. ..................................................................6

        B.     Plaintiffs' Suit Is Barred by the Political Question Doctrine. ..........................7

        C.     The Secretary's Decision Is Not Subject to Judicial Review under the Administrative Procedure Act. ............................................................................8

II.    PLAINTIFFS FAIL TO STATE AN ENUMERATION OR APPORTIONMENT CLAUSE CLAIM ...........................................................................................................................8

III.   PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION CLAIM ...............................9

IV.   PLAINTIFFS' CONSPIRACY CLAIM UNDER 42 U.S.C. § 1985(3) SHOULD BE DISMISSED .............................................................................................................................14

CONCLUSION .....................................................................................................................................18

## TABLE OF AUTHORITIES

**CASES**

*Affiliated Prof'l Home Health Care Agency v. Shalala*,
   164 F.3d 282 (5th Cir. 1999) ................................................................................15

*Brissett v. Paul*,
   141 F.3d 1157, 1998 WL 195945 (4th Cir. 1998) ................................................16

*Buschi v. Kirven*,
   775 F.2d 1240 (4th Cir. 1985) ........................................................................15, 16

*Chang v. U.S. Citizenship & Immigration Servs.*,
   254 F. Supp. 3d 160 (D.D.C. 2017) ......................................................................14

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,
   538 U.S. 188 (2003) ..............................................................................................10

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ................................................................................................4

*Davis v. U.S. Dep't of Justice*,
   204 F.3d 723 (7th Cir. 2000) ................................................................................15

*Dep't of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999) ................................................................................................8

*Kravitz, et al. v. U.S. Dep't of Commerce*,
   2018 WL 4005229 (D. Md. Aug. 22, 2018) ..................................................2, 7, 9

*New York v. U.S. Dep't of Commerce*,
   315 F. Supp. 3d 766 (S.D.N.Y. 2018) ............................................................*passim*

*Powers v. Ohio*,
   499 U.S. 400 (1991) ................................................................................................6

*Reno v. Bossier Par. Sch. Bd.*,
   528 U.S. 320 (2000) ..............................................................................................11

*Simmons v. Poe*,
   47 F.3d 1370 (4th Cir. 1995) ................................................................................16

*Sylvia Dev. Corp. v. Calvert Cty.*,
   48 F.3d 810 (4th Cir. 1995) ..................................................................................11

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ..........................................................................................14

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,*
    463 U.S. 825 (1983) ............................................................................................................ 14, 17

*Utah v. Evans,*
    536 U.S. 452 (2002) ....................................................................................................................7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ..................................................................................................................10

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) ..................................................................................................................... 7, 9

*York Assocs., Inc. v. Sec'y of Hous. & Urban Dev.,*
    815 F. Supp. 16 (D.D.C. 1993) ................................................................................................14

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ..............................................................................................................15

## STATUTES

5 U.S.C. § 706 .....................................................................................................................................14

12 U.S.C. § 1702 ................................................................................................................................14

42 U.S.C. § 1985 .................................................................................................................1, 14, 15, 16

## INTRODUCTION

In opposing Plaintiffs' attempt to invalidate the Secretary's reinstatement of a citizenship question on the decennial census questionnaire, Defendants set forth the multiple reasons that this case is not justiciable and explained why the Court should not second guess the Secretary's judgment regarding his exercise of authority delegated to him by the Constitution through Congress. Plaintiffs' opposition does nothing to dispel these justiciability concerns. In particular, Plaintiffs fail to allege the existence of an imminent injury that is traceable to the actions of Defendants, instead of some third party. Plaintiffs also fail to show how the organizational Plaintiffs have standing to bring these claims given the lack of any plausible allegation that the organizations will somehow suffer a particularized harm as a result of the question's inclusion in the 2020 Census. Plaintiffs' claims are also not justiciable because they raise a political question not suitable for judicial determination and challenge a decision by the Secretary over a matter that is committed to his discretion by law.

Even if Plaintiffs' claims were justiciable, their constitutional claims and 42 U.S.C. § 1985(3) claim should be dismissed for failure to state a claim upon which relief may be granted. Plaintiffs' Enumeration Clause claim—that reinstating a citizenship question could potentially reduce responsive rates—ignores that the census has always had goals beyond simply enumeration, and there is no support for the notion that the census must pursue accuracy at the expense of all other goals. Plaintiffs' equal protection claim likewise fails because Plaintiffs have not alleged that the decisionmaker, Secretary Ross, had any discriminatory motive. Finally, Plaintiffs' conspiracy claim under § 1985(3) fails because Plaintiffs have not identified any waiver of sovereign immunity for that claim, and it is barred by the intra-corporate conspiracy doctrine. For these reasons, and those set forth in Defendants' previous memorandum, this case should be dismissed.

## ARGUMENT

## I.  THIS CASE IS NOT JUSTICIABLE

### A.  Plaintiffs Lack Standing to Maintain This Action.

#### 1.  The individual Plaintiffs have not alleged sufficient injury in fact.

The seven individual Plaintiffs do not have standing to bring these claims because they failed to plausibly allege how they are at imminent risk of suffering a concrete, particularized harm from Defendants' decision to reinstate a citizenship question on the 2020 Census.  In support of this argument, and in accordance with this Court's order of August 22, 2018, ECF No. 52, Defendants refer this Court to Defendants' briefing on this issue as set forth in Section I(A)(1) of their memorandum in support of their motion to dismiss in *Kravitz*, ECF No. 54-2, and section I(A) of Defendants' reply in further support of their motion to dismiss in *Kravitz*, ECF No. 54-3.[1]

#### 2.  The individual Plaintiffs' alleged injuries are not fairly traceable to the citizenship question.

The individual Plaintiffs also have failed to plausibly allege how their supposed injuries are fairly traceable to Defendants' actions to reinstate a citizenship on the 2020 Census, as opposed to intervening actions of other parties.  In support of this argument, and in accordance with this Court's order of August 22, 2018, Defendants refer this Court to Defendants' briefing on this issue as set forth in Section I(A)(2) of their memorandum in support of their motion to dismiss in *Kravitz*, and section I(A) of Defendants' reply in further support of their motion to dismiss in *Kravitz*.[2]

---

[1]  While Defendants acknowledge that this Court previously held that a group of individual plaintiffs had alleged an injury in fact from the citizenship question sufficient to survive Defendants' motion to dismiss, *Kravitz, et al. v. U.S. Dep't of Commerce*, 2018 WL 4005229 (D. Md. Aug. 22, 2018), Defendants respectfully disagree with the Court's analysis in that decision.

[2]  While Defendants acknowledge that this Court previously held that a group of individual plaintiffs had alleged a fairly traceable injury from the citizenship question sufficient to survive Defendants' motion to dismiss, *Kravitz*, 2018 WL 4005229, Defendants respectfully disagree with the Court's standing analysis in that decision.

### 3.      The organizational Plaintiffs lack standing.

The organizational Plaintiffs have also failed to meet the standing requirements.  Most of the organizational Plaintiffs' claims first lack standing because they have failed to identify any of their members, let alone demonstrate that those individual members would themselves have standing to bring these claims.  In fact, Plaintiffs concede that they must show that at least one member of each organizational Plaintiff has suffered or will suffer harm, but all but a couple of them simply decline to do so until the merits stage.  Pls.' Opp'n, ECF No. 62, at 8.  Plaintiffs concede that only one of the organizational Plaintiffs, La Unión Del Pueblo Entero (LUPE), specifically identifies an individual member, Juanita Valdez-Cox.  *Id.* at 8.  Plaintiffs also note that one of the individual Plaintiffs, Oliver Semans, is the executive director of one of the other organizational Plaintiffs, Four Directions.  *Id.* at 8 n.6; Am. Compl. ¶¶ 120-21.  Plaintiffs have provided no reason that the other organizational Plaintiffs have not or cannot provide the identities of individual members upon whom the organizational Plaintiffs rely for standing, and in fact state that they "are prepared to submit affidavits from specific identified members to further establish standing."  *Id.* at 8 n.7.  At the very least, the Court should require all organizational Plaintiffs to identify specific members who allegedly have been or will be harmed by the citizenship question on the 2020 Census.[3]

Furthermore, organizational Plaintiffs have failed to plausibly allege that they have standing to bring these claims on their own behalf.  Organizational Plaintiffs assert that they have standing to bring these claims because the citizenship question has "forced" them to divert resources away from

---

[3] In the pending litigation in the Southern District of New York, the organizational plaintiffs challenging the decision to reinstate a citizenship question on the 2020 Census on behalf of their members submitted affidavits providing information about certain individual members and explained how those members would allegedly be harmed by the citizenship question.  *See, e.g., NYIC, et al. v. U.S. Dep't of Commerce, et al.*, S.D.N.Y. No. 18-5125, ECF Nos. 49-1, 49-2, 49-3, and 49-4.  The information in these declarations was relied upon by that court in denying Defendants' motion to dismiss for lack of standing.  The court later ordered the organizational plaintiffs to provide specific contact information for any member on whose behalf the organizational plaintiffs were bringing a challenge.  *See, e.g., NYIC*, S.D.N.Y. No. 18-5125, ECF No. 119.

other program priorities in order to "mitigate the negative effects of the citizenship question." Pls.' Opp'n at 12. However, for the reasons explained above and in more detail in Defendants' memoranda in support of their motion to dismiss in this case, ECF No. 54-1, and *Kravitz*, ECF No. 54-2, Plaintiffs' allegations concerning any injury that may arise from the citizenship question are tenuous and rest entirely upon Plaintiffs' speculations. Here, the basis set forth by organizational Plaintiffs for standing rests even more so on pure speculation because Plaintiffs are not only claiming that the citizenship question will lead to harm, but also that they can anticipate what form that harm will take with enough specificity to divert resources to "mitigate" it.

Courts have held that organizational Plaintiffs do not have standing when the claimed injury is an organizational decision about the expenditure of resources. While Plaintiffs claim that this case is distinguishable from *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), because here "the Secretary's decision has already been made," Pls. Opp'n at 10, this completely misunderstands the rationale of that case. The Supreme Court's holding in *Clapper*—that plaintiffs lacked standing—was not based on uncertainty about the government's action, but upon uncertainty about whether plaintiffs would actually be *harmed* by the government action. The Court held that "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical *future harm that is not certainly impending.*" 568 U.S. at 416 (emphasis added). The Court went on to specifically reject the notion that a plaintiff could manufacture standing "simply by making an expenditure based on a nonparanoid fear." *Id.* The test set forth by the Court, then, is a stringent one: it is not sufficient simply to have a reasonable, "nonparanoid" anticipation of some harm; rather, the expenditure of resources claimed as the basis for standing must be "certainly impending." *Id.* Here, not only is Plaintiffs' theory reliant upon speculation as to harm, but Plaintiffs have provided no details about amount of funds they are diverting to "mitigate" the effects of the citizenship question, what form that alleged resource diversion will take, and what effect it will have upon their

4

other programs and projects.  This falls well short of the specificity required for an organizational plaintiff to assert standing based on harm from its own decision to divert resources.

The seven organizational Plaintiffs that are legislative caucuses in state legislative bodies and the five individual plaintiffs who are state legislators also fail to allege standing because they have not satisfied the requirements of legislative standing or any other basis for standing.  In their response, Plaintiffs concede that they are not claiming that they are entitled to proceed under legislative standing. Pls.' Opp'n at 12.  Instead, the Legislative Caucus Plaintiffs allege that they may assert organizational standing in the same manner as a nonprofit or charitable organization.  *Id.*  However, these Plaintiffs offer no explanation as to how a legislative caucus, or any specific legislators, would suffer any particularized harm as a result of the citizenship question, and have offered no explanation as to how the citizenship question forced any diversion of resources by any of the legislative caucuses.  Tellingly, Plaintiffs cite no case law to support the position that legislators or legislative caucuses may challenge any policy with which they disagree; if legislators were able to do so, the Supreme Court's legislative standing doctrine would be rendered completely irrelevant.  This Court should therefore hold that the legislators and Legislative Caucus Plaintiffs lack standing to pursue their claims.

Finally, the organizational Plaintiffs have failed to show that they have prudential standing to bring an equal protection claim because they advance no allegation that the Secretary intentionally discriminated against the *organizations*, as opposed to individuals.  As explained in more detail above, the membership-based organizational Plaintiffs have failed to disclose the identities of any members allegedly harmed by the citizenship question, and none of the organizational Plaintiffs provided any details in support of their conclusory allegations that they have diverted resources away from their normal operations because of the citizenship question.  Under these circumstances, an organizational plaintiff only has standing to sue if it has a close relationship to the party on whose behalf it is suing and there is some legal hindrance to the third party exercising his or her own legal rights.  *See Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).  Here, all but two of the organizational Plaintiffs have not provided

any information about the third-party persons on whose behalf they are suing, and none have shown any hindrance to third parties exercising their own legal rights. Accordingly, organizational Plaintiffs have failed to show that, in the absence of any claim of discrimination against them, they have standing to bring an equal protection claim on behalf of others.

### 4. Plaintiffs' funding-related injuries are outside the zone of interests protected by the Enumeration Clause.

The Plaintiffs also lack standing to bring their claims under the Enumeration Clause because their theory of those claims falls outside the zone of interests protected by that Clause. Plaintiffs' response is essentially nothing more than a claim that they will be adversely impacted by the reinstatement of a citizenship question, Pls.' Opp'n at 16, but this misses the point. The Enumeration Clause requires only an "actual Enumeration" every ten years. Decisions about how to use information from the census for funding or state apportionment purposes are not governed by the Enumeration Clause. Plaintiffs' theory would seem to render any government decision based in any way upon census data subject to a direct constitutional challenge under the Enumeration Clause no matter how attenuated from the enumeration. Here, Plaintiffs base their alleged harm upon speculative allegations regarding apportionment and funding consequences, not the allegedly inaccurate apportionment itself. Their Enumeration Clause claims are therefore actually challenging decisions they claim will be made subsequent to the 2020 Census, not the enumeration itself, and is accordingly not within the zone of interests protected by the Enumeration Clause.

### B. Plaintiffs' Suit Is Barred by the Political Question Doctrine.

For the reasons previously set forth in this case and in *Kravitz*, Plaintiffs' claims are barred by the political question doctrine. Plaintiffs' citation to this Court's opinion in *Kravitz*—which held applicable the Supreme Court's standard in *Wisconsin v. City of New York*—is misplaced for two reasons.

First, as Judge Furman recognized in this context, the *Wisconsin* reasonable-relationship test is inapposite because "*Wisconsin* cannot be read to suggest, let alone hold, that each and every question

on the census must bear a 'reasonable relationship' to the goal of an actual enumeration." *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 804 (S.D.N.Y. 2018). Instead, the *Wisconsin* standard "applies only to decisions that bear directly on the actual population count." *Id.* at 805; *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) ("[T]he Secretary's decision *not to adjust* [the population count] need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population." (emphasis added)).

Second, even if the *Wisconsin* standard applied here, it provides no guidance as to how courts should adjudicate challenges to pre-census information-gathering procedures. In order to determine whether any particular procedure "bears a reasonable relationship to the accomplishment of an actual enumeration of the population," *Kravitz v. U.S. Dep't of Commerce*, 2018 WL 4005229, at *14 (D. Md. Aug. 22, 2018) (quoting *Wisconsin*, 517 U.S. at 20), the Court must examine the meaning of an "actual enumeration." That phrase, the Supreme Court has held, simply means that the Secretary must conduct a person-by-person headcount rather than a population estimate. *Utah v. Evans*, 536 U.S. 452, 475 (2002) ("Article I makes clear that the original allocation of seats in the House was based on a kind of 'conjectur[e],' in contrast to the deliberately taken count that was ordered for the future. What was important was that contrast—rather than the particular phrase used to describe the new process." (citations omitted)). As Justice Stevens emphasized, "[t]he words 'actual Enumeration' require post-1787 apportionments to be based on actual population counts, rather than mere speculation or bare estimate, but they do not purport to limit the authority of Congress to direct the 'Manner' in which such counts should be made." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 363 (1999) (Stevens, J., dissenting). Absent an allegation that the Secretary is estimating rather than counting the population, the *Wisconsin* standard is no standard at all.

Accordingly, the Court lacks judicially manageable standards for evaluating the content of the census questionnaire, and this case should be barred by the political question doctrine.

C.    **The Secretary's Decision Is Not Subject to Judicial Review under the Administrative Procedure Act.**

For the reasons previously set forth in this case and in *Kravitz*, Plaintiffs' APA claim is committed to agency discretion by law and should be dismissed.[4]

## II.    PLAINTIFFS FAIL TO STATE AN ENUMERATION OR APPORTIONMENT CLAUSE CLAIM

Reiterating irrelevant allegations of the First Amended Complaint and merely parroting this Court's decision in *Kravitz*, Plaintiffs fail to substantively respond to Defendants' Enumeration and Apportionment Clause arguments.  For example, Plaintiffs emphasize that "Defendants violated the Enumeration Clause by . . . adding the citizenship question for discriminatory reasons."  Pls.' Opp'n at 18.  But no Court to consider this issue has found that the Secretary's intent is relevant under the Enumeration Clause.  *New York*, 315 F. Supp. 3d at 799 ("[T]here is nothing in either the text of the Enumeration Clause itself or judicial precedent construing the Clause to suggest that the relevant analysis turns on the subjective intent of either Congress or the Secretary."); *California, et al. v. Ross, et al.*, 18-cv-1865 (N.D. Cal. Aug. 17, 2018), ECF No. 75 at 27 ("Plaintiffs agree that the standard for evaluating a challenge under the Enumeration Clause is an objective one.").  Likewise, Plaintiffs also emphasize the Secretary's reinstatement of "the citizenship question at the eleventh hour without any pretesting in the context of decennial Census."  Pls.' Opp'n at 18.  Setting aside that the citizenship question at issue underwent extensive testing for inclusion on the American Community Survey ("ACS"), it is unclear what Plaintiffs envision as "pretesting" when the first demographic questions were asked in 1790 and when citizenship information was first collected in 1820.  Regardless, even accepting Plaintiffs' allegations of an undercount, the logical conclusion of Plaintiffs' theory is that the

---

[4] While Defendants acknowledge that this Court previously held that this question is not committed to agency discretion by law, *Kravitz, et al. v. U.S. Dep't of Commerce*, 2018 WL 4005229 (D. Md. Aug. 22, 2018), Defendants respectfully disagree with the Court's analysis in that decision.

Enumeration Clause prohibits any demographic questions, tested or untested, that may theoretically reduce response rates and cause some differential undercount.

Unfortunately, this slope is exactly as slippery as it seems.  *See Kravitz*, 2018 WL 4005229, at *13.  As Defendants pointed out, the census has, from the beginning, asked demographic questions that may disproportionately deter respondents in certain areas of the country.  Defs.' Mem., ECF No. 54-1, at 16-17.  This included race- and citizenship-related questions during turbulent political times when census "demographic questions [ ] would, allegedly, be viewed by a specific segment of the population as an attempt to further [ ] law enforcement objectives related to that population."  *Id.* at 17-18 (citing *Kravitz*, 2018 WL 4005229, at *13).  Plaintiffs have no response to this argument.  *See* Pls.' Opp'n at 18.  That is because applying their theory, along with the inapposite *Wisconsin* standard, would "lead ineluctably to the conclusion that each and every census—from the Founding through the present—has been conducted in violation of the Enumeration Clause."  *New York*, 315 F. Supp. 3d at 805.  This "would, of course, be absurd."  *Id.*

If Plaintiffs' other claims are allowed to proceed (they should not), their arguments "may support the contention that reintroducing the citizenship question is a bad decision."  *Id.*  "But nothing in the history of the census, recent or otherwise, plausibly suggests that asking a citizenship question" violates the Enumeration or Apportionment Clauses.  *Id.*

## III.    PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION CLAIM

In their opposition, Plaintiffs do not dispute that all possible allegations of discriminatory animus in the FAC relate to the statements of others, not the sole decisionmaker, Secretary Ross.[5]

---

[5] Plaintiffs cite this Court's prior determination—regarding extra-record discovery—that *Kravitz* Plaintiffs "made a strong preliminary showing that . . . Defendants' stated reason for adding the citizenship question . . . was pretextual."  Pls.' Opp'n at 25.  But, as Judge Furman recognized, "evidence that Secretary Ross's rationale was pretextual does not necessarily mean that it was a pretext for discrimination."  *New York*, 315 F. Supp. 3d at 809.  Thus, this Court's prior decision regarding the bad-faith exception provides no support for Plaintiffs' equal protection claim.

Instead, their argument boils down to one point: broad and unrelated statements by the President and others, without more, "*can* raise an inference of discriminatory motive for related actions by the head of the Department of Commerce and by every other Cabinet member working in concert with the White House." Pls.' Opp'n at 28. But such an expansive view of the Equal Protection Clause is contradicted by law and unsupported by the FAC's allegations.

Plaintiffs cite no precedential support for their capacious interpretation of the discriminatory-motive inquiry,[6] which is understandable because Supreme Court and Fourth Circuit cases routinely note that this inquiry is focused on the *decisionmaker's* statements and actions. In the seminal case of *Arlington Heights*, for example, the Supreme Court set forth various factors that may be probative of whether a decisionmaker was motivated by discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977). In doing so, the Court repeatedly emphasized that the inquiry focused on the decisionmaker's statements and actions. *Id.* at 267 ("The specific sequence of events leading up to the challenged decision also may shed some light on *the decisionmaker's* purposes." (emphasis added)); *id.* ("Substantive departures too may be relevant, particularly if the factors usually considered important *by the decisionmaker* strongly favor a decision contrary to the one reached." (emphasis added)); *id.* at 268 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements b*y members of the decisionmaking body*, minutes of its meetings, or reports." (emphasis added)). Subsequent Supreme Court cases also emphasized this point. *See, e.g.*, *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003) (noting that "statements made *by decisionmakers* or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent"); *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 343 (2000) (explaining the *Arlington Heights* factors, including "contemporary statements *of*

---

[6] Defendants respectfully disagree with Judge Furman's denial of Defendants' motion to dismiss with respect to the equal protection claim before him, and further note that the complaint in *New York* differs from the FAC here. *New York*, 315 F. Supp. 3d at 811.

*decisionmakers*") (emphasis added).  And the Fourth Circuit has followed this straightforward approach with respect to each of the *Arlington Heights* factors.  *See, e.g.*, *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995).[7]  Nothing in *Arlington Heights* or its progeny supports the notion that broad and unrelated statements by persons other than the decisionmaker can raise a plausible inference of discriminatory motive.

Even if statements by the President and others were somehow relevant, the FAC is devoid of allegations regarding two critical links: (1) a connection between anyone's purportedly discriminatory statements and reinstatement of a citizenship question, and (2) a connection between the persons making purportedly discriminatory statements and the Secretary.

First, none of the purportedly discriminatory statements catalogued by the FAC have anything to do with reinstating a citizenship question on the decennial census.  *See* FAC ¶¶ 219-54.  For example, the President's remark that "[i]n addition to winning the Electoral College in a landslide, I won the popular vote if you deduct the millions of people who voted illegally," FAC ¶ 237, has no connection to the decennial enumeration, the content of the census questionnaire, or even citizenship. Piling irrelevant quote on top of irrelevant quote does nothing to establish such a connection.  *See, e.g.*, FAC ¶ 222 (noting the Attorney General's comments regarding immigration policies in the Twentieth

---

[7] As the Fourth Circuit explained, the discriminatory-motive inquiry focuses on the *decisionmaker's* statements and actions:

> Several factors have been recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent, including: (1) evidence of a "consistent pattern" of actions *by the decisionmaking body* disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination *by the decisionmaking body* or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements *by decisionmakers* on the record or in minutes of their meetings.

*Sylvia Dev. Corp.*, 48 F.3d at 819 (emphasis added).

Century); ¶¶ 230, 246, 254 (noting the President's comments on Senator Elizabeth Warren); ¶ 234 (noting comments by Carl Higbie regarding "a Muslim registry"); ¶ 243 (noting that the President pardoned a former Maricopa County, Arizona sheriff); ¶ 251 (noting a White House article that used the term "animals" to describe members of a criminal gang, MS-13).[8]

Second, the FAC contains no allegations linking the persons making purportedly discriminatory statements to the Secretary. There are no allegations, for example, regarding a connection between Carl Higbie and the Secretary, FAC ¶ 234, Thomas Homan and the Secretary, FAC ¶ 242, or John Kelly and the Secretary, FAC ¶ 249. The vast majority of Plaintiffs' discriminatory-motive allegations relate to the President's statements.

But far from the Secretary "working in concert with the White House" to reinstate a citizenship question, Pls.' Opp'n at 28, Plaintiffs advance only three allegations that the White House even envisioned the possibility of a citizenship question prior to the Secretary's decision, none of which relate to the Secretary in any way. First, Plaintiffs point to a draft Executive Order regarding a citizenship question "on the long-form questionnaire in the decennial census." FAC ¶ 238-40, Pls.' Opp'n at 22. But this is a non-sequitur: there is no allegation that the President even saw the draft Executive Order, there is no allegation that interest in a citizenship question "on the long-form questionnaire" (which no longer exists) is related to a citizenship question on the 2020 short-form questionnaire, and there is certainly no allegation that the Secretary (who had not taken office in January 2017) knew of the draft Executive Order.[9] Second, Plaintiffs note a conversation between

---

[8] Even if the FAC's allegations evidence discriminatory animus—and such an inference is far from clear—Defendants note that many allegations of the FAC have nothing to do with the groups relevant to Plaintiffs' equal protection claim: Latinos, Asian Americans, non-U.S. citizens, or foreign-born persons. FAC ¶ 371.

[9] Allegations regarding the Attorney General and the Kansas Secretary of State are similarly flawed. *See* FAC ¶¶ 174-77, 222, 235, 241, 244. In addition, there are no allegations plausibly alleging any discriminatory statements or actions *by these individuals*.

the President and the Kansas Secretary of State regarding a citizenship question.  FAC ¶ 241.  Again, the FAC has no allegation that the Secretary knew of the conversation or was in any way influenced by a conversation, occurring over a month before he took office, between two people outside the Department of Commerce.  Third and finally, Plaintiffs cite an email by the President's reelection campaign, just before the Secretary's decision, that merely notes, "[t]he President wants the 2020 United States Census to ask people whether or not they are citizens."  FAC ¶ 185.  Certainly, a campaign email about the President "want[ing]" the 2020 Census to ask about citizenship cannot be enough to plausibly attribute broad and unrelated statements by the President to the Secretary for discriminatory-motive purposes;[10] many people "want[ed]" the 2020 Census to ask about citizenship. *See* AR 1141 (discussing a congressman's bill to reinstate a citizenship question on the census).

Plaintiffs attempt to sidestep these obvious deficiencies by stating that the President "chooses and directs and demands loyalty from his Cabinet."  Pls.' Opp'n at 28.  But, again, the FAC is conspicuously devoid of allegations related to Presidential demands of Secretary Ross or, really, any interaction at all between the President and the Secretary.  *See* FAC ¶¶ 255-59.

An equal protection claim challenging the Secretary's decision to reinstate a citizenship question on the census should not proceed based on purportedly discriminatory statements by people with no connection to the Secretary about matters with no connection to the census.  Such a holding would not only contravene settled equal protection principles, but would open the door to a flood of litigation challenging literally every Cabinet Head's facially neutral decisions on equal protection grounds.  *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (upholding a facially neutral Presidential

---

[10] A fundraising email after the Secretary made his decision—again from the President's campaign, not the President—plausibly suggests nothing of relevance.  FAC ¶ 189.  Presumably the President's campaign would have noted the President's "mandate[]" *before* the Secretary's decision if it were anything other than an attempt to fundraise.

directive despite the President's prior statements regarding the precise decision at issue).[11]  The Court

should decline Plaintiffs' invitation to do so and dismiss their equal protection claim.

## IV.   PLAINTIFFS' CONSPIRACY CLAIM UNDER 42 U.S.C. § 1985(3) SHOULD BE DISMISSED

Defendants' motion explained that Plaintiffs' § 1985(3) conspiracy claim is barred by sovereign

immunity.  In response, Plaintiffs do not dispute that *§ 1985(3)* does not waive federal sovereign

immunity.  Instead, Plaintiffs contend that the *Administrative Procedure Act* waives federal sovereign

immunity over APA claims for injunctive relief.  Pls.' Opp'n at 31.  But that sovereign immunity waiver

applies only to Plaintiffs' *APA claim*—Count V of the FAC.[12]  FAC ¶¶ 382–92.  A plaintiff must

identify a sovereign immunity waiver for *each separate claim* asserted in the complaint.  *See, e.g., York*

*Assocs., Inc. v. Sec'y of Hous. & Urban Dev.*, 815 F. Supp. 16, 21 (D.D.C. 1993) ("Section 702 of the APA

waives sovereign immunity as to Counts III, IV, VIII, and IX which claim arbitrary and capricious

agency action.  The waiver of sovereign immunity contained in 12 U.S.C. § 1702 is applicable to

Counts I, X, XI, and XII." (footnote omitted)).  Plaintiffs have not identified a sovereign immunity

waiver for their *§ 1985(3) claim*—Count III of the FAC.  FAC ¶¶ 373–77.

---

[11] Contrary to Plaintiffs' contention, Defendants did not rely on *Trump v. Hawaii* for "the exact same point" as in *New York*.  Pls.' Opp'n at 28.  There, Defendants cited *Trump v. Hawaii* for the proposition that "facially neutral policies are subject to only limited, deferential review." *New York*, 315 F. Supp. 3d at 810.  Here, Defendants cite *Trump v. Hawaii* for the straightforward proposition that the Supreme Court upheld a facially neutral Presidential directive despite the President's prior statements regarding the precise decision at issue.  Defs.' Mem. at 21.

[12] The APA's sovereign immunity waiver also applies to Plaintiffs' constitutional claims—Counts I, II, and IV of the FAC—because the APA provides for judicial review of agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also Chang v. U.S. Citizenship & Immigration Servs.*, 254 F. Supp. 3d 160, 161–62 (D.D.C. 2017).

The fact that the APA also provides for judicial review of agency action that is "not in accordance with law" and "in excess of statutory … limitations" (5 U.S.C. § 706(2)(A), (C)) does not mean that the APA's sovereign immunity waiver extends to § 1985(3) claims because § 1985(3) itself provides no substantive rights.  *See United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983).

Multiple circuits have thus held that sovereign immunity bars § 1985(3) suits against federal officers in their official capacities, as explained in Defendants' motion. *See Davis v. U.S. Dep't of Justice*, 204 F.3d 723, 726 (7th Cir. 2000); *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999). This principle applies equally to § 1985(3) claims for damages and to § 1985(3) claims for injunctive relief, like Plaintiffs' claim here. Plaintiffs acknowledge that *Affiliated Professional Home Health* held that sovereign immunity barred a § 1985(3) claim for injunctive relief. Pls.' Opp'n at 31 n.16. Their sole response is that that case is "not persuasive" because it "did not grapple with the plaintiffs' request for injunctive relief." *Id*. Notably, however, Plaintiffs do not cite a single case holding that sovereign immunity does *not* bar a § 1985(3) claim for injunctive relief against a federal official in her official capacity.[13] The § 1985(3) claim should therefore be dismissed under Rule 12(b)(1).

Defendants' motion also explained that, besides being barred by sovereign immunity, Plaintiffs' § 1985(3) claim should also be dismissed under Rule 12(b)(6) in light of the intracorporate-conspiracy doctrine. In response, Plaintiffs question whether the intracorporate-conspiracy doctrine—originally an antitrust principle—applies in the civil rights context, an issue the Supreme Court has not decided. Pls.' Opp'n at 33–34. But as explained in Defendants' motion, the Fourth Circuit has squarely held that the doctrine applies not just to civil rights claims generally, but to § 1985(3) claims specifically. *See Buschi v. Kirven*, 775 F.2d 1240, 1251–53 (4th Cir. 1985). Plaintiffs thus ask the Court to disregard binding Fourth Circuit law merely because the Supreme Court has yet to decide the issue—an invitation the Court should decline.

Plaintiffs next contend that the intracorporate-conspiracy doctrine does not apply to conspiracies among government officials in different agencies. Pls.' Opp'n at 33. But *Buschi* held that

---

[13] Plaintiffs cite *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), but that case involved § 1985(3) claims against federal officials in their *individual* capacities. In any event, *Abbasi* dismissed the § 1985(3) claims on another threshold immunity ground and did not discuss sovereign immunity. *Id*. at 1865–69.

the doctrine barred a § 1985(3) claim alleging a conspiracy among not just public hospital administrators, but also the governor. 775 F.2d at 1244, 1251–53. The doctrine's application therefore does not rise and fall on the formalistic bureaucratic boundaries of a governmental organization.

Plaintiffs also contend that the intracorporate-conspiracy doctrine does not bar § 1985(3) claims alleging *unauthorized* acts. Pls.' Opp'n at 33. But that exception to the doctrine—which is "less well recognized" than other exceptions, *Buschi*, 775 F.2d at 1253 n.4—applies only to actions by defendants outside their official capacities and in their *individual* capacities. *See id.* at 1252–53. If the exception applied any time a defendant's action was alleged to be unauthorized, as Plaintiffs contend, the exception would swallow the rule because every § 1985(3) conspiracy is by definition unlawful and thus unauthorized. Here, Plaintiffs have sued Secretary Ross and Acting Director Jarmin in their official capacities only. The intracorporate-conspiracy doctrine therefore bars the § 1985(3) claim.

Defendants' motion next explained that the FAC's allegations are too conclusory to state an actionable conspiracy. In response, Plaintiffs contend that the stringent "meeting of the minds" conspiracy standard—which the Fourth Circuit has "rarely, if ever," found met, *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995)—applies only at the summary judgment stage. Pls.' Opp'n at 30. But the Fourth Circuit applies that same "very high" standard at the motion to dismiss stage. *See, e.g.*, *Brissett v. Paul*, 141 F.3d 1157, 1998 WL 195945 at *2 (4th Cir. 1998) (unpublished) (per curiam) (citing *Simmons*). The FAC's allegations do not meet that standard. Plaintiffs allege that the White House drafted an executive order about a citizenship question (Pls.' Opp'n at 29 (citing FAC ¶¶ 238–39)), but they allege no *coordination with* Secretary Ross or Acting Director Jarmin. Plaintiffs allege that President Trump and Kris Kobach discussed a citizenship question and seemed to agree on the issue (Pls.' Opp'n at 29 (citing FAC ¶ 241)), but again they allege no *involvement by* Secretary Ross or Acting Director Jarmin. Plaintiffs allege that Secretary Ross had calls about a citizenship question with Kris Kobach and Steve Bannon (Pls.' Opp'n at 29 (citing FAC ¶¶ 174–76)), but they allege nothing about the *content* of those calls, like whether any joint plans were formed. Finally, Plaintiffs allege that Acting

Assistant Attorney General John Gore agreed to send a letter requesting that a citizenship question be reinstated on the 2020 Census (Pls.' Opp'n at 29–30 (citing FAC ¶¶ 178, 180, 186, 190)), but they allege no facts suggesting that Assistant Attorney General Gore did so with the *shared purpose* of depriving anyone of their constitutional rights.  The FAC thus fails to state an actionable conspiracy.

Finally, Defendants' motion explained that Plaintiffs' § 1985(3) claim—which seeks only injunctive relief—should be dismissed because injunctive relief is not available under § 1985(3).  In response, Plaintiffs contend that because § 1985(3) does not unambiguously *divest* courts of their equitable powers, the Court retains its authority to "enjoin Defendants from continuing their § 1985(3) violation."  Pls.' Opp'n at 32.  That contention fundamentally misconstrues § 1985(3), which provides no substantive rights.  *See United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 833 (1983).  Instead, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere."  *Id.*  Section 1985(3)'s only purpose is to provide a remedy—and that remedy by its terms is limited to damages, not injunctive relief.

17

## CONCLUSION

Defendants' motion should be granted and this case should be dismissed.

Dated: September 14, 2018                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

JOSHUA E. GARDNER
CARLOTTA P. WELLS
Assistant Directors, Federal Programs Branch

 /s/ Stephen Ehrlich
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
MARTIN TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-9803
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*