**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

|  |  |  |
|---|---|---|
| | * | |
| **LA UNIÓN DEL PUEBLO ENTERO,** *et al.,* | | |
| | * | |
| **Plaintiffs,** | | **Case No.: GJH-18-1570** |
| | * | |
| **v.** | | |
| | * | |
| **WILBUR ROSS,** *et al.,* | * | |
| | | |
| **Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

This case arises out of the Census Bureau's decision to add a citizenship question to the

2020 Census. Plaintiffs, seven individuals and twenty-six immigrant advocacy organizations,

claim that asking about respondents' citizenship status will dramatically depress response rates in

Plaintiffs' communities, compromising the survey's accuracy, disproportionately diluting

political power, and leading to a malapportionment of federal funding.[1] Based on these

allegations, Plaintiffs assert claims pursuant to the Census Clause of the United States

Constitution (Counts I and IV), the Equal Protection Clause of the Fifth Amendment of the

United States Constitution (Count II), 42 U.S.C. § 1985 (Count III), and the Administrative

Procedures Act (APA) (Count V); and seek to enjoin the Census Bureau from including the

---

[1] Individual named Plaintiffs are: Juanita Valdez-Cox (Texas), Gene Wu (Texas), Mia Gregerson (Washington), Cindy Ryu (Washington), Sharon Tomiko Santos (Washington), Raj Mukherji (New Jersey), OJ Semans (South Dakota). Organizational named Plaintiffs are: La Unión del Pueblo Entero (LUPE), Texas Senate Hispanic Caucus, Texas House of Representatives Mexican American Legislative Caucus, Southwest Voter Registration Education Project, California Latino Legislative Caucus, Coalition for Humane Immigrant Rights, Dolores Huerta Foundation, Mi Familia Vota Education Fund, Somos Un Pueblo Unido, Georgia Association of Latino Elected Officials, Labor Council for Latin American Advancement, Promise Arizona, El Pueblo, Inc., Maryland Legislative Latino Caucus, Asian Americans Advancing Justice-Chicago, Asia Services in Action, Inc., Minkwon Center for Community Action Inc., Chelsea Collaborative, Chicanos por La Causa, Latino Community Fund of Washington, Arizona Legislative Caucus, California Asian Pacific Islander, Legislative Caucus, California Legislative Black Caucus, Oca-Greater Houston, Friendly House, Four Directions, Inc.

citizenship question.[2] Defendants' Motion to Dismiss, ECF No. 54, and Plaintiffs' Motion for

Discovery, ECF No. 70 are presently pending before this Court. No hearing is necessary. *See*

Loc. R. 105.6. For the following reasons, Defendants' Motion to Dismiss and Plaintiffs' Motion

for Discovery are both denied.

## I.   BACKGROUND[3]

This court has previously described in detail the decennial census's purpose, preparation

for the 2020 census, and the citizenship question's alleged impact on similarly-situated

individual plaintiffs. *See Kravitz v. United States Dep't of Commerce*, No. GJH-18-1041, 2018

WL 4005229, at *2–4 (D. Md. Aug. 22, 2018). The court incorporates that background here, but

also briefly reviews the factual and legal background pertinent to the new legal issues before it.

### A.  Factual background

The United States Constitution requires that the Congress conduct an "actual

Enumeration" of the population every ten years "in such a manner as" the House of

Representatives "shall by law direct." U.S. Const., Art. I, § 2, cl. 3 ("Enumeration Clause").

"Representatives shall be apportioned among the several states according to their respective

numbers, counting the whole number of persons in each state." U.S. Const. Am. XIV § 2

("Apportionment Clause"). The Court refers to the Enumeration Clause and the Apportionment

Clause together as the "Census Clause." The population count is used to apportion representation

---

[2] Wilbur L. Ross in his official capacity as Secretary of Commerce, Ron Jarmin in his official capacity as Director of the Census Bureau, the United States Department of Commerce, and the United States Census Bureau are the named Defendants.

[3] Unless noted otherwise, the facts are taken from the First Amended Complaint, ECF No. 42, and assumed to be true. The Court may also take judicial notice of matters of public record and consider documents attached to the pleadings, to the extent that they are integral to the Amended Complaint and authentic. *See Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of published stock prices when considering a motion to dismiss). The Court also cites to the facts described in *Kravitz v. United States Dep't of Commerce*, No. GJH-18-1041, 2018 WL 4005229, at *2–4 (D. Md. Aug. 22, 2018)—a companion case pending before the Court—because the parties expressly incorporated the *Kravitz* background in their papers. ECF No. 54-1 at 9; ECF No. 62 at 10–11.

as well as to allocate more than $675 billion in federal funding for over 130 different federal programs and to collect demographic data. ECF No. 42 ¶ 138–39. Congress delegates the duty of conducting the decennial census to the Secretary of Commerce. 13 U.S.C. § 141 *et seq.* Within two and three years of the census, the Secretary must submit "a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census" to Congress. 13 U.S.C. § 141(f)(1)–(2).

In the lead up to the 2020 Census on March 28, 2017, the Secretary submitted such a report to Congress; this initial report did not include citizenship as a proposed subject. ECF No. 42 ¶ 173. Plaintiffs allege that citizenship was not a proposed subject because although the Trump administration began to consider adding a citizenship question in as early as January 2017, *id.* ¶ 241, the Census Bureau recognized that reinstating a citizenship question would "inevitably jeopardize the overall accuracy of the population count" given that "suspicious and fearful" respondents would refuse to cooperate, concerned that the information would be used against them. *Id.* ¶¶ 213.

Secretary Ross began considering adding the citizenship question, "which other senior Administration officials had previously raised," "[s]oon after [his] appointment as Secretary of Commerce."  ECF No. 42 ¶ 190 & n. 55 (citing Supplemental Memorandum by Secretary of Commerce Wilbur Ross, New York et al v. Dep't of Commerce et al, No. 1:18-cv-0291-JMF (S.D.N.Y. June 6, 2018), ECF No. 189-1). Around the time when Defendant Ross was appointed Secretary of Commerce, Kansas Secretary of State Kris Kobach spoke with President Trump about adding a citizenship question because, in Kobach's view, states like California have had "congressional seats inflated by counting illegal aliens." ECF No. 42 ¶ 241. Soon after Mr. Kobach and the President spoke about the Census, in January 2017, a draft Executive Order,

entitled "Executive Order on Protecting American Jobs and Workers by Strengthening the

Integrity of Foreign Worker Visa Programs" leaked through news reports. *Id.* ¶ 238. The draft

order instructed the Director of the Census Bureau to include a citizenship question on the 2020

Census to "fulfill several campaign promises" and address "the flow of illegal entries and visa

overstays." *Id.* ¶ 239. The draft order did not mention enforcing the Voting Rights Act—the

rationale that the administration would later use to support reinstating the citizenship question.

*Id.* ¶ 240.

In July 2017, Mr. Kobach emailed Defendant Ross to follow up about adding a

citizenship question to the 2020 Census. *Id.* ¶ 174. Prior to the email exchange, Kobach and Ross

had at least one phone conversation about adding a citizenship question. *Id.* The phone call took

place "at the direction of" Trump Administration advisor Steve Bannon. *Id.* ¶ 175. Mr. Kobach's

interest in the 2020 Census stemmed from his belief that the lack of a citizenship question "leads

to the problem that aliens who do not actually 'reside' in the United States are still counted for

congressional apportionment purposes." *Id.* ¶ 174. Plaintiffs allege that Secretary Ross and Mr.

Kobach spoke on the phone again about the citizenship question at another point in July 2017. *Id.*

¶ 176.

Eventually, despite DOJ's initial reluctance, at Secretary Ross's request, the acting head

of the Civil Rights Division of the Department of Justice, John Gore, provided the Voting Rights

Act justification around November 2017—after Mr. Kobach's communications with the

administration. ECF No. 42 ¶ 178, 180. Specifically, Mr. Gore drafted a letter claiming that the

addition of the citizenship question was necessary to enforce Section 2 of the Voting Rights Act.

*Id.* On November 3, 2017, Mr. Gore sent the draft letter to a Department of Justice Management

Division official, Arthur Gary, and asked that the official pass it along to the Census Bureau

4

under Mr. Gary's name. *Id.* ¶ 178. Mr. Gary did so. *Id.* ¶ 180. Notably, the Department of Justice has filed only four Section 2 Voting Rights Act enforcement actions since 2010, *id.* ¶ 183, and in testimony before Congress, Mr. Gore could not identify a single case brought under the Voting Rights Act that failed due to a lack of citizenship data. *Id.* ¶ 184.

On March 26, 2018, Secretary Ross directed the Census Bureau to include a citizenship question. ECF No. 42-1 ¶ 186. Plaintiffs allege that Defendants added the 2020 citizenship question to depress the count of immigrant communities of color, thereby decreasing this population's impact on and benefit from apportioned political power. ECF No. 42 ¶¶ 375–76. Plaintiffs contend that Secretary Ross had no basis to find the citizenship question necessary to enforce the Voting Rights Act or that the benefits of collecting citizenship data outweigh potential adverse effects on response rates. *Id.* ¶ 385. Relying on the above sequence of events, Plaintiffs allege that the Secretary engineered the Voting-Rights-Act rationale with the assistance of the Department of Justice to cloak Defendants' true purpose. *Id.* ¶ 189 n. 53.

Throughout the period when the administration was considering the citizenship question addition, President Trump made the following statements, among others, relevant to his views of the communities that Plaintiffs represent: he complained on January 11, 2018, about "these people from shithole countries" coming to the United States and added that the United States should accept more immigrants from countries like Norway, ECF No. 42 ¶ 248; (2) he commented on May 16, 2018, that "[w]e have people coming into the country, or trying to come in. . . . You wouldn't believe how bad these people are. These aren't people, these are animals . . .," *id.* ¶ 250; and (3) he asserted that Democrats "want illegal immigrants, no matter how bad they may be, to pour into and infest our Country," *id.* ¶ 253.

According to Plaintiffs, the citizenship question will harm the individual Plaintiffs and the organizational Plaintiffs' clients, members, and constituents because Latinos, African Americans, Asian Americans, Native Americans, and Non-U.S. Citizens (collectively, "Undercount Groups") will be disproportionately undercounted in the 2020 Census. ECF No. 42 ¶ 260.[4] The Undercount Groups are already recognized as "hard-to-count populations," *id.* ¶ 261, and they are more likely to be suspicious about the purpose of the decennial census and the government's use of census data than other population groups, a suspicion allegedly exacerbated by the current political environment. *Id.*¶¶ 213, 215, 268, 271. If, as expected, the citizenship question depresses response rates among Undercount Groups relative to the rest of the country, there is a substantial risk that their communities will be deprived of representation in congressional, state, and local governing bodies. *E.g.*, *id.* ¶¶ 276, 288, 294, 297, 301. Further, Plaintiffs allege that they will suffer harm because a disproportionate undercount will lead to a loss of federal funding in their states and localities. *E.g.*, *id.* ¶¶ 5, 10, 15, 20, 33, 38, 43, 48, 53, 57, 61, 66, 71, 76.

**B.  Procedural background**

Plaintiffs' First Amended Complaint asserts claims pursuant to the Census Clause of the United States Constitution (Counts I and IV), the Equal Protection Clause of the Fifth Amendment of the United States Constitution (Count II), 42 U.S.C. § 1985 (Count III), and the Administrative Procedures Act (APA) (Count V) and seeks to enjoin Defendants from adding the citizenship question to the 2020 Census. ECF No. 42. A month before this action commenced, similarly-situated individual plaintiffs filed a different suit in this Court against the Department of Commerce, the Census Bureau, and other defendants to enjoin use of a citizenship question on

---

[4] Plaintiffs plead that they are either themselves members of these Undercount Groups or they represent such individuals in their organizational capacity. ECF No. 42 ¶¶ 4, 9, 14, 19, 23, 27, 32, 37, 42, 47, 52, 56, 60, 65, 70, 75, 79, 88, 92, 96, 101, 107, 112, 116, 124-130.

the 2020 Census. *Kravitz*, No. GJH-18-1041, ECF No. 1. The *Kravitz* plaintiffs brought Census

Clause and APA claims but did not assert Equal Protection Clause or 42 U.S.C. § 1985

Conspiracy claims. *Id.* The Defendants in that case filed a Motion to Dismiss, ECF No. 24, and

the Court held a Motions Hearing on July 18, 2018, ECF No. 45. In their papers and at the

hearing, the *Kravitz* defendants argued that the plaintiffs lacked standing because their alleged

injuries were 1) too attenuated and speculative and 2) not fairly traceable to the challenged

action. Further, they argued that the political question doctrine barred the plaintiffs' suit and that

the Secretary's decision was not reviewable under the APA. Finally, the defendants argued that

the plaintiffs had failed to state a claim under the Census Clause. The Court issued a

memorandum opinion denying the *Kravitz* motion to dismiss on August 22, 2018. *See Kravitz v.

United States Dep't of Commerce*, No. GJH-18-1041, 2018 WL 4005229 (D. Md. Aug. 22,

2018). On August 24, 2018, Defendants here filed their Motion to Dismiss. ECF No. 54.

Plaintiffs filed an opposition, ECF No. 62, and Defendants replied, ECF No. 68. Plaintiffs also

filed a Motion for Discovery, ECF No. 70, to which Defendants responded, ECF No. 75.

## II.   STANDARD OF REVIEW

### A.  Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal

Rules of Civil Procedure, asserting that Plaintiffs lack of standing. A challenge to standing is, in

effect, a challenge to the Court's subject-matter jurisdiction. *Valley Forge Christian Coll. v. Ams.

United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982). Plaintiffs have the

burden of proving that subject-matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d

642, 647 (4th Cir. 1999). When a defendant challenges subject-matter jurisdiction pursuant to

Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and

may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

### B.  Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants also move to dismiss the Amended Complaint, in part, pursuant to Rule 12(b)(6), asserting that Plaintiffs' Census Clause claims, Equal Protection Clause claim and 42 U.S.C. § 1985 Conspiracy claim fail to state claims upon which relief can be granted and that Plaintiffs' Administrative Procedure Act claim is not justiciable. To state a claim that survives a Rule 12(b)(6) motion, a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific inquiry," drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80.  When performing this inquiry, the Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,*

604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009).

## III.   DISCUSSION

### A.  Justiciability

Defendants argue that this case is not justiciable because 1) Plaintiffs lack standing; 2) the political question doctrine bars the Census Clause claim; and 3) courts cannot review the Secretary's decision under the APA. As Defendants have acknowledged, ECF No. 54-1 at 21–22, this Court recently decided that the political question doctrine does not bar courts from considering whether or not the expansive authority granted by Census Clause has been violated. *Kravitz v. United States Dep't of Commerce*, No. GJH-18-1041, 2018 WL 4005229, at *9–12 (D. Md. Aug. 22, 2018). The Court also held that APA claims challenging agency action under the Census Act are reviewable. *Id.* at *15–16. These holdings apply with equal force here, and because Defendants did not introduce any new facts or legal arguments relevant to these issues, the reasoning set forth in *Kravitz* regarding the political question doctrine and APA reviewability is adopted here. The issue of standing, however, remains.

"One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). In order to establish standing, a plaintiff must allege: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). According to the Supreme Court, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v.*

*Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 52 n. 2 (2006); *see also Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 330 (1999) (holding that a case is justiciable where some, even if not all, the plaintiffs have standing to sue); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 263–64 (same).

This Court held in *Kravitz* that individual plaintiffs alleging that their communities would be disproportionately undercounted if a citizenship question were added to the 2020 Census had sufficiently pled standing's injury-in-fact and causation elements—the only two elements in dispute. 2018 WL 4005229 at *8–9. Like the *Kravitz* plaintiffs, the Individual Plaintiffs here have alleged that the undercount will result in a loss of representation in the House of Representatives, as well as a loss of federal funding for their communities' schools and roads. *See e.g.*, ECF No. 42 ¶ 350–361. The Plaintiffs here specifically allege that they will "suffer a dilution of their voting strength and diminished ability to elect candidates of their choice." *See e.g.*, ECF No. 42 ¶ 363. For the reasons discussed in *Kravitz*, Plaintiffs' alleged vote-dilution injury satisfies the injury-in-fact requirement. 2018 WL 4005229 at *6 (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 at 331–32 (1999)). Just as the *Kravitz* plaintiffs plausibly alleged standing's causation element by pleading that the citizenship question would have a coercive effect on individuals' decisions not to respond to the Census, the Plaintiffs here have plausibly alleged that a disproportionate undercount would be "fairly traceable" to the addition of a citizenship question. Although it is true that for an undercount to occur, private individuals would have to choose not to respond to the Census, Plaintiffs allege that government action will directly cause through "coercive effect" those individuals to refuse to answer. *See Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Finally, the

parties do not dispute that the alleged injury—a disproportionate undercount—will be redressed by a decision enjoining the use of the citizenship question on the 2020 Census.

Because the seven Individual Plaintiffs have sufficiently pled standing's three elements, the Court need not consider whether the Organizational Plaintiffs have standing. *Rumsfeld*, 547 U.S. at 52 n. 2 ("the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). In any case, the Organizational Plaintiffs have also properly pled both associational standing and standing to sue on their own behalf. Relevant here (the other elements are not in dispute), to plead associational standing, an organization must allege that "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).[5] Although it is true that organizations cannot rely on a "statistical probability that some of [its] members are threatened with concrete injury," *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009), Defendants cite no Fourth Circuit precedent that suggests Plaintiffs must identify a particular affected member by name at the pleading stage.[6] Instead, they simply must plausibly allege that their members will suffer an injury-in-fact caused by the Defendants' action and redressable by the court—the Organizational Plaintiffs here have pled as much. *See generally,* ECF No. 42 ¶¶ 4–5, 23, 27–28, 32–33, 37–

---

[5] Plaintiffs assert representational organizational standing on behalf of the following eight Organizational Plaintiffs with members and seven legislative caucuses: La Unión Del Pueblo Entero ("LUPE"), Coalition For Humane Immigrant Rights ("CHIRLA"),Georgia Association of Latino Elected Officials ("GALEO"),Labor Council For Latin American Advancement ("LCFLAA"), Somos Un Pueblo Unido ("Somos"), Promise Arizona ("Promise") Chelsea Collaborative ("Chelsea"), OCA-Greater Houston ("OCA-GH"), Texas Senate Hispanic Caucus ("SHC"), Texas House of Representatives Mexican American Legislative Caucus ("MALC"), Maryland Legislative Latino Caucus ("MLLC"), Arizona Latino Legislative Caucus ("ALLC"), California Latino Legislative Caucus ("CLLC"), California Asian Pacific Islander Legislative Caucus ("API Caucus"), and California Legislative Black Caucus ("CLBC").
[6] Defendants cite to *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.23 (1982) to support their position that "a general reference to unidentified members is insufficient to confer" organizational standing. However, that footnote only stands for the uncontroversial point that a plaintiff is "obligated to allege facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury." In *Valley Forge*, the organizational plaintiff claimed "certain unidentified members" resided in Pennsylvania but did not explain how that fact "establish[ed] a cognizable injury where none existed before." *Id.* Here, for the reasons discussed above, Plaintiffs have properly established a cognizable injury.

38,42–43, 46–47, 52–53, 56–57. Even if naming a particular affected member was necessary, Defendants concede that at least one Organizational Plaintiff (LUPE) has named a specific member who alleges an injury similar to the named Individual Plaintiffs. ECF No. 54-1 at 14.

Further, the Organizational Plaintiffs have alleged direct standing by pleading a redressable injury-in-fact caused by Defendants. To do so, the Organizational Plaintiffs needed to allege facts demonstrating that the Defendants' actions would cause them to divert resources to counteract Defendants' actions or that the challenged actions would frustrate Plaintiffs' missions. *See Equal Rights Ctr. v. Equity Residential*, 483 F. Supp. 2d 482, 486 (D. Md. 2007) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–89 (1982)); *see also Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (an organization pleads an injury-in-fact by alleging "(1) frustration of its organizational mission; and (2) diversion of its resources" to combat the challenged actions by defendant.). It is enough for Plaintiffs to plead that there is "'a 'substantial risk' that the harm will occur, which in turn may prompt a party to reasonably incur costs to mitigate or avoid that harm.'" *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n. 5 2013).

The Organizational Plaintiffs allege that they will "imminently divert resources away from other advocacy activity to secure more funding and resources for increased outreach and ensure an accurate count of hard-to-count populations in" the communities they serve. *See generally,* ECF No. 42 ¶¶ 281, 284, 293, 320, 330, 352. The Organizational Plaintiffs also allege that they rely on the accuracy of the decennial Census to carry out their missions. *See*, *e.g.*, *id.* ¶¶ 3, 8, 13, 18, 22, 26, 31, 36, 41, 45, 51, 55, 59, 64. Thus, the Organizational Plaintiffs properly plead that a citizenship question creates the substantial risk that their organizational missions will be frustrated and their resources diverted.

Defendants' contention that the Organizational Plaintiffs lack prudential standing to bring their equal protection claim because Plaintiffs fail to "satisfy the third-party standing exception to the general rule against asserting the rights of others" is also without merit. ECF No. 54-1 at 18. The Organizational Plaintiffs need not establish third-party standing because, as discussed above, they have established standing to sue on behalf of their members. *See, e.g., N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 9 (1988) (holding that an association had standing to bring a constitutional claim on behalf of its members because the members "would have standing to bring this same suit").

Defendants' other prudential standing argument—that Plaintiffs' funding-related injuries are outside the zone of interests protected by the Enumeration clause—also fails. To be sure, "[A] plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his [C]omplaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). However, Plaintiffs satisfy this requirement by alleging that the citizenship question will lead to an inaccurate enumeration, causing malapportionment of political power and funding. The "actual Enumeration" mandated by the Census Clause is used to apportion representatives and determine equitable distributions of resources. Thus, when the Census yields inaccurate results, there is a substantial risk that the very injuries complained of by Plaintiffs will occur.

### B. Violation of the Census Clause (Counts I, IV)

Finding Plaintiffs' claims justiciable, the Court turns to whether Plaintiffs have adequately stated their claims and begins by looking at whether Plaintiffs properly allege a violation of the Census Clause. The Constitution requires that the Census be conducted in a manner that bears "a reasonable relationship to the accomplishment of an actual enumeration of

the population," while keeping in mind the enumeration's other constitutional purposes (i.e. apportionment and equal protection). *Wisconsin v. City of New York,* 517 U.S. 1, 20 (1996). Although the Census Clause does not require the Census Bureau to achieve perfect accuracy, it does require that a preference be given for "distributive accuracy (even at the expense of some numerical accuracy)." *Id.* at 20.

Therefore, as this Court found in *Kravitz*, it must follow that when the Census Bureau unreasonably compromises the distributive accuracy of the census, it may violate the Constitution. *See id.* at 19–20 ("so long as the Secretary's conduct of the census is 'consistent with the constitutional language and the constitutional goal of equal representation,' it is within the limits of the Constitution") (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992)). As alleged, the citizenship question will reduce participation and depress response rates among the Undercount Groups, resulting in a disproportionate undercount that adversely affects Plaintiffs' congressional apportionment, intra-state representation, and access to federally-funded programs. Furthermore, Defendants allegedly ignored clear evidence that the question would lead to such an undercount. Therefore, Plaintiffs have alleged that the citizenship question unreasonably compromises the distributive accuracy of the census.

In sum, Plaintiffs have adequately stated claims under the Enumeration and Apportionment Clauses (together, the Census Clause), and Defendants' Motion to Dismiss Counts I and IV will be denied.

### C.  Violation of the Equal Protection Clause of the Fifth Amendment (Count II)

Defendants also argue that Plaintiffs have failed to sufficiently allege that Defendants violated the Equal Protection Clause of the Fifth Amendment. Plaintiffs allege that the "inclusion of a citizenship question in the decennial Census violates the equal protection guarantee of the

Fifth Amendment because it is motivated by racial animus towards Latinos, Asian Americans, and animus towards non-U.S. citizens and foreign-born persons." ECF No. 42 ¶ 371. To state an Equal Protection claim under the Fifth Amendment, Plaintiffs have to plausibly allege that Defendants' decision was motivated by discriminatory animus and its application has an adverse effect on a protected group. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp. ("Arlington Heights")*, 429 U.S. 252, 264–65 (1977).

Defendants argue that even if the citizenship question would adversely affect Plaintiffs, Plaintiffs fail to allege discriminatory intent. ECF No. 54-1 at 25. Discriminatory intent implies that the decisionmaking body "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). To survive a motion to dismiss, a plaintiff need not allege that the "challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265. It is enough for a plaintiff to plausibly plead that an "invidious discriminatory purpose was a motivating factor" in the challenged decision. *Id.* at 266. To determine whether discriminatory intent motivated defendants, courts conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* The following factors may be probative:

> (1) evidence of a "consistent pattern" of actions by the  the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016) (quoting *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819 (4th Cir.1995)). This list is non-exhaustive. Further, a

plaintiff can survive a motion to dismiss without independently establishing that each factor weighs in the plaintiff's favor.

Considering these factors, the Court concludes that Plaintiffs' allegations are sufficient to survive Defendants' Motion to Dismiss. First, from the alleged facts, "a clear pattern" emerges "from the effect of the state action" even though it "appears neutral on its face." *Arlington Heights*, 429 U.S. at 266 (citations omitted). The "pattern" is the disparate impact itself, not a showing of multiple bad acts by Defendants. As previously discussed, Plaintiffs allege that a citizenship question will disparately impact "sensitive minority communities" in which the question will "inevitably trigger hostility, resentment and refusal to cooperate." ECF No. 42 ¶ 213. These minority communities are already recognized as "hard-to-count populations." ECF No. 42 ¶ 261. Even if the burden of lower response rates is limited, Plaintiffs sufficiently allege that the "limited burden" will be disparately born by their particular, protected communities. ECF No. 42 ¶¶ 260–69.

Additionally, the Complaint alleges facts that show "significant departures from the normal procedural sequence." Plaintiffs allege that Defendants overruled career staff who strongly objected to including the citizenship question, ECF No. 42 ¶¶ 213, 218, disregarded the historical practice of extensively testing questions before introducing or re-introducing them, ECF No. 42 ¶ 157–67, and ignored evidence that the citizenship question would harm the communities Plaintiffs live in or serve, ECF No. 42 ¶¶ 196–206. The Administrative Record supports these allegations. That record, which the Court may take judicial notice of, "shows, for example, that Secretary Ross overruled Census Bureau career staff, who had concluded that reinstating the citizenship question would be 'very costly' and 'harm[ ] the quality of the census count.'" *State v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 808 (S.D.N.Y. 2018)

16

(Quoting Admin. Record 1277). The Record also confirms that Defendants departed from the historical practice of engaging in "lengthy consideration and testing" even before "minor changes to the census questionnaire." *Id.* The departure here is particularly significant because it is not just that the citizenship question was added without *lengthy* testing, but that it was added without *any* testing at all and no justification was offered for why the citizenship question did not need to be tested. ECF No. ¶ 193.

Further, the plausibly alleged "specific sequence of events leading up to the challenged decision" suggests that Defendants' voting-rights-act rationale may be pre-textual—orchestrated in an effort to cover up a discriminatory purpose. "Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). Allegations that Defendants' explanation here is "unworthy of credence" include the fact that since 1965, when the Voting Rights Act was enacted, neither the Department of Justice nor civil rights groups have ever suggested that citizenship data would be helpful or necessary to enforce the law. *See* ECF No. 42 ¶ 181, 184, 385. In this context, it is suspect that around the same time administration officials urged adding a citizenship question to address "the flow of illegal entries and visa overstays," ECF No. 42 ¶ 239, the voting-rights-act rationale suddenly materialized. At the same time, John Gore, who allegedly ghost-wrote the Department of Justice's letter, could not identify any instance when the Department had failed to enforce the Voting Rights Act because it lacked citizenship data. ECF No. 42 ¶ 184.

Moreover, the Secretary indicated incorrectly that the Department of Justice's letter triggered consideration of a Census citizenship question. ECF No. 42 ¶ 188 n. 53. The Amended Complaint alleges that this version events is inaccurate. The administration first considered

adding a citizenship question months before the Department of Justice's letter—a letter that was not written independently by the Department of Justice but because Secretary Ross and his staff asked the Department of Justice if it "would support, and if so would request, inclusion of a citizenship question." ECF No. 42 ¶ 190. Additionally, in January 2017, a draft executive order instructing the Director of the Census Bureau to include a citizenship question in the 2020 census leaked through press reports. The draft was entitled "Executive Order on Protecting American Jobs and Workers by Strengthening the Integrity of Foreign Worker Visa Programs," did not mention Voting Rights Act enforcement, and instead described the citizenship question addition as a tool to "fulfill several campaign promises." ECF No. 42 ¶ 239.

Plaintiffs have also identified "contemporary statements" by President Trump and members of his administration that further support their claim that intentional discrimination motivated Defendants, at least in part, to add a citizenship question. These statements include President Trump's complaint on January 11, 2018, distinguishing immigrants of color—"these people from shithole countries"— from white immigrants from countries like Norway, ECF No. 42 ¶ 248, and his degrading comparisons of immigrants to "animals," *id.* ¶ 250, who "infest" the country, *id.* ¶ 253. While these statements were not made specifically in relation to the citizenship question they are nonetheless relevant to understanding the administration's motivations. After all, "discriminatory intent is rarely susceptible to direct proof." *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010). And while the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose. *See, e.g.*, *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999); *Freeman v. Arpaio*, 125 F.3d 732, 738 n.6 (9th Cir. 1997), overruled in part on

other grounds by *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008); 315 F. Supp. at 810 (S.D.N.Y. 2018).

Taken together, accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, Plaintiffs state a plausible claim that Defendants' decision to reintroduce the citizenship question on the 2020 Census was motivated by discriminatory animus and will result in an adverse effect on immigrants of color. Therefore, the Defendants' Motion to Dismiss Plaintiffs' Fifth Amendment Equal Protection claim will be denied.

### D.  Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985(3) (Count III)

Defendants argue that Plaintiffs' Civil Rights conspiracy claim should be dismissed based on sovereign immunity and because the Complaint does not sufficiently allege a claim under 42 U.S.C. § 1985(3). The Court will address both arguments.

#### 1.  Sovereign Immunity

Sovereign immunity bars cases against the federal government unless Congress has unequivocally consented to suit or an exception applies. *United States v. Testan*, 424 U.S. 392, 399 (1976); *Dugan v. Rank*, 372 U.S. 609, 621 (1963). The parties agree that the APA waives federal sovereign immunity over Plaintiffs' APA and constitutional claims, ECF No. 68 at 18, but dispute whether sovereign immunity bars Plaintiffs' § 1985(3) Conspiracy claim.

In general, a claim against a federal official for acts performed within his or her official capacity amounts to an action against the sovereign and is barred by sovereign immunity. *Portsmouth Redev. & Hous. Auth. v. Pierce,* 706 F.2d 471, 473 (4th Cir.1983). However, the Supreme Court recognizes exceptions to this general rule. For example, actions by officers that go beyond their statutory power are subject to suit. *Dugan v. Rank*, 372 U.S. 609, 621 (1963). Further, actions that are within the scope of an official's authority but are exercised in a

constitutionally void manner may be challenged. *Id.* 621–22. In these situations, "[a]lthough the officer's power to act may be conferred in form, 'the grant is lacking in substance because of its constitutional invalidity.'" *Int'l Fed''n of Prof'l & Tech. Engineers v. United States*, 934 F. Supp. 2d 816, 820 (D. Md. 2013) (citing *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 690 (1949)). In this context, the relief sought by Plaintiffs in this case—enjoining the Defendants' implementation of an allegedly unconstitutional conspiracy—is precisely the type of claim that is not barred by sovereign immunity.

The two out-of-circuit decisions that Defendants argue show "multiple circuits" have "held that sovereign immunity bars §1985(3) suits," do not change this conclusion. ECF No. 68 at 19 (citing *Davis v. U.S. Dep't of Justice*, 204 F.3d 723, 726 (7th Cir. 2000); *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999)). First, the plaintiff in *Davis* sought damages from government officials, which is typically restricted by sovereign immunity, but here, the Plaintiffs seek only injunctive relief. *Compare Land v. Dollar*, 330 U.S. 731, 738 (1947) ("The general rule is that a suit is against the sovereign" and thus barred if "the judgment sought would expend itself on the public treasury or domain") *with Sea-Land Service, Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) (holding that sovereign immunity did not bar claim for equitable relief). Second, *Affiliated Professional*, without analysis, states broadly that suits against the United States brought under the civil rights statutes, such as § 1985, are barred by sovereign immunity. 164 F.3d at 286. However, *Affiliated* cites to *Unimex, Inc. v. United States Department of Housing and Urban Development*, 594 F.2d 1060 (5th Cir. 1979), which explicitly recognizes the exception for constitutional claims that the Court applies here. 594 F.2d at 1067 ("The claims against the officials are barred, therefore, unless one of the two

exceptions to sovereign immunity applies. . . . No contention is made that the basis for either official's authority to act on the mortgage application is unconstitutional.").

Defendants' additional argument that Plaintiffs' conspiracy claim is barred because Plaintiffs did not sue Defendants in their individual capacity, ECF No. 68 at 19 n. 13 & 20, also fails. Assuming the facts in the Complaint are true, Defendants acted in their official capacity when they sought to implement an unconstitutional conspiracy. Plaintiffs have sued to enjoin them from implementing—in their official capacities—that constitutionally void action. As the Supreme Court has explained, there may be suits for injunctive relief against officers of the sovereign that are not barred by sovereign immunity. *Larson*, 337 U.S. at 689.

In sum, Plaintiffs attempt to enjoin Defendants from implementing an allegedly unconstitutional conspiracy is not barred by sovereign immunity.

## 2. Sufficiency of Allegations

The next issue before the Court is whether Plaintiffs have sufficiently alleged a claim under 42 U.S.C. § 1985(3). To survive a motion to dismiss a 42 U.S.C. § 1985(3) claim, a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). By successfully pleading their Equal Protection Clause claim, Plaintiffs have also pled most of these elements; however a dispute remains over whether Plaintiffs plausibly allege the conspiracy element. It is not enough for a plaintiff to plead "allegations of parallel conduct" by individuals because the plaintiff "must show an agreement or a meeting of the minds by defendants to violate the [plaintiff's] constitutional rights." *Id.* at 1377.

Plaintiffs plausibly allege that such a "meeting of the minds" existed to violate Plaintiffs' constitutional rights. Although Defendants characterize the Complaint as including only allegations "that public officials received recommendations on issues," in reality it includes facts from which the Court can reasonably infer an agreement to violate constitutional rights. To be sure, allegations that public officials merely received recommendations on issues would not be sufficient to state a claim under § 1985. One of the key narrowing principles that the Supreme Court has used to try to avoid the "constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law" is requiring that the agreement between co-conspirators be motivated by invidious discrimination. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69 (1993). Thus, unless a plaintiff pleads facts alleging a "meeting of the minds" where all minds were motivated by invidious discrimination, then a § 1985 claim cannot proceed. Plaintiffs have alleged as much here.

Assuming the facts in the Complaint are true, in January 2017, the Trump Administration drafted an Executive Order directing the Census Bureau to add a citizenship question to the 2020 Census—not to ensure that the Census would be conducted in a manner that would reasonably accomplish actual enumeration or the Census's other constitutional purposes, but to advance the President's anti-immigration political agenda, which, as alleged, is motivated by racial animus. ECF No. 42 ¶ 238–39. The draft order leaked to the press shortly after Mr. Kobach allegedly pitched the idea of adding a citizenship question to the President, ECF No. 42 ¶ 241, and around the time when Secretary Ross says he began considering the citizenship question, ECF No. 42 ¶ 190 n. 55. The draft order did not mention the Voting Rights Act justification. ECF No. 42 ¶¶ 238–40. According to the Complaint, Mr. Kobach's interest in a citizenship question stemmed from his view that states like California have had "congressional

seats inflated by counting illegal aliens." ECF No. 42 ¶ 241. Drawing all reasonable inferences in

Plaintiffs' favor, this allegation suggests Mr. Kobach was motivated to reduce immigrant

response rates to the Census to achieve an unconstitutional goal. As alleged, over a period of

months, Mr. Kobach spoke with Steve Bannon, President Trump, and Secretary Ross to persuade

them to add a citizenship question for the express purpose of reducing the number of immigrant

respondents. ECF No. 42 ¶ 241, 176, 174–75. Mr. Kobach explained to Secretary Ross that the

lack of a citizenship question "leads to the problem that aliens who do not actually 'reside' in the

United States are still counted for congressional apportionment purposes." *Id.* ¶ 174.

Rather than base the question on the motive articulated by Mr. Kobach, it is alleged that

Secretary Ross asked Mr. Gore to send him a letter from the Department of Justice requesting

that the Census Bureau add a citizenship question to the 2020 Census. ECF No. 42 ¶ 190 n. 55.

Mr. Gore agreed to do so. *Id*. Mr. Gore drafted a letter on the Department of Justice's behalf

requesting the addition of the citizenship question and supporting the request with the allegedly

false voting-rights rationale. *Id.* ¶ 178, 180. The allegations indicate that Mr. Gore took this

action based on an agreement with Secretary Ross rather than based on a real concern about

enforcing the Voting Rights Act because the Department of Justice has filed only four Section 2

Voting Rights Act enforcement actions since 2010, *id.* ¶ 183, and in testimony before Congress,

Mr. Gore could not identify a single case brought under the Voting Rights Act that failed due to

a lack of citizenship data. *Id.* ¶ 184. These facts must also be considered in the context of

Plaintiffs' allegation that Defendants knew that a citizenship question would "inevitably

jeopardize the overall accuracy of the population count," particularly "in minority communities"

where the question would "trigger, hostility, resentment and refusal to cooperate." ECF No. 42 ¶

213. Despite knowing that response rates would certainly drop in Plaintiffs' communities, and,

indeed, as alleged, because of it, Secretary Ross chose to add a citizenship question to the 2020

Census, using as pretext the Department of Justice letter, *id.* ¶ 186 &190, and concluding without

citing evidence that the benefits of collecting citizenship data outweighed its adverse effects.

While discovery may very well show that administration officials did not agree to Mr.

Kobach's citizenship question plan for discriminatory purposes such that Plaintiffs' § 1985 claim

cannot survive a motion for summary judgment or trial, Plaintiffs have alleged sufficient facts to

survive the motion to dismiss stage.[7]

For the foregoing reasons, the Defendants' Motion to Dismiss Plaintiffs' conspiracy

claim will be denied.

### E.  Additional Discovery

Having denied Defendants' Motion to Dismiss, the Court must next determine to what

fact discovery Plaintiffs are entitled. The discovery ordered in *Kravitz* and the consolidated cases

of *State of New York, et al. v. United States Department of Commerce, et al.*, and *New York

Immigration Coalition, et al. v. United States Department of Commerce, et al.*, Case No. 18-Civ.-

2921 (the "New York cases") provides a starting point for determining what discovery outside of

the Administrative Record the Plaintiffs are entitled. For the same reasons described in *Kravitz*

and the New York cases, Plaintiffs here have made a strong preliminary showing that Defendants

have acted in bad faith, meaning some limited discovery outside of the existing Administrative

Record is warranted. WL 4005229, at *16–17.

---

[7] Defendants invocation of intracorporate-conspiracy doctrine is misplaced. At the time that it is alleged Mr. Kobach allegedly conspired with Defendants and others "to deprive Latinos, African Americans, Asian Americans, Native Americans and non-U.S. citizens of their Fifth Amendment right to equal protection of the laws" he was not part of the same governmental body as Defendants. ECF No. 42 ¶¶ 174, 376. Defendants further argument that § 1983(3) prohibits courts from issuing injunctive relief is also not persuasive. *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction.").

Since the Court granted the *Kravitiz* plaintiffs' motion for additional discovery, 2018 WL 4005229 at *16–17, Judge Furman has ruled in the New York cases that Secretary Ross and the Department of Justice's John Gore must sit for depositions but denied the New York plaintiffs' request to depose Steve Bannon and Kris Kobach. Case No. 18-Civ.-2921, ECF Nos. 303, 345.[8] However, unlike the litigants in *Kravitz* or the New York cases, the Plaintiffs here allege a 42 U.S.C. § 1985(3) conspiracy claim. Specifically, Plaintiffs allege that Defendants conspired with Mr. Kobach and Mr. Bannon to violate Plaintiffs' constitutional rights. Plaintiffs argue that Mr. Kobach and Mr. Bannon's testimony is thus plainly "relevant" to whether an agreement existed between Defendants and these third parties.

Although it is true that the Plaintiffs here plead a meeting of the minds existed between Defendants, Mr. Kobach, Mr. Bannon, and others, Plaintiffs have had the opportunity to sufficiently test this theory by eliciting testimony from Secretary Ross and Mr. Gore about the source and intent of the citizenship question plan. Additionally, the main focus of the APA claim will be Secretary Ross's decision. Given that the depositions of Secretary Ross and Mr. Gore will have already expanded the generally limited scope of judicial review of APA challenges and to avoid allowing Plaintiffs to get around this limitation through the addition of more claims, the Court will not grant Plaintiffs' request for leave to depose Mr. Kobach or Mr. Bannon. 5 U.S.C. § 706.

As Judge Furman noted, "Mr. Bannon is a former White House adviser and that implicates a whole set of separate and rather more significant issues, namely separation of powers issues, and executive privilege issues, and so forth." ECF No. 71-2 at 64. Further, the Complaint and the existing Administrative Record provide only one limited reason to believe

---

[8] The defendants in those cases filed a Petition for a Writ of Mandamus with the Supreme Court on October 29, 2018; the plaintiff-respondents have yet to respond.

Mr. Bannon has information relevant to the Plaintiffs' claims. Specifically, the Complaint alleges that on one occasion when Mr. Kobach spoke to Secretary Ross about the citizenship question he did so at "the direction of Steve Bannon." ECF No. 42 ¶ 175. Even if Mr. Bannon was involved in high-level discussions regarding adding a citizenship question to the 2020 Census, the content of such communications is likely protected by the presidential communications privilege and/or the deliberative process privilege.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 54, and Plaintiffs' Motion for Discovery, ECF No. 70, shall be denied. A separate Order follows.


Dated: <u>November  9, 2018</u>                    <u>            /s/                          </u>

GEORGE J. HAZEL
United States District Judge