# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| ROBIN KRAVITZ, et al. | Civil Action No. 8:18-cv-01041-GJH |
| *Plaintiffs*, | |
| v. | Hon. George J. Hazel |
| U.S. DEPARTMENT OF COMMERCE, *et. al.*, | |
| *Defendants*. | |
| | |
| LA UNIÓN DEL PUEBLO ENTERO; *et al.* | Civil Action No. 8:18-cv-01570-GJH |
| *Plaintiffs*, | |
| v. | Hon. George J. Hazel |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce; *et al.* | |
| *Defendants*. | |

## JOINT PROPOSED PRETRIAL ORDER

Pursuant to Local Rule 106, the parties, by and through undersigned counsel, hereby submit the following Joint Proposed Pretrial Order. Plaintiffs and Defendants each reserve the right to modify this submission as appropriate.

## INFORMATION REQUIRED BY LOCAL RULE 106.2

### a) Plaintiffs' Statement of Facts and Legal Theories

#### 1) Summary of Facts Plaintiffs Will Prove at Trial

This case arises out of the Secretary of Commerce Wilbur Ross's unlawful directive, set forth in a March 26, 2018 memorandum (the "March 26 Memorandum"), to add a citizenship

question ("CQ") to the 2020 decennial census ("Census") questionnaire. Set forth below is a

non-exhaustive summary of the relevant facts supporting their claims.[1]

a)    *Defendants' Addition of a Citizenship Question to the 2020 Census*

Under the Census Act, 13 U.S.C. § 141, the Department of Commerce ("Commerce

Department") was required to provide Congress with a final list of "subjects" to be included in

the 2020 Census by no later than March 31, 2017. Pursuant to this requirement, in March 2017,

the Commerce Department and the Census Bureau (the "Bureau") submitted a report to Congress

identifying only five subjects that would be included in the 2020 Census: age, gender,

race/ethnicity, relationship, and homeowner status. However, upon taking office and at the

prompting of other senior Administration officials, Secretary Ross decided to include citizenship

as a 2020 Census subject by adding the CQ to the 2020 Census questionnaire.

Communications among Secretary Ross, former White House Chief Strategist Steve

Bannon, Kris Kobach (former Vice-Chairman of President Trump's now-disbanded Presidential

Advisory Commission on Election Integrity), Attorney General Sessions, and Secretary Ross's

staff show that these individuals coordinated the addition of a CQ to further the unconstitutional

goal of diluting the political power of non-white immigrant communities. Consistent with

numerous other statements and actions of President Trump and Trump Administration officials,

these efforts were driven by racial animus against non-white immigrants. Indeed, the events

leading up to the March 26, 2018 Memorandum show that the Secretary had decided to add the

CQ at the time he took office and worked with political appointees on his staff and other Trump

---

[1] A more detailed, but still non-exhaustive, summary of the relevant facts are set forth in the
legal memoranda submitted by Plaintiffs in opposition to Defendants' motions for summary
judgment. *See Kravitz, et al. v. U.S. Dep't of Commerce*, Case No. 18-1051, Dkt. 69
(Memorandum of Law In Opposition to Defendants' Motion for Summary Judgment); *La Unión
Del Pueblo Entero, et al. v. Wilbur L. Ross*, et al., Case No. 18-1570, Dkt. 85 (Plaintiffs'
Memorandum of Law In Opposition to Defendants' Motion for Summary Judgment).

administration officials to contrive a pretextual justification for adding the CQ. Relevant facts

include, but are not limited to, the following:

- A May 2, 2017 email from Secretary Ross to Earl Comstock, the Director of Policy and Strategic Planning at the Commerce Department, confirms that Secretary Ross had requested the addition of a CQ months earlier. The Secretary complained to Comstock that nothing had been done in response to this previously communicated request, and Comstock assured the Secretary that they would get it done.

- Beginning in early May 2017, Comstock and other Commerce officials sought to identify a willing agency to provide Commerce with a request to add a CQ. Comstock met with a DOJ White House liaison and conferred several times with the Acting Director of DOJ's Executive Office of Immigration Review. On September 8, 2017, however, Comstock informed the Secretary that DOJ did not want to request a CQ.

- Comstock then turned to the Department of Homeland Security ("DHS") and held several phone calls with a DHS official concerning the matter. But DHS also declined to get involved. At that point, Comstock told the Secretary that he had gone so far as to ask a Commerce Department attorney to look into the legal issues and how the Commerce Department could itself add the question to the Census.

- By September 17, 2017, the Secretary had spoken directly with Attorney General Jeff Sessions concerning the matter. That same day, the Attorney General's office assured the Secretary that, with regard to the CQ, "we can do whatever you all need us to do."

- On December 12, 2017, at Secretary Ross's request, DOJ issued a letter (the "DOJ Letter") under Gary's signature, formally requesting that the Census Bureau "reinstate on the 2020 Census questionnaire a question regarding citizenship." The DOJ Letter asserted that citizenship data is "critical" to its enforcement of Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973. The DOJ Letter claimed that the ACS "does not yield the ideal data for such purposes," noting that unlike decennial census data, ACS data is not "reported to the Census block level." Though DOJ stated its belief that "decennial census questionnaire data regarding citizenship" would be "more appropriate for use" than ACS citizenship data, it did not claim that census citizenship data was "necessary" for its purposes.

- Prior to Secretary Ross's intervention, DOJ did not request the collection of citizenship data through the 2020 Census at any time prior to November 2017. To the contrary, Arthur E. Gary, General Counsel of the DOJ Justice Management Division, transmitted a letter to the Census Bureau in July 2016 advising that DOJ had no needs to amend the current content and uses or to request new content in the ACS for the 2020 Census. Subsequently, in a letter dated November 4, 2016,

Mr. Gary did request that the Census Bureau include a topic on the ACS relating to LGBT populations. But at no point did DOJ, until prompted by the Commerce Department, make any request for the inclusion of a citizenship question on the decennial census questionnaire or make any mention of a need for better citizenship data.

- In later testimony before Congress about the addition of the CQ, Secretary Ross and his staff insisted that it was done at the request of DOJ, omitting any mention of Secretary Ross' early 2017 insistence on adding the CQ and the Commerce Department's subsequent campaign to lobby DOJ to request the CQ.

Following receipt of the DOJ Letter that the Commerce Department had itself solicited, professional staff at the Census Bureau advised the Secretary against adding a CQ. However, the Secretary insisted on adding the CQ despite evidence that doing so would harm the quality and accuracy of the Census count, likely led to a differential undercount of certain populations, increase the cost and burden associated with the 2020 Census, and actually fail to meet DOJ's purported need for citizenship data as well as other alternatives recommended by the Census Bureau. Relevant facts regarding the Secretary's irrational rejection of the Census Bureau's findings include, but are not limited to, the following:

- By December 22, 2017, a "SWAT team" of Census Bureau scientists under the supervision of the Bureau's Chief Scientist, Dr. John Abowd, had prepared a technical memorandum and an accompanying white paper analyzing DOJ's request. Based on the white paper's analysis, the technical memorandum recommended meeting DOJ's request for block-level CVAP data through the use of existing federal government administrative records, and advised against adding a CQ to the 2020 Census questionnaire on the grounds that it not only would have a "potential negative impact on voluntary cooperation with the census" but also would result in "poorer quality citizenship data than would be available through administrative records."

- On or about January 19, 2018, Dr. Abowd provided the Secretary with a more detailed memorandum (the "January 19 Memo"), which considered three potential "Alternatives" for meeting DOJ's request for block-level citizenship data: (A) no change in data collection (i.e., continued reliance on ACS citizenship data), (B) adding a citizenship question to the decennial Census questionnaire, and (C) combining ACS citizenship data with data from federal administrative records for the whole population. The January 19 Memo concluded that asking the CQ (Alternative B) was the worst option among these three because it would be "very costly, harm[] the quality of the census count," and result in substantially less

accurate citizenship data than are available from administrative sources. In particular, the Bureau concluded that the addition of a CQ would lead to a differential drop in self-response among households with at least one non-citizen, compared to all other households. The Bureau recommended adopting either Alternative A or Alternative C.

- After reviewing the January 19 Memo recommending against the CQ, the Secretary directed the Census Bureau analyze another alternative—Alternative D—that would combine a CQ with the use of administrative records. In a follow-up analysis, the Bureau concluded that Alternative D would have "all the negative cost and quality implications" of just adding the citizenship question alone (Alternative A), and would also "result in poorer quality citizenship data than" just using administrative records along with existing ACS data (Alternative C). The Census Bureau reported its findings and recommendation against Alternative D to Secretary Ross, and also contacted DOJ to arrange an in-person meeting to discuss the Census Bureau's conclusion that a linked file of administrative and survey data already in the possession of the Census Bureau would both meet the DOJ's stated need and "result in higher quality data produced at a lower cost." After learning of the proposed meeting, however, Attorney General Sessions instructed DOJ staff not to proceed, cutting off any further dialogue concerning the DOJ request.

- Despite the Bureau's expert analysis and unwavering recommendation against adding a CQ, and the lack of any other expert analysis disputing the Bureau's findings, the Secretary trumped that recommendation in his March 26, 2018 Memorandum, which claimed that adding a CQ would provide DOJ with citizenship data "at the census block level," thereby permitting more effective enforcement of the VRA. However, the Memorandum ignored or mischaracterized key findings by the Census Bureau that the CQ would both harm the quality of the Census count *and* provide lower-quality citizenship data to DOJ than Alternative C.

- The March 26 Memorandum cited no evidence contradicting these and other aspects of the Census Bureau's analysis. The only evidence cited to support the Secretary's view consisted of two unrecorded informal conversations that Secretary Ross claimed to have had with Dr. Herman Habermann, a Census Bureau official in the Bush administration, and with Christine Pierce, an executive at the private-sector media company Nielsen. In fact, the Secretary materially mischaracterized Ms. Pierce's statements.

The Census Bureau did not undertake any testing of how the CQ would perform on the decennial census questionnaire. Instead, the Secretary relied solely on the fact that the question had been tested before its inclusion on in the ACS sample survey questionnaire. Prior to the Secretary's March 26, 2018 Memorandum, senior Commerce political staff rewrote the Census

Bureau's initial written response to question 31 of a set of 35 questions, replacing the Census Bureau's detailed step-by-step summary of the "well-established process" for adding questions to the decennial census or the ACS, citing OMB and Census Bureau procedures with a truncated response asserting that the Bureau "did not fee[l] bound" by precedent with regard to new Census questions. Commerce staff failed to advise Dr. John Abowd, who was in charge of all Bureau responses to the 35 questions, of this change, and Defendants did not include a copy of the Census Bureau's original response to question 31 in their initial production of the Administrative Record. Plaintiffs will present expert testimony by the recent former Director of the Census Bureau, John Thompson, that the decision to add the CQ represented a drastic deviation from long-established practice and procedure of the Census Bureau with regard to testing.

> b)     *The Impact of Defendants' Addition of a Citizenship Question to the 2020 Census*

The CQ will cause a differential increase in the number of noncitizen and Hispanic households that either choose not to self-respond to the 2020 Census questionnaire at all, or choose to respond but omit certain household members. Because the Bureau's non-response follow up ("NRFU") procedures will not ensure that these individuals are enumerated, there will be a differential undercount of areas containing significant noncitizen and Hispanic populations—including the communities in which individual Plaintiffs (and members belonging to various Plaintiff organizations) reside.

The Census Bureau's own analysis, including the January 19, 2018 memo, demonstrated that because of the CQ, households with at least one noncitizen member will choose to respond to the 2020 Census at a differentially lower rate compared to the rest of the population. The Bureau's analysis also revealed that the percent of Hispanic respondents who failed to respond to

the citizenship question on the ACS, or broke off responding upon encountering the citizenship question was significantly higher than for non-Hispanic whites. Subsequent Bureau analyses further confirmed that the citizenship question is especially sensitive for Hispanics and that the sensitivity of the question for Hispanics has been growing over time. Focus groups of Spanish speakers conducted by the Census Bureau revealed that the CQ is a determining factor for participation. Plaintiffs' experts will present analyses further demonstrating that the CQ will cause a differential decline in self-response among non-citizen and Hispanic households.

In addition to the increase in non-citizen and Hispanic households that entirely fail to self-respond to the 2020 Census as a result of the citizenship question, a significant number of noncitizen and Hispanic households will respond to the Census but omit certain individuals from the household count. These "rostering omissions" occur where households choose to conceal individual members out of fear of the consequences of providing sensitive information. Plaintiffs' experts will provide testimony explaining how the CQ will lead to rostering omissions in certain populations, a phenomenon that the Census Bureau has acknowledged.

The procedures that the Bureau uses to count households that do not self-respond to the census will not ameliorate the decline in self-response among noncitizen and Hispanic households induced by the CQ. Because of the limits of the Bureau's non-response follow-up efforts and the unique challenges posed by the citizenship question, it is expected that the CQ will cause a differential undercount of at least 2 percent among noncitizens and Hispanics and will lead to higher undercount rates among both Hispanics and Asians, who are over-represented among non-citizen households.

A differential undercount in Plaintiffs' communities will result in the dilution of Plaintiffs' votes and a loss of federal funding to their states and communities, including for

programs on which they directly rely, in three ways. *First*, because Plaintiffs' states have larger noncitizen and Hispanic populations compared to the rest of the United States, a differential undercount of noncitizens and Hispanics will translate to a differential net undercount in Plaintiffs' states relative to rest of the country, thereby putting those states at risk of losing a Congressional seat. *Second*, when the flawed data resulting from the differential undercount is used to draw legislative districts of equal size in Plaintiffs' states, Plaintiffs' districts will in fact have a greater population compared to other districts—thus diluting Plaintiffs' votes. *Third*, a differential undercount will result in the loss of federal funding to Plaintiffs' states and communities under several federally-funded programs, including Medicaid, the Surface Transportation Block Grant program ("STBG") and set-aside for transportation alternatives ("TA set-aside"), and Title I.

Organizational Plaintiffs will also be injured by the addition of a citizenship question to the 2020 Census. Fifteen organizational Plaintiffs[2] have members who will suffer the above-described harms. In addition, organizational Plaintiffs, including non-membership organizations,[3] will be harmed because the CQ will frustrate their organizational missions by

---

[2] Plaintiffs assert associational organizational standing on behalf of the following eight Organizational Plaintiffs with members and seven legislative caucuses: La Unión Del Pueblo Entero ("LUPE"), Coalition For Humane Immigrant Rights ("CHIRLA"), Georgia Association of Latino Elected Officials ("GALEO"), Labor Council For Latin American Advancement ("LCFLAA"), Somos Un Pueblo Unido ("Somos"), Promise Arizona ("Promise"), Chelsea Collaborative ("Chelsea"), OCA-Greater Houston ("OCA-GH"), Texas Senate Hispanic Caucus ("SHC"), Texas House of Representatives Mexican American Legislative Caucus ("MALC"), Maryland Legislative Latino Caucus ("MLLC"), Arizona Latino Legislative Caucus ("ALLC"), California Latino Legislative Caucus ("CLLC"), California Asian Pacific Islander Legislative Caucus ("API Caucus"), and California Legislative Black Caucus ("CLBC").

[3] Plaintiff Organizations without members are the Dolores Huerta Foundation ("DHF"), Southwest Voter Registration Education Project ("SWVREP"), Mi Familia Vota Education Fund ("MFV"), Chicanos Por La Causa ("CPLC"), El Pueblo, Inc., Latino Community Fund of Washington

causing them to expend more resources to attempt to mitigate disproportionate undercounts in the communities they serve.

2) Plaintiffs' Legal Theories

The *Kravitz* and *LUPE* Plaintiffs have in common three claims for relief, arising under the Enumeration Clause of the U.S. Constitution, the Administrative Procedure Act, and the Equal Protection Clause of the U.S. Constitution. In addition, the *LUPE* Plaintiffs have a claim for relief for conspiracy to deny equal protection of the law, in violation of 42 U.S.C § 1985(3), and Section 1985.

To establish standing to bring these claims, Plaintiffs need only demonstrate "(1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is fairly trace[able] to the challenged action of the defendant; and (3) a likelihood that the injury suffered will be redressed by a favorable decision." *Kravitz v. United States Department of Commerce,* 336 F.Supp.3d 545, 556 (D.Md. 2018) (citations omitted). Individual Plaintiffs will show that their injury—loss of political representation and federal funding—is concrete; impending in that it creates a substantial risk of future harm to Plaintiffs; traceable to the addition of the CQ to the Census; and redressable by an order from this Court enjoining the challenged addition of the CQ. Plaintiffs will present this evidence principally through the testimony of several expert witnesses and documents supporting that testimony. Organizational Plaintiffs will demonstrate associational and/or representational injury based on the harms suffered by their individual members and/or the increased expenditures that they will incur in seeking to mitigate

---

("LCF"), Asian Americans Advancing Justice-Chicago (Advancing Justice-Chicago"), Asia Services In Action, Inc. ("ASIA"), Minkwon Center For Community Action, Inc. ("MinKwon"), Friendly House, and Four Directions, Inc.

disproportionate undercounts. *Equal Rights Ctr. v. Equity Residentia*l, 483 F.Supp.2d 482, 486 (D. Md. 2007)

### a) Enumeration Clause

The conduct of the census must bear a "reasonable relationship to the accomplishment of an actual enumeration of the population." *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996). The Enumeration Clause reflects a "strong constitutional interest in accuracy"—and in particular "distributive accuracy" (i.e. "getting most nearly correct the proportions of people in different areas." *Id.* at 11, 20. Thus, "when the Census Bureau unreasonably compromises the distributive accuracy of the census, it may violate the Enumeration Clause." *Kravitz* MTD Mem., Dkt. No. 48, at 24. Plaintiffs will demonstrate that Defendants unreasonably compromised the distributive accuracy of the Census in adding the CQ to the 2020 Census questionnaire.

### b) Administrative Procedure Act

Under § 706(2) of the APA, a court must hold unlawful and set aside any final agency action that is arbitrary and capricious, an abuse of discretion, and not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction and authority; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A)-(D). Plaintiffs will show that Defendants' addition of a CQ is unlawful under all of these provisions.

### c) Equal Protection Clause

The Fifth Amendment prohibits invidious discrimination against non-citizens, including discrimination against non-citizens "whose presence in this country is unlawful." *Plyler v. Doe*, 457 U.S. 202, 210 (1982). Actions that target people of color warrant strict scrutiny review. *Associated Util. Contractors of Maryland, Inc. v. Mayor of Baltimore*, 83 F. Supp. 2d 613, 618 (D. Md. 2000), (citing *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995)). Consistent with the evidentiary factors set forth in *Village of Arlington Heights v. Metropolitan Housing*

*Development Corporation*, 429 U.S. 252, 266–68 (1977), Plaintiffs will prove that the challenged action will disparately impact non-white immigrants, that the historical background of the action reflects improper motives, that Defendants departed from normal procedures and substantive practices, and that contemporary statements by the decision-makers reflect racial animus and discrimination against non-white immigrants.

d)    *42 U.S.C. § 1985*

To establish a claim under 42 U.S.C § 1985(3) for conspiracy to deny equal protection of the law, a plaintiff must show: "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).

The *LUPE* Plaintiffs will establish most of these elements by successfully establishing Plaintiffs' Equal Protection claim, *see LUPE I*, 2018 WL 5885528, at *11, and will prove the remaining element with evidence of shared motive and coordination between the White House officials, Kris Kobach, Attorney General Sessions, and Secretary Ross. *La Unión Del Pueblo Entero v. Ross*, No. GJH-18-1570, 2018 WL 6830226, at *9 (D. Md. Dec. 28, 2018) (LUPE II).

**b)    Defendants' Statement of Facts and Legal Theories[4]**

The Constitution requires an "actual Enumeration" of the population every ten years to allocate representatives in Congress among the States, and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3.

---

[4] More detailed summaries are set forth in the government's summary judgment motions, *see* ECF No. 67-1 (No. 18-cv-1041) & ECF No. 82-1 (No. 18-cv-1570), which are incorporated here by reference.

The Census Act, 13 U.S.C. § 1 *et seq*., delegates to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine," and "authorize[s] [him] to obtain such other census information as necessary." *Id*. § 141(a). The Census Bureau assists the Secretary in performing this duty. *See id*. §§ 2, 4. The Act directs that the Secretary "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title." *Id*. § 5. Nothing in the Act directs the content of the questions included on the decennial census.

With the exception of 1840, decennial censuses from 1820 through 1880 asked about citizenship or birthplace in some form, and decennial censuses from 1890 through 1950 specifically requested citizenship information.[5] In 1960, the Census Bureau asked 25% of the population for the respondent's birthplace and that of his or her parents. Between 1970 and 2000, the Bureau distributed a more detailed "long-form questionnaire" to a sample of the population in lieu of the "short-form questionnaire" sent to the majority of households. The long-form questionnaire, which went to about 1 in 6 households, included questions about the respondent's citizenship or birthplace; the short form did not.

Beginning in 2005, the Census Bureau began collecting the more extensive long-form data—including citizenship—through the American Community Survey (ACS), an annual survey of about one in 38 households. The introduction of the yearly ACS allowed the 2010 census to be a "short-form-only" census. The 2020 census will also be a "short-form-only"

---

[5] Beginning in 1820, the census was used to tabulate citizenship by inquiring of each household the number of "foreigners not naturalized." No question regarding birthplace or citizenship status was included in the 1840 census. The 1850, 1860, and 1880 questionnaires asked for place of birth. The 1870 census included an express question about citizenship. Decennial censuses from 1890 through 1950 specifically requested citizenship information more consistently, including asking for place of birth and (for some respondents) naturalization status and birthplace of parents.

census. The ACS will continue to collect additional data each year, including information on the citizenship status of respondents. Because the ACS collects information from only a sample of the population, the smallest geographic units for which it produces annual estimates are "census tracts" and "census-block groups." The decennial census, by contrast, is designed to undertake a full count of the people and produces information down to an even smaller geographic level, the "census block." As in past years, the 2020 census will ask a number of questions beyond the number of residents at a location, including questions about sex, Hispanic origin, race, and relationship status.

Soon after Wilbur L. Ross, Jr., was appointed as Secretary of Commerce in February 2017, he began considering a number of key issues about the 2020 census, including whether to include a citizenship question. As part of his deliberative process, he and his staff consulted with other federal agencies and asked whether the Department of Justice would support including a citizenship question to help enforce the Voting Rights Act.

In a December 12, 2017 letter, the Department of Justice responded that citizenship data was important to its enforcement of Section 2 of the Voting Rights Act for several reasons, and that the decennial census would provide more useful data about citizen voting-age population than that provided by the annual ACS survey. The Department of Justice letter "formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship."

After receiving the formal Department of Justice request, Secretary Ross began a comprehensive review process led by the Census Bureau. Secretary Ross considered the views of scores of stakeholders on whether to include the citizenship question—some for, some against, and some with other proposals. For example, Secretary Ross spoke with Kansas Secretary of

State Kris Kobach, who urged Secretary Ross to include a question that differentiated between citizens, lawful permanent residents, and other non-citizens (including those in the country illegally). Ultimately, however, Secretary Ross rejected that proposal in favor of a citizenship question that had been on the ACS since 2005.

Secretary Ross also confirmed with the Census Bureau that the census-block-level citizenship data requested by the Department of Justice was not available from the ACS. Secretary Ross then asked the Census Bureau to evaluate the best means of providing the data identified in the Department of Justice letter. The Census Bureau initially presented three alternatives. After reviewing those alternatives, Secretary Ross asked the Census Bureau to consider a fourth option, which would combine two of the options the Census Bureau had presented.

Ultimately, Secretary Ross concluded that this fourth option—including a citizenship question on the 2020 census while simultaneously linking available administrative-record data to Census Bureau files—would provide the Department of Justice with the most complete and accurate citizen voting-age population data in response to its request. On March 26, 2018, Secretary Ross issued a memorandum reinstating a citizenship question on the 2020 census questionnaire. Secretary Ross's reasoning and the procedural background are set out in that memorandum and in a supplemental memorandum issued on June 21, 2018.

Secretary Ross's memorandum observed that collecting citizenship data in the decennial census had a long history and that the ACS had included a citizenship question since 2005. Secretary Ross determined, and the Census Bureau confirmed, that the citizenship question had been well tested before it was added to the ACS. Secretary Ross therefore decided to use the

same wording from that well-tested question on the ACS for the citizenship question on the 2020 census:



Secretary Ross carefully considered, but was ultimately unpersuaded by, concerns that including a citizenship question would reduce the self-response rate for non-citizens. While Secretary Ross acknowledged that a significantly lower self-response rate by non-citizens could impair the accuracy of the decennial census and increase costs for non-response follow-up operations, he concluded that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially" from a citizenship question. Based on his extensive process of consultation and review, Secretary Ross determined that, to the best of everyone's knowledge, there was limited empirical data on how a citizenship question might affect self-response rates.

Secretary Ross also emphasized that "[c]ompleting and returning decennial census questionnaires is required by Federal law," meaning that concerns about lower self-response rates were based on a belief that some people would "violat[e] [a] legal duty to respond," and "the Census Bureau's analysis did not provide definitive, empirical support for that belief."

Secretary Ross further explained that the Census Bureau would conduct respondent and stakeholder outreach to mitigate any effects on self-response rates from a citizenship question. In light of these considerations, Secretary Ross concluded that even if a citizenship question had some effect on self-response rates, "the value of more complete and accurate [citizenship] data derived from surveying the entire population outweighs such concerns."

No evidence—either in the administrative record or beyond—suggests that Secretary Ross's decision to include the citizenship question was motivated by any discriminatory animus against a protected class. Indeed, no evidence in the administrative record or beyond suggests that any stakeholder whose views Secretary Ross considered had a discriminatory motive in seeking to include the citizenship question—let alone that Secretary Ross shared any such motive.

On March 29, 2018, in accordance with 13 U.S.C. § 141(f), the Census Bureau submitted to Congress the questions planned to be asked on the 2020 census—including the citizenship question.

At trial, Plaintiffs will be unable to prove that the citizenship question—as opposed to the more general political and social climate, among other factors—will cause lower self-response rates among some groups on the 2020 census. Even if they could, Plaintiffs cannot prove that any decline in self-response rates attributable to the citizenship question will cause net undercounts, given the Census Bureau's extensive procedures to ensure that households that fail to respond are nevertheless counted. These procedures include not only subsequent mailings and in-person visits from census enumerators, but also interviews with proxy respondents like neighbors and building managers, high-quality administrative records from other federal agencies, and imputation. Nor can Plaintiffs prove that any net undercounts attributable to the citizenship

question will lead to vote dilution or lost federal funding for Plaintiffs or their members. Finally, Plaintiffs cannot show that any loss in federal funding—which is paid not to Plaintiffs or their members, but instead to non-party states and other governmental entities—will affect any public services that they use. Plaintiffs therefore lack Article III standing.

**c)       Counterclaims, Crossclaims, and Third-Party Claims**

There are no counterclaims, crossclaims, or third-party claims.

**d)       Amendments to the Pleadings**

There are no amendments required of the pleadings.

**e)       Issues in the Pleadings to be Abandoned**

There are no issues in the pleadings that are to be abandoned.

**f)       Stipulations of Fact**

See attached Stipulations of Fact.

**g)       Damages and Other Relief Sought**

Plaintiffs seek a declaration from the Court that Defendants' addition of a citizenship question to the 2020 Census questionnaire is (1) unauthorized by, and contrary to, Article I, Section 2, Clause 3 of the United States Constitution; (2) unauthorized by, and contrary to, the Fifth Amendment to the United States Constitution; (3) unauthorized by, and contrary to, the Section 2 of the Fourteenth Amendment to the United States Constitution; and (4) arbitrary and capricious, an abuse of discretion; not in accordance with law; contrary to constitutional right, power, privilege or immunity; and without observance of procedure required by law, in violation of §§ 706(2)(A)-(D) of the APA.

Plaintiffs seek to enjoin Defendants and all those acting in concert with them from including a citizenship question on the 2020 Census questionnaire, and from taking any irreversible steps to include a citizenship question on the 2020 Census questionnaire.

Plaintiffs will prove statutory and procedural violations that warrant vacatur without remand.

Plaintiffs seek an award of their reasonable costs, expenses, and attorney's fees, pursuant to 28 U.S.C. § 2412.

**h)** **Exhibit Lists[6]**

    **1.** **Plaintiffs' Exhibits**

        See attached Plaintiffs' Exhibit List.

    **2.** **Defendants' Exhibits**

        See attached Defendants' Exhibit List.

**i)** **Witness Lists**

    **1.** **Plaintiffs' Witnesses[7]**

John Abowd

Diana Alexander

Lauren Rachel Berman

Peter Bloch

Sarah Bryan

Elizabeth Buchanan

Alejandro Chavez

Earl Comstock

Jacob Cunningham

Virginia Garcia

---

[6] Pursuant to Local Rule 106.2(h), the parties do not identify herein documents or exhibits which may be used for purposes of impeachment and reserve the right to seek the admission of such documents or exhibits as appropriate.

[7] Unless otherwise indicated, Plaintiffs' counsel is the contact for all Plaintiffs' witnesses.

Jerry Gonzalez

John Gore

Ron Jarmin

Michael Kagan

Robyn Kravitz

Michael Kravitz

Karen Dunn Kelley

David Langdon

Lazara Yoelvis Magadan

Richard McCune

Jose Moreno

Raj Mukherji

Otoniel Navarrete

Catherine Nwosu

Nnabugwu Nwosu

Maegan Ortiz

John Park

Sahra Park-Su

Christine Pierce
501 Brooker Creek Blvd
Oldsmar, FL 34677

T. Carter Ross

Angelica Salas

Martha Sanchez

Sonia Casarez Shafer

Wendy Teramoto

Elaine Tso

Juanita Valdez-Cox

Joanne Wilson

## 2. Defendants' Witnesses

Dr. John M. Abowd
4600 Silver Hill Road
Washington, DC 20233
(301) 763-5880

Dr. Stuart D. Gurrea
101 Mission Street, Suite 1000
San Francisco, California 94105
(415) 975-3225

## j) Expert Lists

## 1. Plaintiffs' Experts

Dr. Matthew Barreto
*Expert on survey methodology, public opinion polling, and racial and ethnic politics*

Kimball W. Brace
*Expert on reapportionment, redistricting, election administration, and analysis of census and political data*

Lisa Carruth
*Expert on funding and administration of federal Medicaid program*

David Ely
*Expert on redistricting, voting behavior, and demographic analysis*

Dr. Nora Gordon
*Expert on funding and administration of federal education programs*

Terri Ann Lowenthal
*Expert on the federal statistical system, decennial census procedures, and data collection*

Dr. Douglas Massey

*Expert on demography and the collection, dissemination, and analysis of population statistics*

Dr. Nancy Mathiowetz
*Expert on survey methodology and statistical methods*

Roger Mingo
*Expert on funding and administration of federal transportation programs*

Dr. William O'Hare
*Expert on statistical methods and census data analysis*

Dr. Andrew Reamer
*Expert on the federal statistical system and uses of federal statistics in domestic policy*

John Thompson
*Expert on decennial census procedures*

### 2. Defendants' Experts

Dr. John M. Abowd
*Expert on census operations, census procedures, statistics, economics, and econometrics*

Dr. Stuart D. Gurrea
*Expert on data analysis, economics, and econometrics*

**k)** **Deposition Designations**

See attached Deposition Designations.

**l)** **Pretrial Relief Requested**

Plaintiffs and Defendants have filed motions *in limine* to be ruled on prior to trial.

**m)** **Additional Matters Added by the Court**

As of this date, no other matters have been added by the Court.

**n)** **Evidentiary Stipulations**

1. Defendants shall not proffer any evidence or argument regarding any post-hoc rationale for the directive to add a citizenship question to the 2020 decennial census announced in Secretary Ross's memorandum dated March 26, 2018, including but not limited to

any rationale unrelated to enforcement of Section 2 of the Voting Rights Act or not stated in that memorandum.

        2.      Defendants shall proffer no fact witnesses at trial, including any individual identified in the Plaintiffs' initial disclosures or witnesses who have been deposed in this case.


Dated: January 14, 2019

COVINGTON & BURLING LLP

By: /s/ Shankar Duraiswamy
Daniel Grant (Bar Number: 19659)
Shankar Duraiswamy*
Dustin Cho*
Bianca Nunes*
Tina M. Thomas*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6302
dgrant@cov.com
sduraiswamy@cov.com
dcho@cov.com
bnunes@cov.com
tthomas@cov.com

P. Benjamin Duke*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
Fax: (212) 841-1010
pbduke@cov.com

Lawrence A. Hobel*
Karun Tilak*
COVINGTON & BURLING LLP
One Front Street


Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Branch Directors

JOSHUA E. GARDNER
Special Counsel

/s/ Garrett Coyle
GARRETT COYLE
STEPHEN EHRLICH
COURTNEY D. ENLOW
MARTIN M. TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel.: (202) 616-8016
Fax: (202) 616-8470
Email: garrett.coyle@usdoj.gov

*Counsel for Defendants*

San Francisco, CA 94111-5356
Tel: (415) 591-6000
Fax: (415) 591-6091
lhobel@cov.com
ktilak@cov.com

*Attorneys for Kravitz Plaintiffs*

By:*/s/ Denise Hulett*
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
Burth G. Lopez (Bar No. 20461)
Thomas A. Saenz (CA Bar No. 159430 )*
Nina Perales (TX Bar No. 24005046)*
Denise Hulett (CA Bar No. 121553)*
Andrea Senteno (NY Bar No. 5285341)*
Tanya G. Pellegrini (CA Bar No. 285186)*
Julia Gomez (CA Bar No. 316270)*
1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828


ASIAN AMERICANS ADVANCING
JUSTICE | AAJC
John C. Yang (IL Bar No. 6210478)*
Niyati Shahº (NJ Bar No. 026622005)*
Terry Ao Minnis (MD Bar No. 20547)
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318
*º Admitted in New Jersey and New York only.
DC practice limited to federal courts.*

*Attorneys for LUPE Plaintiffs*

*       Admitted pro hac vice