# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBYN KRAVITZ, et al. | Civil Action No. 8:18-cv-01041-GJH |
| *Plaintiffs*, | |
| v. | Hon. George J. Hazel |
| U.S. DEPARTMENT OF COMMERCE, *et. al.*, | |
| *Defendants.* | |
| | |
| LA UNIÓN DEL PUEBLO ENTERO; *et al.* | Civil Action No. 8:18-cv-01570-GJH |
| *Plaintiffs*, | |
| v. | Hon. George J. Hazel |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce; *et al.* | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' RULE 60(B)(2) MOTION FOR RELIEF FROM FINAL JUDGMENT & REQUEST FOR INDICATIVE RULING UNDER RULE 62.1(A)

This motion seeks relief under Fed. R. Civ. P. 60(b)(2) based on newly discovered evidence of discriminatory animus and unconstitutional intent by Secretary Ross and the political appointees and operatives involved in adding a citizenship question to the 2020 Census. This evidence provides the link between the explicitly discriminatory purpose behind the citizenship question and the Commerce Department's actions, a link that this Court found wanting in the record and thus prevented it from ruling in Plaintiffs' favor on their claims under the Equal Protection Clause (*Kravitz* and *LUPE* Plaintiffs) and 42 U.S.C. § 1985(3) (*LUPE* Plaintiffs only). Thus, pursuant to Rule 60(b)(2) the Court should set aside its final judgment for Defendants on these claims and should enter judgment for Plaintiffs, or, at a minimum, should allow Plaintiffs

1

to obtain limited discovery to supplement the record in order to enable the Court to reconsider its prior ruling on these claims. Because these consolidated cases are currently on appeal to the Fourth Circuit Court of Appeals, Plaintiffs request an immediate indicative ruling under Fed. R. Civ. P. 62.1(a) that this Court would be inclined to grant their Rule 60(b)(2) motion *or that* Plaintiffs' motion raises a substantial issue. This will enable Plaintiffs to move for limited remand by the Fourth Circuit restoring this Court's full jurisdiction over the Equal Protection and Section 1985 claims, thereby allowing the Court to rule on the merits of Plaintiffs' request for relief under Rule 60(b)(2).

The new evidence, consisting of documents belonging to the late Dr. Thomas Hofeller, a leading Republican redistricting strategist and map-drawing expert, first came to light last week in a May 30, 2019 motion for an order to show cause filed by the plaintiffs ("*New York* plaintiffs") in *State of New York, et al. v. U.S. Dep't of Commerce, et al.*, No. 18-CV-2921 (S.D.N.Y.). *See State of New York,* No. 18-CV-2921 (hereinafter "*New York* Dkt."), ECF Nos. 587, 595.[1] The documents reveal the role that Dr. Hofeller played in getting the citizenship question added to the 2020 Census, including by drafting key portions of DOJ's pretextual letter to the Census Bureau requesting the citizenship question purportedly on the grounds that it was necessary to enforce the Voting Rights Act ("VRA"). *See Kravitz* Dkt. ECF No. 154 (Findings of Fact & Conclusions of Law) at 10-17 (describing how the DOJ's VRA rationale was "manufactur[ed]"). Furthermore, the Hofeller documents demonstrate that the addition of the citizenship question was, contrary to the VRA enforcement rationale, motivated by an explicit,

---

[1] The *New York* plaintiffs initially filed redacted copies of the motion and exhibits on May 30, 2019. *New York* Dkt. ECF No. 587. Defendants did not object to the unredacted filing of the motion, *see id.* No. 595 (Grant Decl. Ex. 1). All references to the motion for order to show cause and the attached exhibits herein are to the unredacted filings.

racially discriminatory scheme to dilute the representation of Hispanics and increase over-representation of non-Hispanic Whites, thereby serving Republican political ends at Hispanics' expense. Dr. Hofeller prepared a memo explaining that adding a citizenship question would be "advantageous to Republicans and Non-Hispanic Whites" in the redistricting process and would "provoke a high degree of resistance from Democrats and the major minority groups in the nation." Grant Decl. Ex. 1 (*New York* Motion) at Ex D. p. 9. Thus, the newly discovered evidence eliminates any doubt about the discriminatory purpose driving the addition of the citizenship question, and directly connects that discriminatory purpose to Secretary Ross and the other Department of Commerce ("Commerce") and DOJ officials responsible for the citizenship question decision.

When this evidence is fully considered by the Court in the context of the existing trial record, Plaintiffs respectfully submit that the Court will reconsider its previous conclusions on the Equal Protection and Section 1985 claims and enter judgment in Plaintiffs' favor. Accordingly, this motion under Rule 60(b)(2) at least raises a substantial issue, such that the Court should issue an indicative ruling under Rule 62.1 so that Plaintiffs can secure from the Fourth Circuit a limited remand to this Court.

## STATEMENT OF FACTS

This Court entered its judgment in this case on April 5, 2019. *Kravitz* Dkt. ECF No. 155. While the Court ruled in Plaintiffs' favor on their claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Enumeration Clause of the U.S. Constitution, art. I, § 2, cl. 3, and permanently enjoined addition of the citizenship question on the 2020 Census, it ruled against all Plaintiffs on their Equal Protection claims, and against *LUPE* plaintiffs on their claim under 42 U.S.C. § 1985(3). *Id.* In ruling against Plaintiffs on the Equal Protection and § 1985(3)

3

claims, the Court found that while Plaintiffs had put forward evidence that certain administration officials may have been motivated to add a citizenship question out of discriminatory animus towards Hispanics, Plaintiffs had failed to "sufficiently tie[] those views to Secretary Ross's decision." *Kravitz* Dkt. ECF No. 154 at 116; *see also id.* at 42 ("Ultimately, Secretary Ross's original rationale remains, to some extent, a mystery.").

Defendants subsequently appealed the Court's judgment on the APA and Enumeration Clause claim, and *LUPE* Plaintiffs filed their cross-appeal of the Court's judgment on their Equal Protection claim. The Fourth Circuit has set an expedited briefing schedule on the Equal Protection claims, for which all briefing is expected to be completed in June, and has held Defendants' appeal in abeyance until the Supreme Court issues its opinion in the *New York* case. Order, *LUPE, et al. v. Ross*, et al., No. 19-1382, ECF No. 26 (May 29, 2019).

On May 30, 2019, the *New York* plaintiffs filed the *New York* Motion, publicly revealing the new evidence concerning the citizenship question contained in the Hofeller documents. These materials were contained within a larger set of documents belonging to Hofeller that were first produced recently in unrelated redistricting litigation in North Carolina state court, and were subsequently obtained and identified as relevant to the citizenship question cases by the *New York* plaintiffs. *See* Grant Decl. Ex. 1 at 2. The newly discovered evidence shows that Dr. Hofeller had a significant role in promoting the addition of the citizenship question to the 2020 Decennial Census for the purpose of advantaging "Republicans and Non-Hispanic Whites" in redistricting, Grant Decl. Ex. 1 at Ex. D p. 9, and in supporting the creation of DOJ and Commerce officials' pretextual VRA enforcement rationale for the citizenship question.

In 2015, Dr. Hofeller conducted a detailed study demonstrating how the use of citizen voting-age population (CVAP) data could be used to radically shift political power in favor of

white voters and away from Hispanic voters. Using the Texas State House of Representatives as a case study, Dr. Hofeller detailed how a switch from the current norm of drawing legislative districts of equal population, pursuant to the Supreme Court's decision in *Wesberry v. Sanders*, 376 U.S. 1 (1964), based on total population, to drawing districts based on CVAP, would reduce the number of districts in South Texas, El Paso, and the Rio Grande Valley. He explained that this reduction in the number of districts would occur because a "considerable population would have to be added to a majority of the Latino districts to bring their population up to acceptable levels." Grant Decl. Ex. 1 at Ex. D pp. 6-8, Tables 4-8. Dr. Hofeller concluded that using CVAP as an apportionment base would eliminate 5 of the current 35 Hispanic majority House districts. *Id.* at 8-9. Specifically, he explained:

> The use of CVAP as the population based would cause a loss of relative population (and, thus districts) in the Greater Dallas/Ft. Worth Area (-.7 districts overall), with the greatest loss in Dallas County (1.7 districts). Harris County and its suburbs would lose relative population (1.7 districts overall), with a loss of 1.9 districts being slightly offset by the gain in the surrounding suburban counties. The greatest loss would be in South Texas, El Paso and the Rio Grande Valley which would lose 2.6 districts overall. All other regions of the State would enjoy relative gains in population, with the greatest gains being in Central as well as West Texas' rural and semi-rural counties.

*Id.* at 8; *see also id.* at Table 2 (demonstrating that the areas experiencing the greatest losses in districts generally had the highest Hispanic population). Dr. Hofeller acknowledged that the shift from redistricting based on total population to CVAP was a "radical departure"—one that would alienate Hispanic voters. *Id.* at 8. But, he concluded, "[a] switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites." *Id.* at 9. To generate the necessary CVAP data and achieve this goal of diluting Hispanic representation while increasing over-representation of non-

Hispanic Whites, Dr. Hofeller concluded that a citizenship question must be added to the 2020 Census. *Id.* at 9.

The newly-discovered documents also reveal that Dr. Hofeller had a direct hand in drafting and feeding to Commerce and DOJ officials, including A. Mark Neuman and John Gore, the substantive content of the December 2017 DOJ Letter requesting the addition of the citizenship question. Neuman served as the point person for all issues related to the Census during the Presidential transition in 2016-2017 and went on to serve as a "trusted advisor" to Secretary Ross on Census issues. *Kravitz Dkt.* ECF No. 154 at 9; *id.* at 14 (quoting PX-614). Hofeller, a long-time friend of Neuman's, was the first person to approach Neuman about adding a citizenship question to the 2020 Census, and the two discussed the issue on several occasions during the transition. Grant Decl. Ex. 2 (Neuman Dep. Tr.) at 36:19-37:22; 51:7-52:2. Neuman, in turn, discussed the issue with Ross and his senior advisers multiple times in the spring and summer of 2017. Grant Decl. Ex. 2 at 128:4-130:9; 248:21-249:22; *id.* Ex. 3 (PX-193); *id.* Ex. 4 (PX-87); *id.* Ex. 5 (Neuman Dep. Ex. 5); *id.* Ex. 6 (Neuman Dep. Ex. 7). Dr. Hofeller's files produced in discovery in the North Carolina case include a Word document, created on his computer in August 2017, bearing striking similarities to a draft letter requesting a citizenship question that Neuman provided to Gore at a meeting in October 2017. *See* Grant Decl. Ex. 1 at Ex. F, p.2; Ex. G; Ex. H. Indeed, an entire paragraph setting forth the purported VRA enforcement rationale in Dr. Hofeller's draft document was incorporated verbatim into Neuman's draft. *Compare id.* Ex. G *with id.* Ex. H. That draft was provided to Gore and became the template for DOJ's formal request to Secretary Ross to add the citizenship question. [2]

---

[2] Indeed, the DOJ Letter contains many similarities to the Neuman-Hofeller letter. *See* Grant Decl. Ex. 9 (PX-32); *id.* Ex. 1 at Ex. G; Ex. I. For example, the two documents contain similar descriptions of the history of a citizenship question on the census and the ACS, and make many

Senior Commerce Department staff were directly involved in coordinating Neuman's efforts to provide the Hofeller-Neuman draft letter to Gore. The October 2017 Neuman-Gore meeting, at which Neuman gave Gore the draft letter, was arranged by the Commerce Department's in-house counsel. *See* Grant Decl. Ex. 1 at Ex. F p. 2 (Gore testified in a congressional interview that Peter Davidson, Commerce General Counsel, asked him to meet Neuman in October 2017, and Neuman provided him a draft letter at the subsequent meeting); *id.* Ex. 2 at 112 (Neuman testified that James Uthmeier, one of the Secretary's advisors, asked him to meet Gore). Secretary Ross himself was deeply involved in this effort and well aware of Neuman's role as a go-between; when he asked Peter Davidson, the Commerce Department's general counsel, about the "Letter from DoJ" in an October 8, 2017 email, Davidson replied that he was "on the phone with Mark Neuman right now" getting a "readout of his meeting last week" and offered to "give [the Secretary] an update via phone if you'd like." Grant Decl. Ex. 7 (PX-52). The Hofeller documents thus provide a direct link between the machinations within the Commerce Department and DOJ that led to the DOJ Letter, and the partisan, explicitly discriminatory purpose behind the addition of the citizenship question set forth in the Hofeller analysis.

This new evidence therefore provides a direct line from Dr. Hofeller's 2015 study— endorsing the addition of the citizenship question to help non-Hispanic Whites and Republicans at Hispanics' expense— to Ross's "trusted advisor" Neuman and senior Commerce officials

---

of the same arguments, including that (1) the "5-year rolling sample" of the ACS does not align in "time" with decennial census data; (2) ACS data is inaccurate for small units of geography, and (3) the smallest unit of geography on the ACS is Census Block Groups, which are larger than the "fundamental" or "basic" "building blocks" for a redistricting plan and therefore "require" jurisdictions to "compute" or "perform" estimates to impute the CVAP of legislative districts. *See* Grant Decl. Ex. 1 at Ex. I.

around Ross, and ultimately to the DOJ Letter, which Secretary Ross himself solicited and induced DOJ to provide. *See* Grant Decl. Ex. 10 (PX-26); *id.* Ex. 11 (PX-2). The circle of involvement between Dr. Hofeller, Neuman, DOJ, and Commerce is thus closed: indeed, Secretary Ross's closest advisors at Commerce connected Neuman and Gore, with Department of Commerce General Counsel Peter Davidson urging Gore to meet with Neuman, and Secretary Ross's advisor James Uthmeier asking Neuman to meet Gore. Grant Decl. Ex. 1 at Ex. F p. 2; *id.* Ex. 2 at 112. In short, Dr. Hofeller crafted the pretextual rationale to conceal the true purpose of the citizenship question; Neuman gave it to Gore after Secretary Ross' General Counsel asked them to meet; and Gore finished and finalized the draft and sent it back to Commerce.

## JURISDICTION & LEGAL STANDARD

To obtain relief under Rule 60(b), Plaintiffs must show that their motion is timely, that they have a meritorious claim or defense, and that the opposing party would not be unfairly prejudiced by having the judgment set aside. *See Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993) (quoting *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987)).[3] To obtain specific relief under Rule 60(b)(2), Plaintiffs must provide "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2).

While an appeal is pending, a district court retains jurisdiction to consider a motion for relief under Rule 60(b). *See Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 891 (4th Cir. 1999) ("[W]hen a Rule 60(b) motion is filed while a judgment is on appeal, the district court has jurisdiction to entertain the motion, and should do so promptly."). The Fourth Circuit has

---

[3] Because Plaintiffs seek relief more than 28 days after the entry of judgment in this case, Rule 60(b) controls. *Cross v. Fleet Reserve Ass'n Pension Plan,* No. WDQ-05-0001, 2010 WL 3609530, at *2 (D. Md. Sept. 14, 2010).

instructed that, upon a filing of a Rule 60(b) motion while an appeal is pending, the district court

may deny the motion, or may "issue an indicative ruling under Fed. R. Civ. P. 62.1 stating that a

Rule 60(b) motion raises a substantial issue or would be granted." Fourth Circuit Appellate

Procedure Guide (Dec. 2018) at 22-23.

## ARGUMENT

In light of the newly discovered evidence from Dr. Hofeller's files, the Court should,

pursuant to Rule 60(b)(2), vacate its judgment for the Defendants on Plaintiffs' Equal Protection

and Section 1985 claims and enter judgment in Plaintiffs' favor, or, at a minimum, allow

Plaintiffs to take limited additional discovery so that the Court may reconsider its prior ruling on

a more complete record. Because the case is currently on appeal, it is necessary for the Court to

issue a Rule 62.1(a) indicative ruling stating (i) that it would be inclined to grant Plaintiffs' Rule

60(b)(2) motion or (ii) that Plaintiffs' motion raises a substantial issue.

### I.      Plaintiffs' Newly Discovered Evidence Establishes that Plaintiffs' Equal Protection and § 1985(3) Claims Should Be Granted on the Merits.

The new evidence that Plaintiffs proffer clearly demonstrates that they are entitled to

relief on their Equal Protection and § 1985(3) claims. The Court previously ruled against

Plaintiffs on these claims at trial because, while Plaintiffs had demonstrated that others around

Secretary Ross may have been motivated by discriminatory animus, they did "not sufficiently

tie[] those views to Secretary Ross's decision." *See Kravitz* Dkt. ECF No. 154 at 116-17. While

Plaintiffs respectfully disagree with that conclusion, the newly discovered evidence leaves no

further room for reasonable dispute about the discriminatory motivation and purpose animating

Secretary Ross's determined solicitation and finagling of the DOJ Letter and his ultimate

decision to add the citizenship question to the 2020 Census.

As set forth above, Dr. Hofeller's documents demonstrate that the decision to add a citizenship question was motivated by a discriminatory purpose: to dilute Hispanic representation to the advantage of Republicans and non-Hispanic Whites. These documents also tie this discriminatory motivation to Secretary Ross's decision by establishing a clear through-line from Dr. Hofeller's study, through Mr. Neuman (a Trump transition official and "trusted adviser" to Secretary Ross, and a close personal friend and Republican Party colleague of Dr. Hofeller), to the ultimate DOJ Letter that Secretary Ross used to justify the final agency decision.

This evidence dispels any lingering mystery behind the true motivation and purposes of adding the citizenship question—which had nothing to do with enforcing the VRA. To the contrary, Secretary Ross and his advisors knowingly enacted a policy that Dr. Hofeller—the Republicans' gerrymandering mastermind—analyzed in depth and determined would benefit Whites and harm Hispanics. Moreover, Dr. Hofeller was directly involved in concocting and supplying the key language to support the Secretary's pretextual rationale. Combined with the trial record that Plaintiffs previously mounted, Plaintiffs' new evidence demonstrates that the addition of a citizenship question plainly violates the equal protection guarantee of the Fifth Amendment Due Process Clause and Section 1985(3).[4]

---

[4] Moreover, the documents that Plaintiffs submit with this motion are admissible under Fed. R. Evid. 804(b)(3) as statements against interest of an unavailable witness. Dr. Hofeller passed away in August 2018, *see* Grant Decl. Ex. 2 at 36:21-22, and is therefore unavailable under Rule 804(a)(4). The statements in these documents are also clearly against Dr. Hofeller's interest because they reveal that the purpose of including a citizenship question was not for Voting Rights Act enforcement, as DOJ has publicly represented, but instead to dilute Hispanic representation by skewing districts to the benefit of Republican and non-Hispanic White voters. Indeed, Dr. Hofeller tried to distance himself from the report, asking that it not be attributed either directly or indirectly to him, further suggesting that he viewed these statements as against his interest. *See* Grant Decl. Ex. 1 at Ex. C p. 2. If there is any dispute as to their authenticity, the documents can be authenticated by Stephanie Lizon, Dr. Hofeller's daughter, who produced

a. **The New Evidence Provides the Direct Link Between the Discriminatory Motives of the Administration and the Final Action Taken by Secretary Ross, Warranting Entry of Judgment for *Kravitz* and *LUPE* Plaintiffs on their Equal Protection Claim.**

This Court's post-trial decision found that Plaintiffs had substantial evidence supporting their Equal Protection claim under the various factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ("*Arlington Heights*"). In particular, the Court found as a matter of fact that (1) the addition of the citizenship question "bears more heavily" on non-citizens and Hispanics; (2) the historical background of the decision included manipulation and suspect motives; (3) there were significant departures from the "normal procedural sequence" that usually dictates when a new question may be added, including the refusal of the Secretary to take into account the unanimous recommendations of the Census Bureau's Chief Scientist and other expert personnel, recommendations that are "usually considered important"; and, (4) the evidence included "contemporary statements" by governmental actors, including President Trump and former Kansas Secretary of State Kris Kobach, who directly pressed the Secretary to move forward with the citizenship question for discriminatory reasons. *See Arlington Heights*, 429 U.S. at 266-68; *Kravitz* Dkt. ECF No. 154 at 8-42, 45-49, 96-111, 116. The Court also acknowledged that in "the absence of any other non-pretextual rationale, discriminatory animus may well be the most likely explanation for Secretary Ross's" decision. *Kravitz* Dkt. ECF No. 154 at 116. However, the Court held that it could not, "by a preponderance of the evidence, connect the dots between the President and Kobach's

---

them in response to a subpoena by the Plaintiffs in the North Carolina lawsuit. *See* Grant Decl. Ex. 12 (Apr. 30, 2019 Hr'g Tr. in *Common Cause v. Lewis*) at 5-6 (describing process by which documents were obtained); *id.* Ex. 13 (Document Subpoena to Stephanie Lizon).

views, the Secretary's failure to disclose his real rationale, and the Secretary's final decision." *Id.*
at 42. The new evidence connects the dots.

As this Court concluded in denying Defendants' motion for summary judgment on
Plaintiffs' Equal Protection claim, the trial record established beyond doubt that Secretary Ross
"did not act alone" in generating the DOJ request that provided a façade for adding the
citizenship question. *See Kravitz v. U.S. Dep't of Commerce*, 355 F. Supp. 3d 256, 270 (D. Md.
2018). Rather, the Secretary acted in close concert with senior Commerce Department appointees
and at least one outside "trusted advisor"—Neuman—as well as senior DOJ officials including
then-Attorney General Jeff Sessions in orchestrating the creation of an administrative record to
provide ostensible support for the addition of a citizenship question to the 2020 Census. The trial
evidence of unconstitutionally discriminatory intent, however, came principally from other actors
such as Kobach and President Trump. This Court found that, notwithstanding the suspicious
nature of Ross's conduct and other trial evidence, Secretary Ross's "original rationale remains,
to some extent, a mystery." *Kravitz* Dkt. ECF No. 154 at 42.

The newly discovered evidence powerfully and concretely demonstrates the link between
the Secretary's pretextual rationale for the decision and an overtly discriminatory political
scheme designed to harm Hispanics and advantage non-Hispanic Whites. The record establishes
that, during the transition in 2016-2017, Dr. Hofeller and Neuman discussed the need for a
citizenship question. Grant Decl. Ex. 2 at 33:8-10, 36:19-37:22, 51:7-16, 57:5-9, 60:18-24. In
April of 2017, Secretary Ross's senior advisor, Earl Comstock, was in touch with Neuman about
the possibility of changing the content of the 2020 Census. *Kravitz* Dkt. ECF No. 154 at 9. By
August 2017, however, Comstock and Commerce lawyer James Uthmeier were struggling to
find an agency to request a citizenship question and were facing pressure from Secretary Ross

about the lack of progress. *Id.* at 10-13. As the newly discovered evidence shows, that same month, Dr. Hofeller created the Word document containing the VRA justification for the citizenship question that ultimately appeared verbatim in a draft version of the DOJ Letter produced by Neuman. Grant Decl. Ex. 1 at Ex. G. Not only Comstock and Uthmeier but also Commerce's General Counsel, Peter Davidson, were intimately involved with Neuman in developing Dr. Hofeller's brainchild into the final DOJ Letter. *See Kravitz* Dkt. ECF No. 154 at 14, 34. In October 2017, at a meeting between Neuman and Gore facilitated by Davidson and Uthmeier, *see* Grant Decl. Ex. 1 at Ex. F, p. 2; *Id.* Ex. 2 at 112:5-11, Neuman gave Gore the draft letter bearing Dr. Hofeller's indelible imprint, and Ross was fully informed about this meeting. *See* Grant Decl. Ex.  (PX-52). The spurious VRA enforcement rationale contained in this draft letter was permeated with the discriminatory animus and intent manifested in Dr. Hofeller's 2015 study, and was embraced and adopted by the Secretary in the final determination to add the citizenship question to the 2020 Census.

When viewed alongside the trial record, the newly discovered Hofeller documents demonstrate how the Secretary and his advisors worked in close coordination with co-conspirators to ensure a citizenship question was added to the 2020 Census, knowing, and in fact because, it would achieve their political ends at the expense of Hispanic representation. *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016) ("Even if done for partisan ends, that constituted racial discrimination."). The new evidence thus connects the dots between alleged co-conspirators and the Secretary, addressing precisely this Court's articulated reasoning for the denial of Plaintiffs' Equal Protection claim.

**b.  The New Evidence, When Considered With the Findings of the Court, Support Entry of Judgment for *LUPE* Plaintiffs on their Conspiracy Claim under 42 U.S.C. § 1985(3).**

The new evidence further supports an entry of judgment on *LUPE* Plaintiffs' conspiracy claim because it directly ties Commerce Department officials, Neuman, and Gore to the same conspiratorial objective expressed by Kobach in his February and July 2017 communications to Secretary Ross.

To prove a Section 1985 conspiracy, a plaintiff "must show an agreement or a 'meeting of the minds' by defendants to violate the [plaintiff's] constitutional rights," *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) (citations omitted), and the plaintiff must "come forward with specific circumstantial evidence" that reasonably leads to the inference "that each member of the alleged conspiracy shared the same conspiratorial objective," *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 660 (4th Cir. 2017) (internal quotations omitted). A plaintiff need not produce direct evidence of a meeting of the minds, *Penley*, 876 F.3d at 658, nor does a plaintiff need to show that there was an express agreement among all the conspirators. *Simmons*, 47 F.3d at 1378. Instead, a plaintiff must only show that the participants in the conspiracy shared "the general conspiratorial objective. It simply must be shown that there was a 'single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" *Simmons*, 46 F.3d at 1378 (quoting *Lenard v. Argento*, 699 F.2d 874, 882–83 (7th Cir. 1983)).

Here, the trial record taken together with the new evidence leaves no doubt that the conspirators shared the same general objective to add a citizenship question to the 2020 Census in order to dilute the political power of Hispanics. Dr. Hofeller had the same conspiratorial objective, came up with the VRA pretext, ghostwrote the DOJ Letter, and then provided the

letter to Neuman—who then provided the letter to the DOJ after Commerce connected him with people at the DOJ.

In April 2017, Bannon contacted the Secretary to ask that he speak with Kobach about adding a citizenship question to the census. *Kravitz* Dkt. ECF No. 154 at 9. The Secretary complied with this request, and discussed with Kobach adding a citizenship question to the census to address the problem of counting immigrants for Congressional apportionment purposes. *See id*. The Secretary then used the Commerce Department to further the conspiracy by directing staff to research the exclusion of immigrants from apportionment and the manner in which to add a citizenship question to the census. *See, e.g., id.* at 8-17 (discussing genesis of the Secretary's interest and the manufacturing of the DOJ's VRA rationale).

The Secretary and the Commerce Department proceeded to solicit the assistance of DOJ and then DHS, before finally securing the participation of DOJ, *id*. at 10-12, after a discussion between Secretary Ross and Attorney General Sessions led Sessions to inform the Secretary that he was "eager to assist," *id.* at 15. The Secretary and the Commerce Department coordinated with Sessions, other members of the DOJ, and the White House to fabricate a "need" for the citizenship question. *Id.* at 10-17. During the process, the true purpose for adding the citizenship questions was sometimes discussed. In July 2017, for example, Kobach again raised the issue with the Secretary, writing that a citizenship question was necessary to address the "problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purpose," and offering his assistance. *Id.* at 12 (quoting PX-19). Likewise, in August 2017, Uthmeier advised Comstock that Commerce's "hook" for adding the citizenship question was that Commerce was not going to decide how the citizenship data would be used for

apportionment, that would be for Congress or possibly the President to decide. *Id*. at 13 (quoting PX-607).

Based on the newly-discovered evidence, we now know that Neuman, who was advising Commerce on the citizenship question, provided Gore and DOJ with the pretextual VRA rationale to conceal the true purpose of the citizenship question, and that Hofeller wrote a first draft of the letter articulating this VRA justification. *See* Grant Decl. Ex. 1 at Ex. F p.2; Ex. G; Ex. H. Hofeller, for his part, did not want to add a citizenship question to the census to help enforce the VRA and ensure fair minority representation. To the contrary, Hofeller knew that adding a citizenship question would enable him and his political allies to dilute minority voting power by decreasing minority-majority Congressional districts, and would "be advantageous to Republicans and Non-Hispanic Whites," *id.* Ex. 1 at Ex. D pp. 1, 4, 9.

After Gore received the letter ghostwritten by Hofeller, he received input from Uthmeier, *Kravitz* Dkt. ECF No. 154 at 34, and "had a conversation with Sessions about the question of the use of total population or some other measure for apportionment purposes," Grant Decl. Ex. 8 (Gore Dep. Tr.) at 338:2-12. The other measure to be used for drawing legislative districts suggested by Kobach and Hofeller was, of course, data that excludes non-citizens. *Kravitz* Dkt. ECF No. 154 at 8, 12; Grant Decl. Ex. 1 at Ex. D p. 1. Sessions ultimately made the decision on behalf of the DOJ to make the pretextual request. *Kravitz* Dkt. ECF No. 154 at 33. The Secretary then proceeded to ignore advice from the Census Bureau *not* to add a citizenship question to the 2020 Census, and issued a memorandum on March 26, 2018, to add the citizenship question to the census. *Id.* at 22-31. Thereafter, the Trump campaign publicly admitted its role in the conspiracy, *id.* at 41, and the Secretary and his co-conspirators have since attempted to conceal the continued existence of the conspiracy. Not only has the Secretary lied to Congress about the

true reason for adding the citizenship question, *see, e.g., id.* at 32, but in this and in related

litigation Commerce Department and DOJ officials have misrepresented and concealed key

information and documents from plaintiffs, *see infra* Part II (summarizing misstatements by

Neuman and Gore).

Courts have consistently found that this type of concerted activity supports the finding of

a conspiracy. In *National Organization for Women v. Operation Rescue*, for example, a district

court found that the conspirators had engaged in a conspiracy when they "combined with each

other . . . to plan, organize, coordinate, and carry out [ ] demonstrations" to accomplish their

unlawful purpose. 726 F. Supp. 1483, 1492 (E.D. Va. 1989), *aff'd*, 914 F.2d 582, 585–86 (4th

Cir. 1990), *overruled on other grounds by Bray v. Alexandria Women's Health Clinic*, 506 U.S.

263, 274-75 (1993) (holding that Section 1985(3) does not prohibit a conspiracy to obstruct

access to abortion clinics). Similarly, in *New York State National Organization for Women v.*

*Terry*, the Second Circuit affirmed the district court's findings that defendants engaged in a

conspiracy, noting that "[d]efendants agreed with other individuals to engage in unlawful

activity," that defendants facilitated the conspiracy by "providing transportation and

accommodation to participants," and that defendant Operation Rescue disseminated literature

that encouraged the public to participate in the unlawful activity. 886 F.2d 1339, 1359 (2d Cir.

1989).

Taken alone, the Secretary meeting and communicating with stakeholders and members

of other departments may appear to be no more than part of a policymaking process. Even acts,

however, "done for a legitimate purpose in furtherance of a conspiracy may, together with other

evidence, be evidence of a conspiratorial purpose." *United Steelworkers of Am. v. Phelps Dodge*

*Corp.*, 865 F.2d 1539, 1547 (9th Cir. 1989) (citing *Braverman v. United States*, 317 U.S. 49, 53

(1942)); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946) (noting that, in the anti-trust context, "[a]cts done to give effect to the conspiracy may be in themselves wholly innocent acts"). Importantly, here the record reflects that the purpose of these meetings and communications was to facilitate and conceal the conspiracy to violate the constitutional rights of people of color and immigrants and exclude them from Congressional apportionment. The trial record taken together with the new evidence leave no doubt that the Secretary, Kobach, members of the Trump Administration, including Neuman, members of the DOJ, and Hofeller engaged, and some of the conspirators continue to engage, in an unlawful conspiracy.

## II.     Plaintiffs' Motion is Timely And Based on Evidence That Could Not Reasonably Have Been Previously Discovered.

Plaintiffs' motion is filed within a reasonable time after the judgment, as soon as possible after the discovery of the evidence, and less than the one year limitation provided in Rule 60(c). This Court entered judgment on April 5, less than two months ago. Plaintiffs could not reasonably have obtained this evidence prior to or within 28 days of that judgment, despite their diligent discovery efforts. The documents that Plaintiffs now proffer were only recently brought to Plaintiffs' attention after they came to light as part of a larger production of Dr. Hofeller's documents in unrelated state court litigation over North Carolina's redistricting practices, *Common Cause v. Lewis*, No. 18-cv-14001 (N.C. Super. Ct.). *See* Grant Decl. Ex. 12 (Apr. 30, 2019 Hr'g Tr. in *Common Cause v. Lewis*) at 5-6 (describing process by which documents were obtained); *id.* Ex. 13 (Document Subpoena to Stephanie Lizon). Plaintiffs' counsel in the *New York* case subsequently obtained the documents, and soon after, filed them with their motion for an order to show cause. *Id.* Ex. 1.

Prior to their revelation in the North Carolina lawsuit, and subsequent filing in the New York case, Plaintiffs in this case had little opportunity to obtain the relevant documents in Dr.

Hofeller's files. During the course of accelerated discovery in this case, Dr. Hofeller's name only arose in Neuman's deposition, on virtually the last day of fact discovery and after the courts had narrowly circumscribed Plaintiffs' ability to obtain third-party discovery. While Neuman indicated that Dr. Hofeller first raised the citizenship question to him, Grant Decl. Ex. 2 at 51:15-16, he mischaracterized Dr. Hofeller's substantive involvement, representing that the "substance" of his conversations with Dr. Hofeller "about the citizenship question" in 2017 was limited to mere encouragement by Dr. Hofeller that Neuman "make sure that we take a good census" and "that the administration doesn't skimp on the budget," *id.* at 138:3-15, and that he did not rely on Dr. Hofeller for "expertise on the Voting Rights Act," *id*. at 143:25-144:6—statements that are contradicted by the newly discovered evidence showing that Dr. Hofeller penned the paragraph of the draft letter that Neuman provided to Gore that asserted the pretextual VRA enforcement rationale.

Furthermore, Neuman failed to disclose that Hofeller's detailed study recommended the inclusion of a citizenship question to benefit "Republicans and Non-Hispanic Whites" and disadvantage Democrats and minorities. Grant Decl. Ex. 1 at Ex. D p. 9.  Rather, Neuman suggested that Hofeller's interest in obtaining citizenship data from the decennial census was for the purposes of creating Latino-majority voting districts, Grant Decl. Ex. 2 at 54:11-56:24—a preposterous notion in light of the discovery of Hofeller's 2015 study showing that such citizenship data would be used to accomplish precisely the opposite result.

Indeed, Neuman went to great lengths to conceal both his and Dr. Hofeller's role in providing Gore with the draft DOJ Letter. In blatant contradiction of Gore's subsequent admission in Congressional interviews that Neuman provided him a draft of the DOJ Letter (which Plaintiffs did not learn about until well after the conclusion of trial in this case), Neuman

19

claimed under oath at his deposition that he "wasn't part of the drafting process of the [DOJ]

letter" and denied that his October 2017 meeting with Gore was about a "letter from DOJ

regarding the citizenship question." Grant Decl. Ex. 2 at 114:15-21, 273:10-21. When asked

about a phone call with Peter Davidson regarding the DOJ Letter—a call that was clearly

documented in an email from Davidson to Secretary Ross, *see* Grant Decl. Ex. 7—Neuman

responded with a series of evasive answers, even going so far as to claim "I don't have a reason

to know whether it happened or it didn't happen" and insisting that he did not recall even how

long his "typical phone calls" with Davidson were. Grant Decl. Ex. 2 at 272:10-278:22. With

respect to Dr. Hofeller, Neuman testified that he "wasn't part of the drafting process of the [DOJ]

letter," Grant Decl. Ex. 2 at 114:15-21, a fact clearly belied by the identical language in Dr.

Hofeller's documents and Neuman's letter.

　　　　Based on these evident misrepresentations and omissions, Plaintiffs were hardly on notice

of Dr. Hofeller's significant role in promoting the addition of the citizenship question in order to

politically benefit Republicans and non-Hispanic Whites, as the newly discovered evidence

reveals.[5] Further, Dr. Hofeller passed away two months prior to Neuman's deposition, *see id.* at

36:21-22, appearing to foreclose the possibility that Plaintiffs would be able to obtain discovery

from him. Plaintiff had no reason to be aware, at that time, that his documents would come into

the possession of his daughter, who ultimately produced them in the North Carolina lawsuit. *See*

Grant Decl. Ex. 12 (Apr. 30, 2019 Hr'g Tr. in *Common Cause v. Lewis*) at 5-6; *id.* Ex. 13

(Document Subpoena to Stephanie Lizon). Thus, despite their diligent efforts at pursuing

discovery in this case, Plaintiffs could not have previously obtained these documents.

---

[5] Given these misrepresentations, Defendants can hardly be heard to complain that they will
suffer unfair prejudice by having the judgment set aside. *See supra* pp. 18-19 (discussing
Neuman's misrepresentations).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an indicative ruling that it is inclined to grant Plaintiffs' Rule 60(b)(2) motion for relief from final judgment on Plaintiffs' Equal Protection claims and the *LUPE* Plaintiffs' Section 1985(3) claim or that the motion raises a substantial issue.

Dated: June 3, 2019                              Respectfully Submitted,


                                                 /s/ Daniel Grant (Bar. No. 19659)
                                                 /s/ Denise Hulett

                                                 **COVINGTON & BURLING LLP**
                                                 Shankar Duraiswamy*
                                                 José E. Arvelo*
                                                 Dustin Cho*
                                                 Amee Frodle*
                                                 Daniel Grant (Bar. No. 19659)
                                                 Bianca Nunes*
                                                 Tina M. Thomas*

                                                 One CityCenter
                                                 850 Tenth Street, NW
                                                 Washington, D.C. 20001-4956
                                                 Tel: (202) 662-6000
                                                 Fax: (202) 662-6302
                                                 dgrant@cov.com
                                                 sduraiswamy@cov.com
                                                 jarvelo@cov.com
                                                 dcho@cov.com
                                                 afrodle@cov.com
                                                 bnunes@cov.com
                                                 tthomas@cov.com

                                                 P. Benjamin Duke*
                                                 COVINGTON & BURLING LLP
                                                 The New York Times Building
                                                 620 Eighth Avenue
                                                 New York, NY 10018-1405
                                                 Tel: (212) 8411000
                                                 Fax: (212) 841-1010
                                                 pbduke@cov.com

Lawrence A. Hobel*
Karun Tilak*
COVINGTON & BURLING LLP
Salesforce Tower, 415 Mission Street
San Francisco, CA 94105-2533
Tel: (415) 591-6000
Fax: (415) 591-6091
lhobel@cov.com
ktilak@cov.com

*Attorneys for Kravitz Plaintiffs*


**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**
Thomas A. Saenz*
Nina Perales *
Denise Hulett*
Andrea Senteno*
Burth G. López (Bar No. 20461)
Tanya G. Pellegrini*
Julia A. Gomez*

1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
tsaenz@maldef.org
nperales@maldef.org
dhulett@maldef.org
asenteno@maldef.org
blopez@maldef.org
tpellegrini@maldef.org
jgomez@maldef.org

*Attorneys for LUPE Plaintiffs*


**ASIAN AMERICANS ADVANCING JUSTICE |
AAJC**
John C. Yang*
Terry Ao Minnis (Bar No. 20547)
Niyati Shah*

1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098

Facsimile: (202) 296-2318
jyang@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org

*Attorneys for LUPE Plaintiffs*

*\*Admitted pro hac vice*