# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBIN KRAVITZ, et al. | Civil Action No. 8:18-cv-01041-GJH |
| *Plaintiffs,* | |
| v. | Hon. George J. Hazel |
| U.S. DEPARTMENT OF COMMERCE, *et. al.,* | |
| *Defendants.* | |
| | |
| LA UNIÓN DEL PUEBLO ENTERO; *et al.* | Civil Action No. 8:18-cv-01570-GJH |
| *Plaintiffs,* | |
| v. | Hon. George J. Hazel |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce; *et al.* | |
| *Defendants.* | |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR RULE 60(B)(2) MOTION FOR RELIEF FROM FINAL JUDGMENT & REQUEST FOR INDICATIVE RULING UNDER RULE 62.1(A)

Defendants try to dismiss Plaintiffs' newly discovered evidence of discriminatory intent by picking it apart in isolation—ignoring the Fourth Circuit's teaching that, under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), it is error to consider "each piece of evidence in a vacuum" without evaluating its significance within the totality of the circumstances presented. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016) ("Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context."). This Court has already made extensive factual findings that the Secretary orchestrated an elaborate pretext to conceal his

true motivation in adding the citizenship question, and his purpose may well have been to disguise a politically motivated scheme harmful to Hispanics and noncitizens. Dkt. 154 (Findings of Fact and Conclusions of Law) at 108, 116. Viewed in that context, the new evidence of Hofeller's role in this stratagem dispels the "mystery" that the Court previously found concerning the operative motive for the Secretary and his aides' machinations and concealment. That motive was discriminatory.

Having blocked the Secretary's deposition and actively concealed the truth behind the citizenship question for over a year, Defendants now attempt to suggest that only direct proof of the Secretary's discriminatory animus can tip the scale in Plaintiffs' favor. That cynical position flies in the face of *Arlington Heights'* recognition that discriminatory intent is rarely advertised. The additional evidence shows that not only Kris Kobach¸ *see* Dkt. 154 at 116, but also the very people who initiated and devised the spurious façade for the Secretary's decision—with his active participation—harbored a discriminatory animus. The inference of the Secretary's discriminatory intent is unavoidable.

This conclusion is reinforced by *additional* documents from the Hofeller production that Plaintiffs obtained for the first time yesterday. These newly discovered documents are submitted herewith, attached to the Declaration of John Matthews, and they eliminate any colorable doubt about the link between Hofeller and government employees involved in the citizenship question approval process. Specifically, these documents show that Christa Jones, now Chief of Staff to the Director of the U.S. Census Bureau, communicated directly with Hofeller *from her private email address* in 2015—earlier in the same year as Hofeller's CVAP study—concerning issues related to the citizenship question. The emails from Ms. Jones to Hofeller alerted him to a Federal Register notice for comment on the Census Bureau's 2015 Content Test, and in one of

them, she specifically suggested that this could "be an opportunity to mention citizenship as well." Matthews Decl. Ex. A-21 (Jan. 7, 2015 Email from Christa Jones to Hofeller). Ms. Jones was also on emails discussing redistricting with Hofeller and various other Republican operatives—including David Avella of GOPAC, a Republican training organization,[1] David Winston, a "strategic advisor to Senate and House Republican leadership for the past 10 years,"[2] Charles R. Black, Jr., a longtime Republican strategist, and Michael Smith, a member of the "Majority America" political organization. *See id.* Ex. A-19.[3]

The trial record in this case reflects that, in the lead-up to the Ross Memo in 2018, Ms. Jones participated in the review and approval of the Commerce Department's revisions to the list of 35 questions, *see* PX-14; Dkt. 154 at 29. She was also involved in the search for stakeholders who would support the citizenship question, and suggested Mark Kirkorian and Steven Camarotta of the Center of Immigration Studies, a group that the Southern Poverty Law Center labels an anti-immigrant hate group.[4] PX-113 (AR8325). Ms. Jones's direct private contact with Hofeller about the citizenship question refutes Defendants' contention that no link between Hofeller and the Secretary can be shown.

The evidence submitted with Plaintiffs' motion and with this reply, when viewed alongside the copious evidence already in the record, clearly establishes that Plaintiffs' Rule

---

[1] *See* GOPAC, www.gopac.org (last visited June 13, 2019).

[2] *See* The Winston Group, David Winston Biography, https://winstongroup.net/people/dwinston/ (last visited June 13, 2019).

[3] Further, there are also emails from Jones to Neuman and Hofeller from her official Census Bureau email address. *See* Matthews Decl. Ex. A-20 (Mar. 19, 2010 Email from Jones to Neuman and Hofeller).

[4] *See* SPLC, Center for Immigration Studies, https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies (last visited June 13, 2019).

60(b)(2) motion should be granted, and this Court should enter judgement in favor of Plaintiffs

on their claims under the Fifth Amendment and 42 U.S.C. § 1985. At a minimum, the motion

raises a substantial issue that at least justifies giving Plaintiffs the opportunity to take limited

additional discovery to supplement the factual record. The Court should therefore issue an

indicative ruling in Plaintiffs' favor, so that Plaintiffs may obtain limited remand from the Fourth

Circuit.

I.      **The Newly Discovered Evidence, When Considered Alongside the Existing Factual
        Record, Is Sufficient to Infer Discriminatory Animus.**

        A.      **The Hofeller Documents Reveal a Discriminatory Purpose That Is Consistent
                With, and Relevant To, The Evidence of Discriminatory Animus Presented at
                Trial.**

        Defendants attempt to discount the newly-discovered Hofeller documents as irrelevant by

claiming that they do not reveal a discriminatory purpose and that, even if they did, that purpose

is different from the evidence of discriminatory purpose adduced at trial. Defendants are wrong

on both counts.

        Defendants contend that the 2015 Hofeller study does not reflect discriminatory animus

but rather consists of uninterested "empirical observations." Dkt. 166 (Defs.' Response Br.) at 7.

This strains credulity, particularly given the totality of the facts. Hofeller concluded that using

CVAP data in redistricting would dilute Hispanic political representation, and emphasized that

this would benefit "Republicans and Non-Hispanic Whites." *See* Dkt. 162-3 at Ex. D at 9. But,

he explained, such a plan could not be put in motion without the addition of a citizenship

question to the 2020 Census. *Id.* at 8. Hofeller then pressed the Commerce Department to do just

that, *see* Dkt. 162-4 (Neuman Dep.) at 51:15-16, Dkt. 162-3 at Ex. H, making abundantly clear

that he did not simply predict a discriminatory outcome, but intended it. *See N.C. State

Conference of NAACP*, 831 F.3d at 233 (holding that legislature's practice of "targeting voters

who, based on race, were unlikely to vote for the majority party" "constituted racial discrimination" "[e]ven if done for partisan ends"). Furthermore, Hofeller was a long-time Republican redistricting strategist; it beggars belief to suggest that he was simply offering uninterested, neutral observations about how adding a citizenship question would disadvantage Hispanics to the benefit of the Republican Party. And, contrary to Defendants' suggestion, Hofeller's acknowledgment that Hispanics might resent politicians for pursing the discriminatory scheme does not make the scheme any less discriminatory. If anything, it explains why Hofeller then helped to develop a pretextual argument that adding a citizenship question would support enforcement of the Voting Rights Act ("VRA") and the creation of majority-minority districts *when his own analysis showed exactly the opposite*.

Defendants' argument that even if the Hofeller documents reveal a discriminatory purpose, it differs from the discriminatory purpose suggested at trial, is equally meritless. The trial record and the Hofeller documents both reveal that the central purpose of adding a citizenship question was to deprive Hispanics and noncitizens of political representation. *See* Dkt. 154 at 8-17, 22.[5] That the citizenship question could enable this outcome by excluding certain populations from the census count *and* by excluding them from the redistricting does nothing to refute Plaintiffs' claim. To the contrary, it explains precisely why Secretary Ross pressed ahead with adding the citizenship question in the face of unequivocal and uncontradicted evidence that it would cause a disproportionate undercount of noncitizens and Hispanics—

---

[5] For example, this Court has already found that Kris Kobach wanted to deprive noncitizens of equal representation by excluding noncitizens from Congressional apportionment, and that he communicated to Ross that a citizenship question was necessary for this purpose. Dkt. 154 at 12-13; PX-19. Indeed, the evidence shows that after coming out and saying that he wanted the citizenship question to assist with excluding noncitizens from apportionment, Kobach later adopted the Hofeller/Neuman pretextual VRA rationale. Dkt. 154 at 22.

because, as the Court found, this would result in the loss of political representation in areas with high Hispanic and noncitizen populations. Dkt. 154 at 17-27, 86-88, 104, 112.[6]

### B.   The Newly Discovered Evidence Provides Further Evidence of Secretary Ross's Discriminatory Animus.

Defendants next argue that any discriminatory animus reflected in the Hofeller documents cannot be imputed to Secretary Ross. But Defendants' argument focuses on the newly-discovered documents in isolation, ignoring entirely how they fit into the existing factual record. Defendants do not dispute or even address the fact that it was *Hofeller and Neuman who drove the Commerce Department's action on the citizenship question*. Hofeller first raised the issue of a citizenship question with Neuman, his long-time friend and the Presidential transition staffer responsible for all issues related to the Census. Neuman then discussed the issue with Ross and his advisors several times early in the administration, at the very time that Ross decided that he wanted to add the question. *See* Dkt. 154 at 10, 31-32; Dkt. 162-4 at 33:2-10; 36:19-37:22; 51:7-52:2, 128:4-130:9, 248:21-249:22; PX-87, PX-145, PX-188, PX-190. Neuman continued to serve as the key advisor to Ross and the agency on this issue throughout 2017. For example, when Ross complained in May 2017 that nothing had been done about his "months-old request to add a citizenship question," *see* Dkt. 154 at 10, his chief of staff asked whether she

---

[6] Defendants argue that "Equal protection principles" do not invalidate the addition of a citizenship question until the citizenship data is used for redistricting, at which point the States who choose to use the data are the proper Defendants. Dkt. 166 at 8. This argument conflates a malapportionment claim under the 14th amendment, which Plaintiffs do not assert here, with a claim of invidious intentional discrimination under the Due Process Clause of the Fifth Amendment, which is at issue here. *Compare Reynolds v. Sims*, 377 U.S. 533 (1964) *with Arlington Heights,* 429 U.S. 252 (1977). Plaintiffs contend that the administration added the citizenship question for a discriminatory purpose. One of the direct consequences of the resulting disparate undercount, as this Court has already found in concluding that Plaintiffs have standing, is injury to plaintiffs by causing vote dilution in intra-state redistricting, even in states that use total population as a redistricting base. *See* Dkt. 154 at 61-66.

should try to set up another meeting with Neuman, and Ross responded that they try to "stick Neuman in there to fact find." PX-83. And later that year, Ross's advisers turned to Neuman to present DOJ with the pretextual rationale that would justify inclusion of the citizenship question. *See* Dkt. 162-1 at 7 (describing Commerce's role in orchestrating the meeting between Neuman and Gore, and Ross's knowledge of the meeting).[7]

Given the role that Hofeller and Neuman played in initiating and executing the Commerce Department's efforts to add a citizenship question, their motivation provides strong evidence of Ross's intent.[8] And the Hofeller documents make those motivations clear in two ways. First, as explained above, the 2015 study reveals the discriminatory intent that led Hofeller to raise the issue with Neuman.[9] Second, the 2017 paragraph reveals the extent to which Hofeller and Neuman collaborated on developing a pretextual justification to conceal that discriminatory

---

[7] The influence of Hofeller and Neuman on the Commerce Department's handling of this issue is further underscored by documents discovered two days ago, including (1) Hofeller's 2015 correspondence about a citizenship question with Christa Jones, a Census Bureau employee who would go on to become the chief of staff of the Census Bureau under Secretary Ross, and (2) an email among Hofeller, Neuman, and Jones showing that the relationship among these three dated at least as far back as 2010. Matthews Decl. Ex. A-19, A-20.

[8] Defendants' efforts to compare this newly discovered evidence to Ross's communications with Kobach are misguided. While Plaintiffs disagree with the Court's conclusion that the Kobach-Ross communications are insufficient to demonstrate Ross's discriminatory animus, the newly discovered evidence, and the related facts already in the record, create an even stronger inference of discriminatory intent given Neuman's central role, as an advisor to Secretary Ross, in orchestrating the addition of the citizenship question.

[9] Defendants ask the Court to conclude that Neuman did not know that Hofeller sought a citizenship question for purposes of diluting Hispanic representation because Neuman testified at his deposition that Hofeller told him census citizenship data was necessary to *increase* minority representation. *See* Dkt. 162-4 at 142:8-11. But that testimony lacks any credibility in light of the new documents revealing Hofeller's conclusion that using census citizenship data would *diminish* Hispanic representation to the advantage of Republicans and non-Hispanic whites. Defendants' argument rests on the utterly implausible assumption that Hofeller successfully deceived and manipulated his long-time friend into believing that his intentions were precisely the opposite of what they were.

intent—a pretext that Secretary Ross adopted and, through Neuman, presented to DOJ.

Defendants do not dispute that the Hofeller paragraph appears verbatim in Neuman's letter, but they attempt to downplay its significance. First, they dismiss it as simply an "inscrutable" paragraph. To the contrary, it is the heart of the draft letter that Neuman provided to Gore, as it lays out the entire pretextual VRA enforcement rationale for adding the citizenship question, even claiming that this will "ensure that the Latino community achieves full representation in redistricting"—in direct contradiction of Hofeller's 2015 conclusions. *Compare* Dkt. 162-3 at Ex. G, *with id.* at Ex.D, Ex. H.  Second, Defendants claim that there is "no apparent connection" between the 2015 study and the 2017 draft paragraph. Dkt. 166 at 12. However, the connection between the documents is obvious from their face: they both address the addition of a citizenship question for purposes of gathering CVAP data.

Third, Defendants contend that there is no proof that Hofeller wrote or transmitted the paragraph to Neuman, but this is the only reasonable conclusion based on the available evidence: Hofeller was the person who first raised the inclusion of the citizenship question to Neuman, *see* Dkt. 162-4 at 51:15-16; he continued to discuss the issue with Neuman in 2017, *id.* at 136:17-24; he drafted the paragraph explaining DOJ's purported need for census citizenship data in August 2017, *see* Dkt. 162-3 at 3 (discussing metadata), at the very time that the Commerce Department was accelerating its efforts to get DOJ to request the addition of a citizenship question, *see* Dkt. 154 at 13; PX-97, and the paragraph subsequently appeared verbatim in the draft DOJ letter that Neuman provided to Gore at a meeting to discuss the issue.[10] Defendants do not dispute any of these facts.  Finally, newly discovered documents suggest that Hofeller had also long been in

---

[10] Even if Hofeller did not himself pen the paragraph, the fact that it appears in his files and in Neuman's letter makes clear that Hofeller and Neuman collaborated on developing the pretextual VRA rationale.

contact with a highly-ranked Census employee, who knew of Hofeller's interest in a citizenship question (and in fact suggested opportunities for him to raise that interest with the Census Bureau), and of his involvement in Republican redistricting efforts. *See* Matthews Decl. Ex. A-21 (Jan. 7, 2015 Email from Christa Jones to Hofeller); Ex. A-19 (Jan. 2010 Emails).

Defendants also argue that there is no evidence connecting the discriminatory intent reflected in Hofeller's study to John Gore. But this is beside the point. Secretary Ross put the plan to add a citizenship question in motion in the Spring of 2017, well before Gore penned the letter formally requesting it on behalf of DOJ. Dkt. 154 at 13. Gore's role was simply to help Secretary Ross execute the plan; whether he knew or shared Ross's intent is irrelevant. And while Defendants contend that the draft DOJ letter that Neuman provided had nothing to do with the one that was ultimately sent (the so-called "Gary letter"), this argument fails on a simple examination of the two documents. Both letters adopt the pretextual VRA rationale that first appears in Hofeller's paragraph. Defendants have identified *no* independent source for the VRA rationale anywhere in the record. The letter that Neuman provided is also drafted as a letter *from DOJ*, including using a salutation nearly identical to one used by Gary in a 2016 letter to the Census Bureau, *see* PX-17, and goes so far as to include "_____@doj.gov" in the closing. *See* Dkt. 162-3 at Ex. G.

In sum, the newly discovered evidence, when combined with the evidence already in the trial record, presents far more than an attenuated chain of imputed discriminatory animus. It confirms that there was a carefully orchestrated scheme to add a citizenship question to deprive Hispanics and noncitizens of their constitutionally protected right to equal representation, with Secretary Ross at its center.

**C.      Plaintiffs' Newly Discovered Evidence is Sufficient to Warrant Rule 60(b) Relief on *LUPE* Plaintiffs' § 1985(3) Claim.**

This Court rejected the *LUPE* Plaintiffs § 1985 claim after trial because it rejected the intentional discrimination claim, not because it found that the alleged co-conspirators did not share a common goal. Dkt. 154 at 116-17. Therefore, this Court has not addressed any of the other requirements under § 1985, including commonality of motive. The factual record supporting the conspiracy claim also supports the conclusion that Secretary Ross did not act alone, that he acted at the behest of the administration and its advisors, in concert with a number of other players, pushing them when they did not respond quickly enough, monitoring their progress, and involving them in creating the fictional rationale necessary to furnish the pretextual cover he needed.

The new evidence reveals that there were two additional co-conspirators—a Republican map-drawer, Hofeller, and Ross's "trusted advisor," Neuman. It reveals more about how the pretext was concocted, and it provides the additional confirmation that the goal of the plan was to diminish Hispanic political representation. *See* Part I.A, B, *supra*. Should this Court reconsider and reverse its denial of Plaintiffs' Equal Protection claim, the trial record, supplemented by the newly discovered evidence, is sufficient to find that Plaintiffs have sustained their burden to prove that Defendants and their co-conspirators, based on discriminatory motives, engaged in conspiratorial conduct for the purpose of depriving Plaintiffs of their constitutionally guaranteed right to equal representation.

Defendants argue that Plaintiffs have not established the requisite meeting of the minds, because the co-conspirators do not share the same objective. To the contrary, the sole objective of the conspiracy was to deprive Hispanics and noncitizens of constitutionally guaranteed rights to equal representation. Hofeller, Kobach and the administration sought to accomplish that goal

by adding the citizenship question in order to exclude noncitizens from the population base used

for apportionment and redistricting.[11] When the Census Bureau told Ross that their plan's

deleterious effect on Hispanics would be *compounded* by a disparate undercount, he proceeded

anyway, because that result obviously furthered the goal. One would think that a reasonable

person, faced with hard evidence from Census experts that adding a citizenship question would

be costly and would impair accuracy, would pursue the alternatives offered by the scientists. Not

so if the predicted disparate impact furthered the original objective, and not so here. Ross

proceeded because of, not in spite of, the known disparate impact. *See Pers. Adm'r of Mass. v.*

*Feeney*, 442 U.S. 256, 279 (1979).[12]

Defendants conflate motive with methods, and methods with animus. The discriminatory

objective, the motive, and the theory of the case, all remain the same—to deprive Hispanics and

---

[11] In addition, the new statements provided by Kobach to the House Committee on Oversight and Reform confirm that Kobach met with President Trump, then-Chief of Staff Reince Priebus, and then-Senior Advisor Steve Bannon, about the addition of the citizenship question in late-January or early February 2017. *See* Duraiswamy Decl. Ex. 1 at 5.

[12] Nor do the cases that Defendants cite require that all conspirators share and express precisely the same motive. Rather, these cases stand for the unremarkable proposition that an allegation of a conspiratorial scheme must be supported by evidence, as it is here. *Penley v. McDowell Cty. Bd. of Educ.,* 876 F.3d 646, 658 (4th Cir. 2017) ( The evidence was "rank speculation and conjecture," showing only that the alleged conspirators knew each other.); *Simmons v. Poe,* 47 F.3d 1370, 1377 (4th Cir. 1995) (no conspiracy where  it was uncontested that the Sheriff, "*on his own*, drew up the warrant application," and that the Sheriff's decision to include race in the application was an "*independent decision*, neither endorsed nor encouraged by" the alleged co-conspirator.); *Facey v. Dae Sung Corp.,* 992 F. Supp. 2d 536 (D. Md. 2014) (conspiracy claim was dismissed because  although the allegations supported the claim that two conspirators shared retaliatory motives, there were no facts to support his claim that they were motived by his race.); *Victors v. Kronmiller,* 2009 WL 971448, at *9 (D. Md. Apr. 8, 2009) (summary judgement granted for defendant nursing home not because there were differing motives, but because there was no direct or circumstantial evidence of an agreement to deprive plaintiffs protected rights.); *Martin v. Boyce,* 2000 WL 1264148, at *7 (M.D.N.C. July 20, 2000) (Section 1985 claim was dismissed because the plaintiff alleged that only one of the co-conspirators had a racial motive for his termination from employment.)

noncitizens of their representational rights.[13] The new evidence and the evidence already in the

record proves a meeting of the minds regarding the same general conspiratorial objective.

Whether by skewing the base for redistricting or Congressional apportionment, or through the

predicted undercount, or some combination of the two, the ultimate objective was to radically

shift political power in favor of white voters and away from Hispanic voters. *See Griffin v.*

*Breckenridge,* 403 U.S. 88, 103 (1971) (conspiracy to prevent plaintiffs from seeking the equal

protection of their constitutional rights to enjoy enumerated rights, accomplished through force,

violence, intimidation, detention, and battery.); *see also N.Y. State NOW v. Terry,* 886 F.2d 1339,

1359-60 (2d Cir. 1989) (conspiracy to prevent access to abortion accomplished by disseminating

literature, organizing demonstrations, encouraging people to blockade clinics, providing

transportation and accommodation to participants in the blockade.). A conspiracy between the

government and partisan operatives to advance their interests by depriving Hispanics and

noncitizens of federally guaranteed rights is not simply government actors discussing policy and

gathering information to make decisions. Racial discrimination "has no place in public policy

and any actions by public officials based on such animus deserve to be chilled with the full force

of federal law." *Burrell v. Bd. of Tr. of Ga. Military College*, 970 F.2d 785, 794 (11th Cir. 1992)

---

[13] The agreed-upon goal need not be express. *Simmons*, 47 F.3d at 1378. Plaintiffs need not
prove that every co-conspirator knew the "exact limits" or all the details of the plan, or even
knew the identity of all of the other conspirators. *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir.
1983). Rather, the co-conspirators must have the same "general conspiratorial objective." *Id.*

**II.      Plaintiffs' Evidence Is Newly Discovered and Admissible.**

**A.      Plaintiffs Could Not Have Previously Discovered the Hofeller Documents Despite Their Diligent Discovery Efforts.**

Defendants insist that Plaintiffs could have readily obtained the Hofeller documents through discovery. As an initial matter, this is a remarkable position given Defendants' successful effort to block Plaintiffs from taking any third-party discovery in this case. Furthermore, when Plaintiffs requested Neuman's deposition, Defendants objected, arguing that the was not actually a Commerce Department witness, even though they had treated him as such for purposes of their broad assertion of privilege over documents regarding the citizenship question. Plaintiffs were finally able to obtain an order allowing them to take Neuman's deposition on virtually the very last day of fact discovery, leaving them with no opportunity for any follow-up discovery.

Furthermore, even if Plaintiffs had been able to seek additional discovery on Hofeller's involvement, Neuman's misleading deposition testimony would have given them little reason to do so. Neuman misled Plaintiffs both about Hofeller's views regarding the impact of a citizenship question on Hispanic political representation and about his and Hofeller's involvement in developing the pretextual rationale for adding a citizenship question to the census—the key issues giving rise to this motion. Specifically:

- The newly discovered documents show how Hofeller determined that using CVAP data to draw districts would in fact lead to increased dilution of Hispanic representation to the advantage of non-Hispanic whites. Dkt. 162-3 at Ex. D. However, Neuman testified that Hofeller told him that a citizenship question was necessary to generate CVAP data because "it will help draw maps, which will be acceptable as the maps that best provide minority representation," Dkt. 162-4 at 142:3-11; *see also id.* at 56:7-24 (stating that Hofeller told Neuman that the absence of block level CVAP data made it "very, very difficult" to draw a district which would elect a Latino); 138:12-16 (stating that Hofeller told Neuman that block level citizenship data were necessary to "draw the most accurate districts."). Defendants ignore this contrary testimony, noting only that Neuman laid claim to using the word "maximization" to describe his supposed desire to maximize Latino representation. Dkt. 166 at 21.

13

- The newly discovered documents show that Neuman and Hofeller were collaborating to develop the pretextual VRA rationale in 2017. However, Neuman insisted that his discussions with Hofeller about the citizenship question in 2017 were limited to Hofeller's mere encouragement that Neuman "make sure that we take a good census" and "that the administration doesn't skimp on the budget." Dkt. 162-4 at 138:3-16. Defendants do not address the falsity of this testimony.

- The newly-discovered documents show that Hofeller drafted key portions of the draft letter that Neuman provided to Gore, but Neuman testified that he did not know who drafted the language in the letter. Defendants disingenuously attempt to blame Plaintiffs' counsel for this misleading testimony based on a selective quotation of the transcript n which Plaintiffs' counsel noted that he was not asking the witness "who the original author" of the draft letter was. Dkt. 166 at 19. In fact, a few questions earlier, when presented with the letter, Neuman had already testified, "I'm not sure who the original author is." Dkt. 162-4 at 280:12-13. Defendants even quote this testimony in their own brief—twice. Dkt. 166 at 12, 19 n.8. Later, in response to a different question, when Neuman offered a non-responsive answer stating he could not figure out who the original author was, Plaintiffs' counsel simply advised Neuman that he had moved to a new line of questions. Dkt. 162-4 at 281.

In addition, while Defendants make much of the fact that the draft letter Neuman provided to Gore was produced from Gore's files towards the end of discovery, Plaintiffs had no reason to know that it was *Neuman who provided the letter to Gore*. That was not revealed until John Gore's congressional testimony following the trial in this case. At his deposition, Neuman concealed this fact, testifying that he was not part of the drafting process, failing to identify the draft DOJ letter when asked what he provided Gore at the meeting, and insisting that the meeting was not about a DOJ letter. Dkt. 162-4 at 120:15-20, 273:15-21, 280-81. Although Neuman acknowledged that he talked to Gore about the citizenship question at that meeting, he never suggested that he provided a draft letter requesting the addition of a citizenship question. That fact is crucial, because it establishes that it was Neuman who generated and presented the pretextual VRA rationale to DOJ—and as we now know, it was Hofeller who helped him craft it.[14]

---

[14] These misrepresentations are even more egregious because defense counsel present at the deposition, including James Uthmeier, the Department of Commerce in-house counsel who orchestrated Neuman's meeting with Gore, failed to correct the record.

Further, while DOJ stresses that it produced its copy of the draft letter that Neuman gave Gore, they neglect to disclose that they initially withheld the document and logged it without any of the identifying information required by Rule 26(b)(5). *See* Duraiswamy Decl. Ex. 2 (Excerpts of DOJ Priv. Log) at Row 424 (Bates DOJ00015199). Only after the New York plaintiffs challenged the entry did Defendants produce the document—but even then, they labeled the document with a different Bates number, buried it in a production of 92,000 pages, and failed to disclose that Neuman gave Gore the document, representing instead that they were unable to provide any information regarding "author, recipient, date, or time" because the document lacked metadata. Duraiswamy Decl. Ex. 3 (Oct. 23, 2018 Email from K. Bailey to Plaintiffs' Counsel). And at his deposition, Gore misleadingly testified that he "drafted the initial draft of the letter to request the citizenship question sometime around the end of October or early November 2017." Dkt. 162-3 at Ex. E (Gore Dep.) at 150-51. But, as Defendants now acknowledge in their response, the letter in Gore's possession came from Neuman, Dkt. 166 at 20, and that letter provided the VRA rationale that Gore ultimately relied on.

Given these misrepresentations, and given Dr. Hofeller's death, there was little reason or opportunity for Plaintiffs to pursue discovery of the documents that they now present to the Court.

**B.     The Newly Discovered Evidence is Admissible.**

The Court should similarly reject Defendants' arguments regarding the admissibility of Plaintiffs' newly discovered evidence. In order to authenticate the Hofeller documents, Plaintiffs attach the deposition testimony of Stephanie Hofeller, Dr. Hofeller's daughter, taken in the North Carolina litigation. *See* Duraiswamy Decl. Ex. 4. That testimony establishes precisely how Ms.

Hofeller came into possession of the documents. *Id.* at 20.[15] Plaintiffs also attach the declaration of John G. Matthews of Stroz Friedberg, a digital forensics and technical investigation firm that processed the hard drives that Ms. Hofeller produced in the North Carolina litigation. *See* Matthews Decl. ¶¶ 1-5. These documents, combined with the April 30, 2019 hearing transcript in the North Carolina litigation and the document subpoena issued in that case, attached as Exhibits 12 and 13 to Plaintiffs' opening brief, *see* Dkts. 162-14, 162-15, are amply sufficient to authenticate the documents.

Nor are the documents barred by the rule against hearsay. Plaintiffs offer the 2015 Study only to prove Hofeller's beliefs and his motivation for seeking the addition of a citizenship question, and not to establish that the assertions in the study will actually occur. Similarly, Plaintiffs do not offer the 2017 draft language to show that the CVAP data is actually needed for Voting Rights Act enforcement; to the contrary, this is evidence of a *false* rationale that Hofeller and Neuman developed to mask their true intentions. But even if the Court were to conclude that these documents were being presented for the truth of the matter asserted therein, they would be admissible as statements against interest of an unavailable witness. Indeed, Hofeller sought to distance himself from the study specifically because it would harm his pecuniary interest. *See*

---

[15] Ms. Hofeller, who lives in Kentucky, Duraiswamy Decl. Ex. 4 at 8:12-21, is an unavailable declarant, *see* Fed. R. Evid. 804(a)(5)(1); Fed. R. Civ. P. 42(c)(1)(A). Under Rule 804(b)(1), Plaintiffs now offer her deposition testimony against Defendants, parties who have "a similar motive" as defendants in the North Carolina case of developing Ms. Hofeller's testimony to test the authenticity of the documents found on the storage devices. Fed. R. Evid. 804(b)(1); *see also Horne v. Owens-Corning-Fiberglas Corp.*, 4 F.3d 276, 283 (4th Cir. 1993) (holding that district court's introduction of past deposition testimony was proper even though plaintiff was not a party to the prior litigation, and noting that "privity is not the gravamen" of Rule 804(b)(1)); *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 128 (4th Cir. 1995) (recognizing *Horne's* holding that privity is not required under Rule 804(b)(1)).

Dkt. 162-3 at Ex. C (Hofeller asked that the study not be attributed to him because "I have to keep my public statements simple outside of the expert court witness work I do").

The summary of Congressional testimony that Plaintiffs offer is also admissible. Both memoranda summarizing Mr. Gore and Mr. Kobach's congressional interviews are self-authenticating under Rule 902(5) of the Federal Rules of Evidence because they are publications "purporting to be issued by a public authority," here the House of Representatives Committee on Oversight and Reform. *Gubarev v. Buzzfeed, Inc*., 340 F. Supp. 3d 1304, 1309 n.5 (S.D. Fla. 2018) ("congressional reports are self-authenticating pursuant to Rule of Evidence 902(5)"); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397 (D. Conn. 2008) (press releases by congressmen are self-authenticating publications issued by a public authority). The facts contained in memoranda are admissible hearsay under Rule 803(8)(A)(iii) because they are "factual findings from a legally authorized investigation," *Gubarev*, 340 F. Supp. 3d at 1309 n.5 (noting that "it can't be any clearer that the facts contained in . . . congressional memoranda are admissible under 803(8)(A)(iii)" (internal quotation marks omitted)). Excerpts of Mr. Gore's interview transcript included in the summary are not hearsay because they are an opposing party's statement under Fed. Evid. R. 801(d)(2)(B)—they are statements that Defendants have adopted or believe to be true. Finally, the statements found in the summary of Mr. Kobach's congressional interview constitute former testimony under Rule 804(b)(1) of the Federal Rules of Evidence, and the statements are admissible because, despite their best efforts, Plaintiffs have been prevented from procuring Mr. Kobach's testimony in this case, *see* Fed. R. Evid. 804(a)(5)(B).

**III.      Defendants Will Not suffer Unfair Prejudice if the Court Grants Plaintiffs' Motion**

As a threshold matter, if the judgment denying Plaintiffs' Fifth Amendment and/or §

1985 claims were to be vacated, the resulting effects of the reversal are insufficient to find undue

prejudice. *See, e.g. Martin v. Buzzard*, 993 F.2d 228 (4th Cir. 1993) (unpublished opinion); *see

also CVLR Performance Horses, Inc. v. Wynne*, 2012 U.S. Dist. LEXIS 71355, at *9 (W.D.Va

May 23, 2012) (holding that granting relief under Rule 60(b) "would unequivocally protract this

matter and cause Defendants to incur additional costs in defending against the action, such are

the invariable consequences of any decision to vacate a judgment . . . ."). As the Fourth Circuit

articulated, "[o]ne cannot be prejudiced by the loss of that to which he was not entitled."

*Compton v. Alton S.S. Co.*, 608 F.2d 96, 103 (4th Cir. 1979). *See Werner v. Carbo*, 731 F.2d 204,

207 (4th Cir. 1984) (holding that the kind of prejudice present when any judgment is vacated—

the protraction of proceedings, the time and expense of a new trial, the loss of post-judgment

interest—did not amount to unfair prejudice).[16]

Defendants claim that they will suffer unfair prejudice from relief under Rule 60(b)

because (1) Plaintiffs have "dramatically shift[ed] the theory of their case"; (2) they would be

effectively foreclosed from appellate review because of the June 30, 2019 printing deadline; and

(3) the *LUPE* Plaintiffs are concurrently appealing their Fifth Amendment claim. Response, Dkt.

166 at 25-26. Defendants' contentions are without merit.

---

[16] Defendants opposed *LUPE* Plaintiffs' motion to expedite appellate briefing, and instead requested the appeals be held in abeyance pending a ruling from the Supreme Court, or in the alternative that briefing only on *LUPE* Plaintiffs' Fifth Amendment claim be expedited, to which Plaintiffs agreed. Defs.' Resp. in Opp'n to Pls.' Mot. To Expedite, No. 19-1382, D.E. 21 at 6-7 (4th Cir. May 20, 2019); Pls.' Resp. Opp'n to Defs.' Mot. for Abeyanc, No. 19-1382, D.E. 24-1 at 2-3 (4th Cir. May 22, 2019). The Fourth Circuit held Defendants' appeal in abeyance and entered an expedited briefing order on the *LUPE* Plaintiffs' Fifth Amendment claim only. Order, No. 19-1382, D.E. 26 at 1 (4th Cir. May 29, 2019).

First, Defendants' argument that Plaintiffs are putting forth a "new" theory along with the newly-discovered evidence is unavailing. Plaintiffs' theory behind the case is and has always been that the addition of the citizenship question was motivated by a desire to deprive Hispanics and noncitizens of their constitutionally protected right to equal representation and that the Secretary, his advisors, and DOJ officials conspired  to add the citizenship question to the 2020 Census for that racially discriminatory purpose. *See supra* Part I.A.

Second, while the need to meet printing deadlines does create urgency, Dr. John Abowd, Chief Scientist and Associate Director of Research and Methodology at the U.S. Census Bureau,[17] testified that "[w]ith exceptional resources, the final date for locking down the content of the census questionnaire is October 31, 2019." PX-1194 at 1023:12-15. Therefore, resolution of Plaintiffs' Rule 60(b) motion and associated relief extending beyond June 30, 2019 will not automatically cause unfair prejudice to Defendants.

Third, Defendants are correct that *LUPE* Plaintiffs have a currently pending cross-appeal in the Fourth Circuit, and they are requesting that the Circuit enter an order invalidating the addition of the citizenship question *without* remand to the district court.[18] Defendants complain that the pending cross-appeal "further highlight[s]" the "unfairness of that prejudice," but do not explain exactly how. Dkt. 166 at 26. There is no inconsistency between asking for that relief on appeal and, while that appeal is pending, asking this Court to seek remand and set aside its judgment based on newly-discovered evidence. Indeed, the case relied on by Defendants' makes

---

[17] Dr. Abowd served as Defendants' witness under Fed. R. Civ. P. 30(b)(6)

[18] Should the Fourth Circuit reverse the denial of the intentional discrimination claim based on the entirety of the administrative record and trial record, it is not required to remand the decision to the district court in order to enter an injunction against the question based on the Fifth Amendment claim. *North Carolina State Conference of NAACP*, 831 F.3d at 220.

clear that a "Rule 60(b) motion seeking relief from a final judgment is not a substitute for a timely and proper appeal." *Dowell v. State Farm Fire & Cas. Auto Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993). Here, *LUPE* Plaintiffs correctly filed their timely cross-appeal, before the new evidence was revealed, and correctly sought expedited review of that cross-appeal given the need to resolve the issue quickly should the Supreme Court rule in Defendants' favor in *New York*.

Furthermore, the Fourth Circuit has held that while a Rule 60(b) motion to revise a judgment is complicated by a pending appeal, it not unfair prejudice and the existence of an appeal does not divest the district court from "jurisdiction over matters in aid of the appeal." *Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 890 (4th Cir. 1999) (quoting *In re Grand Jury Proceedings*, 947 F.2d 1188, 1190 (4th Cir. 1991)). Indeed, the court explained that " a district court's consideration of a Rule 60(b) motion while an appeal from the underlying judgment is pending *is in aid of the appeal*." *Id.* at 890 (citation and quotation marks omitted).

The revelation of new evidence, while relevant to *LUPE* Plaintiffs' cross-appeal, presents its own distinct issues that are properly addressed by the district court. To the extent prejudice exists, it has been suffered by the Plaintiffs as a result of Defendant's conduct and the obfuscation of the underlying motivation for the addition of the citizenship question.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an indicative ruling that it is inclined to grant Plaintiffs' Rule 60(b)(2) motion for relief from final judgment on Plaintiffs' Equal Protection claims and the *LUPE* Plaintiffs' Section 1985(3) claim or that the motion raises a substantial issue.

Dated: June 14, 2019                    Respectfully Submitted,


                                        /s/ Daniel Grant (Bar. No. 19659)
                                        /s/ Denise Hulett

                                        **COVINGTON & BURLING LLP**
                                        Shankar Duraiswamy*
                                        José E. Arvelo*
                                        Dustin Cho*
                                        Amee Frodle*
                                        Daniel Grant (Bar. No. 19659)
                                        Bianca Nunes*
                                        Tina M. Thomas*

                                        One CityCenter
                                        850 Tenth Street, NW
                                        Washington, D.C. 20001-4956
                                        Tel: (202) 662-6000
                                        Fax: (202) 662-6302
                                        dgrant@cov.com
                                        sduraiswamy@cov.com
                                        jarvelo@cov.com
                                        dcho@cov.com
                                        afrodle@cov.com
                                        bnunes@cov.com
                                        tthomas@cov.com

                                        P. Benjamin Duke*

                                        The New York Times Building
                                        620 Eighth Avenue
                                        New York, NY 10018-1405
                                        Tel: (212) 8411000
                                        Fax: (212) 841-1010
                                        pbduke@cov.com

                                        Lawrence A. Hobel*
                                        Karun Tilak*
                                        COVINGTON & BURLING LLP
                                        Salesforce Tower
                                        415 Mission Street
                                        San Francisco, CA 94105-2533
                                        Tel: (415) 591-6000
                                        Fax: (415) 591-6091
                                        lhobel@cov.com

21

ktilak@cov.com

*Attorneys for Kravitz Plaintiffs*

*\*Admitted pro hac vice*
*+Pro hac vice application forthcoming*

**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**
Thomas A. Saenz+
Nina Perales +
Denise Hulett
Andrea Senteno
Burth G. López
Tanya G. Pellegrini
Julia A. Gomez

1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
tsaenz@maldef.org
nperales@maldef.org
dhulett@maldef.org
asenteno@maldef.org
blopez@maldef.org
tpellegrini@maldef.org
jgomez@maldef.org

*Attorneys for LUPE Plaintiffs*

**ASIAN AMERICANS ADVANCING JUSTICE |
AAJC**
John C. Yang*
Terry Ao Minnis (Bar No. 20547)
Niyati Shah*

1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318
jyang@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org

*Attorneys for LUPE Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel T. Grant, hereby certify that, on this 14th day of June, 2019, the foregoing document and all accompanying exhibits was served on all counsel of record by filing it on the Court's CM/ECF system.

Dated:  June 14, 2019                    By:


*/s/ Daniel T. Grant*
Daniel Grant